No. 12-3133

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

---

| | |
|---|---|
| In Re: | ) Appeal from the United States |
| | ) District Court for the Northern |
| ROCKFORD PRODUCTIONS | ) District of Illinois, Western |
| CORPORATION, | ) Division |
| | ) |
| *Debtor,* | ) Bankruptcy Court No. 07-71768 |
| | ) District Court No.: 3:11-cv-50366 |
| **HARRISON KISHWAUKEE, LLC,** | ) |
| | ) The Honorable |
| *Appellant,* | ) **Manuel Barbosa,** |
| **v.** | ) Bankruptcy Judge Presiding. |
| | ) |
| **ROCKFORD ACQUISITION LLC,** | ) The Honorable |
| | ) **Philip G. Reinhard,** |
| *Appellee.* | ) Judge Presiding |

---

## SEPARATE APPENDIX OF
## APPELLANT HARRISON KISHWAUKEE, LLC

---

Thomas J. Lester
Nancy G. Lischer
HINSHAW & CULBERTSON LLP
222 N. LaSalle Street, Suite 300
Chicago, IL 60601
312-704-3000
*Attorneys for appellant*
*Harrison Kishwaukee, LLC*

# TABLE OF CONTENTS OF APPENDIX

**Appendix attached to brief**                                    **Page**

Certificates ........................................................................... iii

District court civil docket ................................................... A1-3

District court order entered August 20, 2012 ......................... A4-7

District court judgment entered  August 20, 2012.................................................. A8

Excerpt of bankruptcy civil docket showing e-order
docket number 587 denying motion to enforce ..................................... A9-10

Transcript of bankruptcy court oral ruling on October 24, 2011 ............... A11-18

**Separate Appendix**                                            **Page**

Sale Order entered by bankruptcy court on November 15, 2007 ............. A19-139

    Schedule 1:  Executed Asset Purchase Agreement............................ A41

        Exhibit A:   Form Sale Procedures Order ................................. A87

        Exhibit B:  Form of Escrow Agreement ................................... A101

        Exhibit C:  Form of Deposit Escrow Agreement........................ A112

    Schedule 2:  The Assumed Agreements ......................................... A126

Exhibit D  attached to Rockford Acquisition, LLC's Motion to Enforce: *Harrison-Kishwaukee, L.L.C. v. Rockford Acquisition, LLC,* 17th Judicial
Circuit, State of Illinois Winnebago County No. 10CH2390,
Summons and Complaint with attached exhibits ............................... A140-45

    Exhibits A to state court complaint consisting of lease and two
    related documents:

        [1]  Assignment and Assumption of Lease between Rockford
        Products Corporation and Rockford Acquisition, LLC
        dated November 16, 2007 ............................................... A146-50

[2]  First Amendment to Lease entered into by Harrison-Kishwaukee, L.L.C. and Rockford Acquisition, LLC dated November 16, 2007 ................................................ A151-55

[3]  Original Lease Between Harrison-Kishwaukee, L.L.C., an Illinois limited liability company, Landlord, and Rockford Products Corporation, Tenant (attachments and legal descriptions omitted) ..................................................... A156-86

Exhibit F to Rockford Acquisition, LLC's Motion to Enforce: *Harrison-Kishwaukee, L.L.C. v. Rockford Acquisition, LLC,* 17th Judicial Circuit, State State of Illinois Winnebago County No. 10CH2390, Memorandum Opinion and Order dated August 10, 2011 .................................................... A187-92

Exhibit C to Rockford Acquisition, LLC's Motion to Enforce: Richard Mowris Affidavit ............................................................. A193-95

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

|  |  |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| ROCKFORD PRODUCTS CORPORATION, *et al.*, | ) Case No. 07 B 71768 |
| | ) Jointly Administered |
| | ) |
| Debtors | ) Hon. Manuel Barbosa |

**ORDER (A) APPROVING THE ASSET PURCHASE AGREEMENT, (B)**
**AUTHORIZING THE SALE OF CERTAIN OF ROCKFORD PRODUCTS'**
**ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND**
**OTHER INTERESTS, (C) AUTHORIZING ASSUMPTION AND ASSIGNMENT**
**OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND**
**(D) GRANTING RELATED RELIEF**

Upon the motion (the "Sale Motion")[1] dated October 29, 2007, of Rockford Products

Corporation ("Rockford Products") and Rockford Products Global Services, Inc. ("Rockford

Global"), chapter 11 debtors and debtors-in-possession (each a "Debtor" and collectively, the

"Debtors"), by and through their attorneys, Dewey & LeBoeuf LLP for entry of an order,

pursuant to sections 105 and 363 of title 11 of the United States Code (the "Bankruptcy Code"),

and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy

Rules"): (A) approving the First Amended and Restated Asset Purchase Agreement, dated as of

November 13, 2007 (the "APA"), a copy of which is attached hereto as **Schedule 1**, by and

between Rockford Products and Rockford Acquisition, LLC (the "Buyer"); (B) authorizing the

sale (the "Sale") of the Acquired Assets (as defined in the APA and hereinafter referred to as the

"Assets") free and clear of all Liens, Interests and/or Claims (as defined below); and (C) granting

certain related relief; and a hearing on the Sale Motion having been held on November 15, 2007

---

[1]   Unless otherwise defined herein, all capitalized terms not defined herein shall have the same meaning as set forth in the Sale Motion.

(the "Sale Hearing"), at which time all interested parties were offered an opportunity to be heard with respect to the Sale Motion; and the Court having reviewed and considered (1) the Sale Motion and exhibits thereto; (2) the APA attached hereto as Schedule 1; (3) objections to the Sale; and (4) the arguments of counsel made at the Sale Hearing; and it appearing that the relief requested in the Sale Motion is in the best interests of the Debtors, their estates, and other parties in interest; and upon the record of the Sale Hearing and this case and after due deliberation thereon; and good cause appearing therefore,

**THE COURT HEREBY FINDS AND DETERMINES THAT:**

A.      This Court has jurisdiction over the subject matter of the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b).  Venue is properly before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The statutory predicates for the relief requested in the Sale Motion are (1) sections 105(a), 363, 503 and 507 of the Bankruptcy Code and (2) Bankruptcy Rules 2002 and 6004.

C.      This Court finds that (1) the Debtors provided proper, timely, adequate and sufficient notice of the Sale Motion, the Sale Procedures (as defined in the Sale Procedures Order), the Sale Procedures Order (as defined below), the Auction (as defined below), the Objections Deadline (as defined in the Sales Procedure Order) and the Sale Hearing, (2) such notice was good and sufficient, and appropriate under the particular circumstances, and (3) no other or further notice of the Sale Motion, the Sale Hearing, and the Sale is or shall be required.

D.      On October 31, 2007, this Court entered an Order Pursuant to Bankruptcy Code Sections 105 and 363 and Bankruptcy Rules 2002 and 6004 (A) Approving Sale Procedures, (B) Approving the Form and Manner of Shortened Notice, (C) Scheduling an Auction and Sale Hearing, and (D) Granting Related Relief [Docket No.211] (as amended, the "Sale Procedures

2

A000020

Order") approving certain bidding procedures (as amended, the "Sale Procedures") for the Sale

of the Assets. On November 6, 2007, the Debtors filed an emergency motion (the "Emergency

Motion") seeking to amend the Sale Procedures Order and among other things, grant a right to a

break-up fee and provide certain bid protection to the Buyer. By Order dated November 6, 2007,

the Court granted the relief requested in the Emergency Motion. The Sale Procedures provided a

full, fair, and reasonable opportunity for any entity to make an offer to purchase the Assets. On

November 12, 2007, Rockford Products conducted an auction (the "Auction") in accordance

with and has otherwise complied in all respects with, the Sale Procedures Order. The Auction

afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or

otherwise better offer to purchase the Assets. The Debtors duly noticed the Auction and

conducted the Auction in a non-collusive, fair, and good faith manner. The Buyer participated in

the Auction and complied, in all respects, with the Sale Procedures Order.

     E.    As demonstrated by the record in these cases, the representations of counsel

and/or testimony and other evidence proffered or adduced at the Sale Hearing: (1) Rockford

Products adequately marketed the Assets; (2) the Purchase Price (as defined in the APA)

constitutes the highest and best offer for the Assets and provides fair and reasonable

consideration for such Assets; (3) the Sale will provide a greater recovery for the Debtors'

creditors than would be provided by any other practical available alternative; (4) no other party

has offered to purchase the Assets for greater economic value to the Debtors or their estates; and

(5) the Purchase Price constitutes reasonably equivalent value and fair consideration under the

Bankruptcy Code and under the laws of the United States, any state, territory, possession or the

District of Columbia.

A000021

3

F.      Rockford Products has (1) full corporate power and authority to execute the APA
and all other documents contemplated thereby and the transfer and conveyance of the Assets by
Rockford Products has been duly and validly authorized by all necessary corporate action of
Rockford Products, (2) all of the corporate power and authority necessary to consummate the
transactions contemplated by the APA, and (3) taken all corporate action necessary to authorize
and approve the APA and the consummation by Rockford Products of the transactions
contemplated thereby, and no consents or approvals, other than those expressly provided for in
the APA, are required for Rockford Products to consummate such transactions.

G.      Rockford Products has demonstrated both (1) good, sufficient, and sound business
purpose and justification for the Sale, because, among other things, Rockford Products and its
advisors diligently and in good faith analyzed all other available options in connection with the
disposition of the Assets and determined that the terms and conditions set forth in the APA, and
the transfer to Buyer of the Assets pursuant thereto, represent a fair and reasonable purchase
price and constitute the highest or otherwise best value obtainable for the Assets and (2)
compelling circumstances for the Sale pursuant to 11 U.S.C. § 363(b) before, and outside of, a
plan of reorganization in that, among other things, absent the Sale the value of the Assets will be
substantially diminished and the estates harmed.

H.      The Debtors afforded proper notice and a reasonable opportunity to object or be
heard with respect to the Sale Motion and the relief requested therein to all interested persons
and entities, including without limitation:  (1) all parties on the Master Service List; (2) all
persons or entities known or reasonably believed to have asserted a Lien on any of the Assets;
(3) all counterparties to any executory contracts or unexpired leases that the Debtors seek to

A000022

4

assume and assign as part of the Sale; (4) all persons or entities known or reasonably believed to have expressed an interest in acquiring the Assets; and (5) the entire service list in these Cases.

I.        The Buyer is not an "insider" of any of the Debtors, as that term is defined in 11 U.S.C. § 101(31).

J.        Rockford Products and the Buyer negotiated, proposed, and entered into the APA without collusion, in good faith, and from arm's-length bargaining positions. Neither Rockford Products nor the Buyer engaged in any conduct that would cause or permit the Sale to be avoidable under 11 U.S.C. § 363(n).

K.        The Buyer is a good faith buyer under 11 U.S.C. § 363(m) and, as such, is entitled to all of the protections afforded thereby. The Buyer is acting in good faith within the meaning of 11 U.S.C. § 363(m) in undertaking the transactions contemplated by the APA.

L.        The Sale must be approved and consummated promptly to preserve the viability of the Debtors as a going concern and to maximize value for the Debtors' estates and creditors.

M.        The transfer of the Assets to the Buyer pursuant to the APA will be a legal, valid, and effective transfer of the Assets, and will vest the Buyer with all right, title, and interest to the Assets free and clear of any and all liens, claims (including as defined in 11 U.S.C. § 101(5)), interests and encumbrances of any type whatsoever (whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising before or after July 25, 2007, and whether imposed by agreement, understanding, law, equity, or otherwise, including claims otherwise arising under doctrines of successor liability), including, but not limited to, those that (1) purport to give to any party a

5

A000023

right or option to effect any forfeiture, modification, right of first or last refusal or termination of

Rockford Products' or the Buyer's interest in the Assets, or any similar rights, and (2) relate to

taxes arising under or out of, in connection with, or in any way relating to the operation of

Rockford Products' business before the transfer of the Assets to the Buyer (collectively, the

"Liens, Interests and/or Claims"), all of which Liens, Interests and/or Claims shall attach to the

proceeds of the sale of the Assets (collectively, the "Sale Proceeds") to the same extent and with

the same validity and priority as existed immediately before the closing of the APA.

     N.    If the Sale of the Assets were not free and clear of all Liens, Interests and/or

Claims as set forth in the APA and this Sale Order, or if the Buyer would, or in the future could,

be liable for any of the Liens, Interests and/or Claims as set forth in the APA and this Sale Order,

the Buyer would not have entered into the APA and would not consummate the Sale or the

transactions contemplated by the APA, thus adversely affecting Rockford Products, its estate,

and its creditors.

     O.    Rockford Products may sell its interests in the Assets free and clear of all Liens,

Interests and/or Claims because, in each case, one or more of the standards set forth in 11 U.S.C.

§ 363(f)(1)-(5) has been satisfied. The Liens, Interests And/Or Claims of Bridge Opportunity

Finance, LLC and Bridge Healthcare Finance, LLC (collectively, the "Agents") in and on the

Assets shall be satisfied by the payment to the Agents of the Sale Proceeds in accordance with

Paragraph 11 of this Order. The holders of any other Liens, Interests and/or Claims who did not

object, or who withdrew, settled, or otherwise resolved their objections, to the Sale, are deemed

to have consented to the Sale, to such assumption and assignments, and to the other transactions

contemplated in the APA, pursuant to 11 U.S.C. §§ 363(f)(2) and 365(c).

A000024

P.    The transfer of the Assets to the Buyer will not subject the Buyer to any liability whatsoever with respect to the operation of the Business prior to the Closing Date or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of successor or transferee liability.

Q.    The offer submitted by Stoutheart Corporation in connection with the Auction shall constitute a "Back-up Bid" under and as defined in the Sale Procedures and shall be deemed to remain outstanding and subject to acceptance by Rockford Products in the event the Closing Date of the APA does not occur on or before November 19, 2007, subject to and in accordance with the Sale Procedures Order and Sale Procedures, and subject to any objections by the Agents or the Committee.

R.    The Objecting Lessors (as that term is defined herein) provided value to the estate by allowing the estate the use of their collateral, which was in fact used by the estate in an amount equal to the monthly contract payments.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

### *GENERAL PROVISIONS*

1.    The Sale Motion is hereby GRANTED to the extent provided herein.

2.    All objections to the Sale Motion or the relief requested therein, including, without limitation, objections to the Sale, that have not been withdrawn, waived, settled, or otherwise resolved, and all reservations of rights included therein, are hereby overruled on the merits.

### *APPROVAL OF THE APA*

A000025

3.    Pursuant to 11 U.S.C. § 363(b), the APA and all of the terms and conditions thereof are hereby approved.

4.    Pursuant to 11 U.S.C. § 363(b), Rockford Products is authorized and directed to perform its obligations under the APA and comply with the terms thereof and consummate the Sale in accordance with and subject to the terms and conditions of the APA; provided, however, that Section 3.2(d) of the APA shall be deemed amended to (a) add the phrase "(including, without limitation, all prepayments or deposits to vendors for steel) after the word "Inventory" in the definition of Closing Date Current Assets, and (b) replace the amount "$23,641,062.39" with "$24,005,729.36."

5.    The Buyer and the Seller are each directed to take all actions necessary or appropriate to effectuate the terms of this Sale Order.

6.    The Debtors are authorized and directed to execute and deliver, and empowered to perform under, consummate, and implement, the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA, and to take all further actions as may be requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer or reducing to possession, the Assets or as may be necessary or appropriate to the performance of the obligations as contemplated by the APA.

7.    This Sale Order and the APA shall be binding in all respects upon all creditors (whether known or unknown) of Rockford Products, the Buyer, all successors and assigns of the Buyer and Rockford Products, all affiliates and subsidiaries of the Buyer and Rockford Products, and any subsequent trustees appointed in the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code and shall not be subject to rejection. To the extent any

8

A000026

provision of this Sale Order is inconsistent with the terms of the APA, this Sale Order shall govern.

8.      The APA and any related agreements, documents, or other instruments, may be modified, amended, or supplemented by the mutual consent of the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment or supplement is not material.

## *SALE AND TRANSFER OF THE ASSETS*

9.      Pursuant to 11 U.S.C. §§ 363(b) and 363(f), upon the consummation of the APA, the Assets shall be transferred to the Buyer free and clear of all Liens, Interests and/or Claims of any kind or nature whatsoever, with all such Liens, Interests and/or Claims attaching to the Sale Proceeds in the order of their priority, with the same validity, force, and effect which such Liens, Interests and/or Claims enjoyed immediately before the Sale of the Assets.

10.     The transfer of the Assets to the Buyer pursuant to the APA constitutes a legal, valid, and effective transfer of the Assets, and shall vest the Buyer with all right, title, and interest in and to the Assets free and clear of all Liens, Interests and/or Claims of any kind or nature whatsoever, including without limitation, any Liens, Interests or Claims held by any of the Debtors, their affiliates, their affiliates' creditors, vendors, suppliers, customers, employees or lessors and any other person (collectively, "Claimants"). Buyer shall not be liable in any way (as assignee, successor entity, or otherwise) for any Liens, Interests or Claims that any Claimant or other third party may have against Rockford Products or its affiliates, or the Business.

11.     All terms used in this Paragraph 11 shall have the meanings set forth in the Order Authorizing Debtors: (A) To Use Cash Collateral; (B) To Incur Postpetition Debt; and (C) To Grant Adequate Protection and Provide Security and Other Relief to Bridge Opportunity

9

A000027

Finance, LLC and Bridge Healthcare Finance, LLC entered in this Case on August 27, 2007 (as amended, modified, or supplemented from time to time, the "Final Cash Collateral/Financing Order") to the extent defined therein. Pursuant to the Final Cash Collateral/Financing Order, the Agents were granted an allowed secured claim in the amount of the Prepetition Debt, subject solely to the rights of the Committee to object to the Agents' liens and claims. Pursuant and subject to the terms of the Final Cash Collateral/Financing Order, the Agents extended Postpetition Debt to the Debtors and will continue to do so through November 16, 2007. The Debtors, the Agents, and the Committee all agree, and this Court orders, that the Agents have an Allowed Claim in the full amount of the Aggregate Debt as of the Closing Date, including, without limitation, the yield maintenance fee under Section 10(d) of the Loan Agreement (the "Yield Maintenance Fee"), which Allowed Claim is secured by a first priority, properly perfected lien on the Aggregate Collateral, including, without limitation, the Assets. As a result, and because the Sale Proceeds are less than the allowed amount of the Aggregate Debt, the Agents are entitled to be paid the entirety of the Sale Proceeds. However, the Agents have voluntarily agreed to allow a portion of the amount to which they are entitled with respect to the Aggregate Debt to be given to certain other creditors of the Debtors in accordance with this Order. Thus, the Debtors, the Agents, and the Committee have agreed, and the Court hereby orders, that the Purchase Price and any other Sale Proceeds shall be paid by the Buyer to the Agents, in cash, on the Closing Date. Promptly upon receipt of such Sale Proceeds, the Agents shall remit and apply the Sale Proceeds as follows:

(a)     first, to the Debtors, to be earmarked for payment of all claims consisting of budgeted, accrued postpetition utilities, budgeted, accrued postpetition vendor credit expenses, and all U.S. Trustee fees, in an amount not to exceed a collective $272,000, which the Debtors represent is the maximum amount owed by the Debtors with respect to such claims (in consideration of which the Agents are deemed to have satisfied any claims arising after the Filing Date, under the Final Cash Collateral/Financing Order, the Bankruptcy Code, or any other

A000028

document, statute or law, of the Debtors or any creditors thereof against the Debtors, any of the Debtors' assets or the proceeds thereof, the Agents, or any of the Agents' assets or the proceeds thereof);

        (b)     second, indefeasibly and finally to the Agents, to be indefeasibly and finally applied to all of the Aggregate Debt other than the Yield Maintenance Fee;

        (c)     third, on a pro rata basis, to the following professionals in the following amounts: (i) to the Debtors' attorneys, Dewey and Leboeuf, in the amount of $110,000, to be applied against their allowed claim for services rendered and expenses incurred; (ii) to the Debtors' financial consultants, Silverman Consulting, in the amount of $150,000, to be applied against their allowed claim for services rendered and expenses incurred; (iii) to the Committee's attorneys, Greenberg Traurig, in the amount of $85,000, to be applied against their allowed claim for services rendered and expenses incurred; (iv) to the Committee's consultants, Mesirow Consulting, in the amount of $70,000, to be applied against their allowed claim for services rendered and expenses incurred, and (v) to the Debtor's service and notice agent, BMC Group, in the amount of $35,000, to be applied against their allowed claims for services rendered and expenses incurred; and

        (d)     finally, (a) with respect to any Sale Proceeds not distributed pursuant to Paragraphs 11 (a) – (c) above, 100% to a trust to be established by the Committee for the benefit of the unsecured creditors of the Debtors' estates other than the Pension Benefit Guaranty Corporation pursuant to a trust agreement and terms reasonably acceptable to the Agents and ~~and ~~ the United States Trustee ("Trust").

Co X

    12.     In addition to the foregoing, the Debtors, the Agents, and the Committee have agreed, and the Court hereby orders, that all other Aggregate Collateral and the proceeds thereof shall be payable to the Trust to be remitted and applied as follows:

        (x)     with respect to any cause of action against MacLean Fogg or any proceeds thereof, 75% to the Trust, and 25% to the Agents to be finally and indefeasibly applied to the Aggregate Debt consisting of the Yield Termination Fee; and

        (y)     with respect to all other Aggregate Collateral and the proceeds thereof, 95% to the Trust, and 5% to the Agents to be indefeasibly and finally applied to the Aggregate Debt consisting of the Yield Termination Fee.

    13.     It is in the best interest of the unsecured creditors that a liquidating trust be created, as provided in Revenue Procedure 94-45, so that such liquidating trust is treated as a liquidating trust for tax purposes pursuant to Treasury Regulation Section 301.7701-4(d), and

A000029

that the creation of such liquidating trust is essential to facilitate the possibility of confirming a plan of liquidation in the future.

14. In consideration of the Agents' agreement to the foregoing, each of the Debtors and their estates, the Committee and their respective past and present affiliates, professionals employed in these cases (including the professionals referenced in Paragraph 11(c) above), agents, representatives, successors and assigns (the "Releasing Parties") hereby release, acquit and forever discharge the Agents, and each of their respective past and present affiliates, subsidiaries, officers, directors, partners, members, shareholders, employees, agents, representatives, professionals, attorneys, successors and assigns (the "Agents' Released Parties") from and against all claims, contracts, disputes, agreements, covenants, demands, obligations, controversies, suits, cross-claims, torts, costs, losses, attorneys' fees, damages, liabilities, surcharges, expenses and causes of action, whether in law or in equity, whether known or unknown, whether anticipated or unanticipated, whether suspected or claimed, whether fixed or contingent, whether yet accrued or not, and whether damages have resulted from such or not, of any kind, nature or description, that the Releasing Parties have or may hereafter assert, under the Bankruptcy Code or otherwise, against the Agents' Released Parties in any way arising out of, arising in, arising in connection with or relating to the Debtors or their respective estates, in any way arising out of, arising in, arising in connection with or relating to the Agents' loans to or relationship with the Debtors and their estates, and/or in any way arising out of, arising in, arising in connection with or related to these cases. For the avoidance of doubt, the foregoing shall be deemed to release Agents' Released Parties from any and all obligations or liabilities arising on account of or related to any expenses (whether or not set forth in the Budget) incurred

12

A000030

by Debtors on, prior to or after the "Termination Date" (as defined in the Final Cash Collateral/Financing Order) and the Carveout.

15.    Upon the Closing Date and the Buyer's payment to the Agents of the Purchase Price, the Buyer is hereby authorized to file, register, or otherwise record a certified copy of this Sale Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Interests and/or Claims in the Assets of any kind or nature whatsoever.

16.    This Sale Order shall be (a) effective as a determination that, upon the Closing Date and the Buyer's payment to the Agents of the Purchase Price, all Liens, Interests and/or Claims of any kind or nature whatsoever existing as to the Assets before the Closing Date have been unconditionally released, discharged, and terminated and that the conveyances described herein have been effected and (b) binding upon and shall govern the acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Assets.

17.    Upon the Closing Date and the Buyer's payment to the Agents of the Purchase Price, all persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, and regulatory authorities, lenders, trade, and other creditors, holding Liens, Interests and Claims of any kind or nature whatsoever against or in the Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-

13

A000031

contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to, Rockford Products, the Assets, the operation of the Business before the Closing Date, or the transfer of the Assets to the Buyer, hereby are forever barred from asserting such persons' or entities' Liens, Interests and Claims against the Buyer, its successors or assigns, its property, the Assets, the Agents or the Sale Proceeds.

18.     Upon the consummation of the transactions contemplated by the APA, the Buyer shall not be deemed to (a) be the successor of Rockford Products, (b) have, *de facto*, or otherwise, merged with or into Rockford Products, (c) be a mere continuation or substantial continuation of Rockford Products or the enterprise(s) of Rockford Products or (d) be liable for any acts or omissions of Rockford Products in the conduct of the Business.

### *ASSUMED AGREEMENTS*

19.     Rockford Products is hereby authorized to assume and assign to Buyer those executory contracts and unexpired leases set forth in the Assumption Notices attached to this Order as **Schedule 2** (collectively, the "Assumed Agreements").

20.     All objections to the Cure Amounts in respect of the Assumed Agreements that have not been withdrawn, waived, settled or otherwise resolved, and all reservations of rights included therein, are overruled on the merits.

21.     With respect to the Assumed Agreements: (a) the Assumed Agreements shall be transferred and assigned to, and following the Closing remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Assumed Agreement (including those of the type described in Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to 11 U.S.C. § 365(k), the Debtors shall be relieved from any further liability with

A000032

respect to the Assumed Agreements after such assumption and assignment to the Buyer; (b) any provisions in any Assumed Agreement that allow the party to such Assumed Agreement to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumed Agreement, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (c) all other requirements and conditions under Section 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of each Assumed Agreement have been satisfied; and (d) upon Closing, in accordance with Sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title and interest of each Assumed Agreement.

22.     Upon assumption of any Assumed Agreement in accordance with this Sale Order, each non-Debtor party to an Assumed Agreement hereby is forever barred, estopped, and permanently enjoined from asserting against the Debtors or the Buyer, or the property of either of them, any default existing as of the Closing Date of the Sale. Failure by any counterparty to an Assumed Agreement to object to the Cure Amount shall be deemed to constitute agreement by such counterparty to the amount listed in the Assumption Notice as the amount required to cure any defaults under such Assumed Agreement and shall likewise be deemed to constitute consent to the assumption and assignment of the Assumed Agreement to Buyer.

23.     Post-petition payments made to (a) Equilease Financial Services, Inc., (b) Center Capital Corporation, (c) National City Commercial Capital, (d) General Electric Capital Corporation, (e) NMHG Financial Services, Inc. d/b/a Yale Financial Services, and (f) Canon Financial Services, Inc. (the "Objecting Lessors") are authorized under Sections 362, 363, 365, and 1108 of the Bankruptcy Code. In consideration for treating certain sales contracts as leases, which characterization the Debtors specifically request and consent to with respect to the leases

15

A000033

entered into by and between the Debtors and the Objecting Lessors, which leases the Debtors have assumed and assigned to the Buyer (the "Objecting Lessors' Assumed and Assigned Leases"), the Debtors hereby release the Objecting Lessors from all avoidance actions under Sections 547, 550 or 549 of the Bankruptcy Code.

24.     The Objecting Lessors' security interests, if any, in the equipment leased to the Debtors pursuant to the Objecting Lessors' Assumed and Assigned Leases shall attach to the respective equipment transferred to the Buyer, subject to applicable non-bankruptcy law, with the same priority as against the Debtors as of the Petition Date. Such security interests shall not attach to the Purchase Price or any other Sale Proceeds.

25.     With respect to the Objecting Lessors, all leases and/or sale contracts which have not been expressly assumed and assigned to the Buyer are hereby rejected and/or excluded from the Sale, and with respect to all such collateral and/or leased equipment, the automatic stay is hereby modified to allow the Objecting Lessors to repossess their collateral, and the Debtors shall cooperate with any such efforts.

26.     With respect to the Debtors' agreements with Integrys Energy Services ("TEG"), including the Stipulation and Agreed Order Regarding TEG's Objection to Debtors' Motion for Entry of Interim and Final Orders Determining Adequate Assurance of Payment for Future Utility Services and Order(s) Related Thereto ("TEG Stipulation" and collectively with the Natural Gas Agreement and the Base Index Price Agreement, the "NG Agreements"), the Debtor will not assume the NG Agreements or assign them to Buyer, however, the Debtors, the Committee, Buyer and TEG have agreed as follows.

(a)     Buyer agrees to determine on or before December 13, 2007 whether to continue a business relationship with TEG and Buyer will pay for natural gas reflected on the December Estimated Invoice in a manner consistent with the ~~TEG Stipulation~~ through the end of

*(x)  NG Agreements*

16                                          A000034

December. If Buyer determines not to continue with the business relationship prior to December *(Cox)* 13, 2007, TEG may terminate the NG Agreement on December 14, 2007, *without further notice* — *NG Agreements (Cox)*                *or order of the Court.*

(b) TEG will agree to continue to supply natural gas to Buyer in December, 2007 per its tariff with NICOR and consistent with the TEG Stipulation. If Buyer pays TEG consistent with the ~~TEG Stipulation~~, TEG agrees to return the entire amount of the Security Deposit, as defined in the ~~TEG Stipulation~~, to the trust referenced in paragraph 11 of this Order

*NG Agreements (Cox)* less 1) any true-up for November and December, 2007 pursuant to paragraph 2(c) of the TEG Stipulation and 2) the asserted claim of TEG pursuant to section 503(b)(9) of the Bankruptcy Code (asserted in the amount of $37,560.45). TEG reserves the right to file an unsecured rejection damages claim against the Debtors pursuant to section 365(g) of the Bankruptcy Code, but TEG shall not be permitted to setoff any such unsecured rejection damages claim against the Security Deposit.

(c) Debtor Rockford Products will move to reject the NG Agreements on or before December 13, 2007, and rejection will ~~shall~~ *(and)* be effective as of December 31, 2007.

27. Further, notwithstanding any obligation that TEG may have to return all or a portion of the Security Deposit in December (based on an election of gas usage for January 2008), TEG will not be obligated to return any portion of the Security Deposit until after the completion of the true-up procedure for actual gas cost in December 2007.

### *ADDITIONAL PROVISIONS*

28. The consideration provided by the Buyer for the Assets under the APA is hereby deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Conveyance Act, the Uniform Fraudulent Transfer Act and under the laws of the United States, any state, territory, possession or the District of Columbia.

29. Upon the occurrence of the Closing Date, this Sale Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of all of the Assets or a bill of sale transferring good and marketable title in such Assets to the Buyer pursuant to the terms of the APA.

A000035

30.     Each and every federal, state, and governmental agency or department, and any other person or entity, is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

31.     All entities that are presently, or on the Closing Date may be, in possession of some or all of the Assets are hereby directed to surrender possession of the Assets to the Buyer on the Closing Date.

32.     Except to the extent expressly set forth in the APA, the Buyer shall have no liability or responsibility for any liability or other obligation of Rockford Products arising under or related to the Assets. Without limiting the generality of the foregoing, and except as otherwise specifically provided herein and in the APA, upon the Closing Date and the Buyer's payment to the Agents of the Purchase Price, the Buyer shall not be liable for any Liens, Interests or Claims against Rockford Products or any of its predecessors or affiliates, and the Buyer shall have no successor or vicarious liabilities of any kind or character whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to Rockford Products or any obligations of Rockford Products arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of the Business prior to the Closing Date.

33.     Upon the Closing Date and the Buyer's payment to the Agents of the Purchase Price, the Buyer shall not be liable, either directly or indirectly, as Buyer, successor, transferee, assignee or otherwise, for any liabilities of or any Lien, Interest or Claim against or in Rockford Products or any of its affiliates (whether under federal or state law or otherwise). Under no circumstances shall the Buyer be deemed a successor of or to Rockford Products for any Lien,

18

A000036

Interest or Claim against or in Rockford Products or the Assets of any kind or nature whatsoever. The sale, transfer, assignment, and delivery of the Assets shall not be subject to any Liens, Interests or Claims, and Liens, Interests or Claims of any kind or nature whatsoever shall remain with, and continue to be obligations of, Rockford Products. After the Closing Date and the Buyer's payment to the Agents of the Purchase Price, all persons holding Liens, Interests or Claims against the Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Liens, Interests or Claims of any kind or nature whatsoever against the Buyer, its successors or assigns, its property or the Assets, the Agents or the Sale Proceeds with respect to any Lien, Interest or Claim of any kind or nature whatsoever such person or entity had, has, or may have against or in Rockford Products, its estate, its officers, its directors or its shareholders.

34. The transactions contemplated by the APA are undertaken by the Buyer without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale of the Assets shall not affect the validity of the Sale to the Buyer. The Buyer is a buyer in good faith of the Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code. Accordingly, on the Closing Date, and in consideration for the terms hereof, all claims of the Debtors against the Buyer, if any, arising in connection with the Sale or the negotiation and proposal of the APA and the documents related thereto are hereby released, except to the extent such claims hereafter arise under the APA.

35. The consideration to be provided by the Buyer for the Assets under the APA is fair and reasonable and the Sale may not be avoided under section 363(n) of the Bankruptcy Code.

A000037

19

36. The terms and provisions of the APA and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, their estates, and their creditors, the Buyer, and its respective affiliates, successors, and assigns, and any affected third parties, including, but not limited to, all persons asserting a Lien, Interest or Claim in the Assets to be sold to the Buyer pursuant to the APA, notwithstanding any subsequent appointment of any trustee, party, entity or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which trustee, party, entity, or other fiduciary such terms and provisions likewise shall be binding and shall not be subject to rejection. Nothing contained in any chapter 11 plan confirmed in these Cases or the confirmation order confirming any such plan or any further order of this Court, shall conflict with or derogate from the provisions of the APA or this Sale Order; provided further that, if any discrepancies exist between the APA or this Sale Order and any such chapter 11 plan or court order are found to exist, this APA and Sale Order shall govern.

37. To the extent permitted by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Assets sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale.

38. Nothing in this Order or the APA approves or provides for the transfer to the Buyer of any avoidance claims (whether under chapter 5 of the Bankruptcy Code or otherwise) of the Debtors' estates.

39. No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

40. There are no brokers involved in consummating the Sale and no brokers' commissions are due.

20

A000038

41.     The Debtors, the Committee and the Trust, including any of their respective representatives agents and professionals, shall have reasonable access to the Business Records (as defined in the APA) relating to the Business prior to the Closing Date for until the second anniversary of the Closing Date (as defined in the APA), subject to any limitations that are reasonably required to preserve any applicable attorney client privilege or third party confidentiality obligation. The party requesting such information shall reimburse the Buyer for all reasonable and necessary out of pocket costs and expenses incurred by such party in providing such information and in rendering such assistance. The access contemplated by this paragraph 41 shall be during normal business hours and upon reasonable prior notice and shall be subject to such reasonable limitations as the party having custody or control thereof may impose to preserve the confidentiality of information contained herein.

42.     For purposes of clarification, the term "Excluded Assets" shall include (a) the escrow deposit relating to the sale of RIG and (b) causes of action against the Debtors' officers and directors that are not officers or directors of Buyer relating to actions or inactions of such officers or directors during periods prior to the Closing Date. Such Excluded Assets shall be deemed Aggregate Collateral.

43.     The failure specifically to include or to reference any particular provision of the APA in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety. The provisions of this Sale Order are non-severable and mutually dependent.

44.     This Court retains exclusive jurisdiction to interpret, construe, enforce and implement the terms and provisions of this Sale Order, the APA, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connection therewith

21

A000039

in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Assets to the Buyer, (b) compel delivery of the Purchase Price or performance of other obligations owed to Rockford Products pursuant to the APA, (c) resolve any disputes arising under or related to the APA, except as otherwise provided therein, (d) interpret, implement, and enforce the provisions of this Sale Order and (e) protect the Buyer against any Liens, Interests and/or Claims against Rockford Products or the Assets, of any kind or nature whatsoever, attaching to the Sale Proceeds.

45. The Sale of the Assets shall not be subject to any transfer taxes.

46. All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

47. Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

48. As provided by Bankruptcy Rule 6004(h), this Order shall not be stayed for 10 days after its entry but shall be effective immediately upon entry and Rockford Products and the Buyer are authorized to close the Sale immediately upon entry of this Order.

49. To the extent that this Order is inconsistent with (a) the APA or any related agreements, documents or other instruments, or (b) any prior order of pleading with respect to the Sale Motion in these Cases, the terms of this Order shall govern.

Dated: November 15, 2007

*Jacqueline P. Cox*

UNITED     STATES     BANKRUPTCY     JUDGE

A000040

## Schedule 1

## Asset Purchase Agreement

A000041

[EXECUTION VERSION]

FIRST AMENDED AND RESTATED

ASSET PURCHASE AGREEMENT

This FIRST AMENDED AND RESTATED ASSET PURCHASE AGREEMENT is dated as of November 13, 2007 (the "Agreement Date") by and among Rockford Products Corporation, an Illinois corporation ("Seller"), and Rockford Acquisition, LLC, a Delaware limited liability company ("Buyer").

RECITALS:

A.     Seller is engaged in the business of manufacturing and distributing cold formed steel products for the automotive and agricultural industries (the "Business").

B.     Seller filed a voluntary petition for relief (the "Chapter 11 Case") on July 25, 2007 under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Illinois, Western Division (the "Bankruptcy Court").

C.     Seller desires to sell to Buyer all of its right, title and interest in and to the Acquired Assets (as defined below), and Buyer desires to purchase such Acquired Assets, all in the manner and subject to the terms and conditions set forth in this Agreement and pursuant to Sections 105 and 363 of the Bankruptcy Code.

D.     Seller and Buyer are parties to that certain Asset Purchase Agreement, dated as of November 5, 2007 (the "Prior Agreement").

E.     Seller and Buyer desire to amend and restate the Prior Agreement in its entirety.

NOW, THEREFORE, in consideration of the mutual agreements and covenants herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto intending to be legally bound hereby, do hereby agree as follows:

## ARTICLE I

## DEFINITIONS

1.1     Defined Terms.  As used herein, the terms below shall have the following respective meanings:

"Accounts Receivable" means all accounts, billed and unbilled, of Seller to the extent arising out of or related to the Business prior to the Closing (including all RIG Accounts Receivable).

"Acquired Assets" shall have the meaning specified in Section 2.1.

A000042

"Affiliate" of any Person means any Person that controls, is controlled by, or is under common control with such Person. As used herein, the term "control" (including the terms "controlling", "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through ownership of voting securities or other interests, by contract or otherwise.

"Agents" shall mean, collectively, Bridge Opportunity Finance, LLC and Bridge Healthcare Finance, LLC.

"Agreement" shall mean this Asset Purchase Agreement, together with the Exhibits and Schedules attached hereto, in each case as amended, restated, supplemented or otherwise modified from time to time.

"Agreement Date" shall have the meaning specified in the preamble.

"Alternative Transaction" shall have the meaning specified in Section 8.1(g).

"Assigned Contracts" shall have the meaning specified in Section 2.1(d).

"Assumed Liabilities" shall have the meaning specified in Section 2.3.

"Bankruptcy Code" shall have the meaning specified in the recitals.

"Bankruptcy Court" shall have the meaning specified in the recitals.

"Benefit Plan" means each pension plan, welfare plan and employment, bonus, pension, profit sharing, deferred compensation, incentive compensation, stock ownership, stock option, stock purchase, phantom stock, performance, retirement, thrift, savings, stock bonus, excess benefit, supplemental unemployment, paid time off, perquisite, fringe benefit, vacation, sick leave, severance, disability, death benefit, hospitalization, medical, dental, life insurance, welfare benefit or other plan, program or arrangement (whether written or unwritten), in each case, maintained or contributed to, or required to be maintained or contributed to, by Seller for the benefit of any present or former directors, officers, employees or independent consultants of the Business.

"Business" shall have the meaning specified in the recitals.

"Business Day" shall mean any day other than a Saturday, Sunday or a legal holiday on which banking institutions in the State of Illinois are not required to open.

"Business Employees" means the employees of Seller who are listed and described on Schedule 4.16(a).

"Business Records" means all books, records, ledgers and files or other similar information located at the Leased Real Property or primarily used or held for use in the operation or conduct of the Business, including price lists, customer lists, vendor lists, mailing lists, warranty information, catalogs, sales promotion literature, advertising materials, brochures,

-2-

A000043

records of operation, historical financial and operating data, standard forms of documents, manuals of operations or business procedures, research materials and product testing reports required by any national, federal, state, provincial or local court, administrative body or other Governmental Body of any country.

"Buyer" shall have the meaning specified in the preamble.

"Buyer Indemnitees" shall have the meaning specified in Section 9.1.

"Chapter 11 Case" shall have the meaning specified in the recitals.

"Closing" shall have the meaning specified in Section 3.1(a).

"Closing Date" shall have the meaning specified in Section 3.1(a).

"Closing Date Balance Sheet" shall have the meaning specified in Section 3.3(a).

"Closing Date Current Assets" shall have the meaning specified in Section 3.2(d).

"Closing Date Statement" shall have the meaning specified in Section 3.3(a).

"COBRA" means the requirements of Part 6 of Subtitle B of Title I of ERISA and Code Section 4980B and of any similar state law.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Contract" means all (i) Third-Party contracts, agreements, leases, subleases, long-term supply contracts, purchase orders, sales orders and instruments used or held for use primarily in the operation or conduct of the Business, and to which Seller or an Affiliate of Seller is a party and (ii) Transferred Leases; provided that the term "Contracts" shall exclude the Excluded Contracts.

"Cure Costs" means the amount required to cure all monetary defaults under any Contract to be assumed by Seller and assigned to Buyer (or one of its designated subsidiaries) pursuant to Section 365 of the Bankruptcy Code.

"Customer-Owned Tooling" means all Tooling owned by a customer of the Business.

"Deposit Agent" shall have the meaning specified in Section 3.4.

"Deposit Escrow Agreement" shall have the meaning specified in Section 3.4.

"Deposit Amount" shall have the meaning specified in Section 3.4.

"DIP Order" means that certain Order Authorizing Debtors To: (A) Use Cash Collateral; (B) To Incur Postpetition Debt; And (C) To Grant Adequate Protection And Provide Security And Other Relief To Bridge Opportunity Finance LLC And Bridge Healthcare Finance, LLC

-3-

A000044

entered by the Bankruptcy Court on August 27, 2007, as amended, modified or supplemented from time to time.

"Dispute Notice" shall have the meaning specified in Section 3.3(a).

"Environment" means soil, surface waters, groundwaters, land, sediments, surface or subsurface strata, air, and any environmental medium.

"Environmental Laws" shall mean any and all applicable Laws relating to pollution, natural resources, protection of the Environment, public health and safety, exposure of persons to Hazardous Materials, and management of Hazardous Materials, including, without limitation, Laws relating to the generation, use, treatment, storage, release, disposal or transportation of Hazardous Materials or the handling and disposal of medical and biological waste.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any entity, trade or business that is a member of a group described in Section 414(b), (c), (m) or (o) of the Code or Section 4001(b)(1) of ERISA, or that is a member of the same "controlled group" with Seller, pursuant to Section 4001(a)(14) of ERISA.

"Estimated Closing Date Current Assets" shall have the meaning specified in Section 3.2(d).

"Excluded Assets" shall have the meaning specified in Section 2.2.

"Escrow Agent" means U.S. Bank National Association, a national banking association.

"Escrow Agreement" means that certain Escrow Agreement, substantially in the form of Exhibit B attached hereto, by and among Seller, Buyer and the Escrow Agent.

"Escrow Amount" means $500,000.

"Excluded Contracts" means the Contracts issued by Seller or any of its Affiliates to vendors and suppliers of goods or services to the Business listed and described on Schedule 2.2(d).

"Excluded Liabilities" shall have the meaning specified in Section 2.4.

"Excluded Taxes" means any Liabilities for Taxes (i) for any Tax period (A) of Seller or any Affiliate or (B) of any other Person for which Seller or any Affiliate is liable under any Tax sharing agreements or agreement, under United States Treasury Regulation § 1.1502-6 (or any similar provision of state, local or foreign Law), as a successor, by contract or otherwise or (ii) for any Pre-Closing Tax Period, imposed on or with respect to the Business or the Acquired Assets.

-4-

A000045

"Executory Contracts" means those Contracts that constitute an "executory contract" or "unexpired lease" as such terms are used in Section 365 of the Bankruptcy Code as of the Closing Date.

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governmental Body" means any legislative, executive or judicial unit of any governmental entity (foreign, federal, state or local) or any department, commission, board, agency, bureau, official or other regulatory, administrative or judicial authority thereof with jurisdiction over the Seller.

"Governmental Order(s)" shall have the meaning specified in Section 4.9.

"Governmental Permits" means all permits and licenses, certificates of inspection, approvals or other authorizations issued by a Governmental Body to Seller with respect to the Business and necessary or convenient for the operation or conduct of the Business as currently conducted under applicable Law.

"Historical Financial Schedules" shall have the meaning specified in Section 4.11.

"Intellectual Property" means all intangible property rights of any kind and nature of the Seller, whether or not protectable by patent, copyright, master works, or trade secret rights, including, without limitation, the following: all trade names, trade dress, trademarks (including common law trademarks), service marks, assumed names, business names and logos, slogans, internet domain names, and all registrations and applications therefore, together with all goodwill symbolized thereby; all rights in United States and foreign patents and patent applications (including, without limitation, all provisional, divisional, continuations, continuations-in-part, reissues, renewals, extensions and reexaminations); all rights in United States and foreign copyrights (whether registered or unregistered) and all applications therefore; all computer programs and software (whether in source code or object code form); "mask works" (as defined under 17 U.S.C. § 901) and any registrations and applications therefore; the inventions, discoveries, technology, trade secrets, improvements, formulae, practices, methods and other confidential information, know-how, show how proprietary processes, formulae, algorithms, models, and methodologies; rights of publicity and privacy relating to the use of the names, likenesses, voices, signatures and biographical information of real persons; in each case used in or in connection with the conduct of the Business as currently conducted.

"Inventory" shall have the meaning specified in Section 2.1(b).

"Knowledge" means the actual knowledge, after due inquiry, of all executive officers of Seller.

"Latest Balance Sheet" shall have the meaning specified in Section 4.11.

"Latest Financials" shall have the meaning specified in Section 4.11.

-5-

A000046

"Law" means any national, federal, state, provincial or local law, statute, ordinance, rule, regulation, code, order, judgment, injunction or decree of any Governmental Body, including common law, applicable to Seller.

"Leased Equipment" means the machinery, equipment, furniture, furnishings, fixtures, computers, cars, trucks, fork lifts, other industrial vehicles and other items of tangible personal property leased by Seller or its Affiliates and either (i) located at the Leased Real Property, or (ii) not located at the Leased Real Property, but primarily used or held for use by Seller or its Affiliates in the operation or conduct of the Business, including as listed and described on Schedule 4.19(a).

"Leased Real Property" means the real property listed and described on Schedule 4.7.

"Leases" shall have the meaning specified in Section 4.7(a).

"Liabilities" shall mean, as to any Person, any and all debts, claims of any kind or nature, including contingent or unliquidated claims or any other claims falling within the definition set forth in Section 101(5) of the Bankruptcy Code, losses, damages, costs, expenses, demands, fines, judgments, penalties, sales commissions, contracts, liabilities, commitments, responsibilities, and obligations of any kind or nature whatsoever, direct or indirect, absolute or contingent, including (a) liabilities for compliance, investigation, remediation, removal and response under Environmental Laws, (b) liabilities for employment and other employment related relief and/or obligation of any type (including all claims by, against or on behalf of and/or in connection with all former or existing employees and others providing services to Seller in respect of actions occurring or alleged to have occurred on or before the Closing Date), (c) intellectual property and (d) product performance and all other product liability matters, whether occurred, vested or otherwise, whether known or unknown and whether or not actually reflected, or required to be reflected, in such Person's balance sheet or other books and records.

"Licenses" means all licenses, agreements and other arrangements identified on Schedule 2.1(e) under which Seller or its Affiliates has the right to use any Intellectual Property of a Third Party.

"Lien" shall mean any lien (statutory or other), claim (including as defined in the Bankruptcy Code), interest (as used in the Bankruptcy Code), pledge, option, charge, hypothecation, easement, security interest, right-of-way, encroachment, mortgage, deed of trust, defect of title, restriction, charge, covenant, assignment, license, conditional sale or other title retention agreement, right of first or last refusal, option to purchase, preference, priority or other security agreement or preferential arrangement of any kind or nature or other encumbrance of any kind.

"Losses" shall have the meaning specified in Section 9.1.

"Material Adverse Effect" shall mean any state of facts, events, changes or effects that, individually or aggregated with other states of facts, events, changes or effects, is materially adverse to or materially impairs, the value, condition or use of the Acquired Assets.

A000047

"Neutral Accountant" shall have the meaning specified in Section 3.3(c).

"Non-Assignable Asset(s)" shall have the meaning specified in Section 6.6(b).

"Notices" shall have the meaning specified in Section 10.4.

"Permitted Liens" shall have the meaning specified in Section 4.5(a).

"Owned Equipment" shall have the meaning specified in Section 2.1(a).

"Owned Tooling" means the Tooling owned by Seller or its Affiliates.

"Person" shall mean an individual, a partnership, a joint venture, a corporation, a business trust, a limited liability company, a trust, an unincorporated organization, a joint stock company, a labor union, an estate, a governmental entity or any other entity.

"Pre-Closing Tax Period" means any (i) Tax period (or portion thereof) ending on or before the Closing Date and (ii) the pre-Closing portion of any Tax period that commences before and ends after the Closing Date.

"Prepaid Items" means all of the prepaid expenses and deposits of Seller relating to the Business, including the Prepaid Tooling.

"Prepaid Tooling" means items for which Seller has given or made an advance, deposit or partial payment to a Third Party and which, upon delivery and sale to Seller in accordance with the applicable Contract, will constitute Tooling.

"Prior Agreement" shall have the meaning set forth in the preamble.

"Prior Agreement Date" means November 5, 2007.

"Purchase Price" shall have the meaning specified in Section 3.2.

"Purchase Price Allocation" shall have the meaning specified in Section 3.2(e).

"Representatives" shall have the meaning specified in Section 6.3.

"Required Consents" shall have the meaning specified in Section 4.4.

"Review Period" shall have the meaning specified in Section 3.3(a).

"RIG Accounts Receivable" means all accounts receivable in respect of Seller's former division known as Rockford International Group.

"Sale" means the sale, transfer and assignment of the Acquired Assets from Seller to Buyer in accordance with this Agreement.

"Sale Hearing" shall have the meaning specified in Section 6.2(b).

-7-

A000048

"Sale Order" means an order of the Bankruptcy Court issued pursuant to Section 363 of the Bankruptcy Code, authorizing and approving the Sale and the lease of the Leased Equipment and Real Property, all in accordance with the terms and conditions of this Agreement.

"Sale Procedures" shall have the meaning specified in Section 6.2(a).

"Sale Procedures Order" means an order approving the Sale Procedures for an auction and overbid procedures under Sections 105 and 363 of the Bankruptcy Code to be entered by the Bankruptcy Court, substantially in the form set forth in Exhibit A attached hereto.

"Seller" shall have the meaning specified in the preamble.

"Seller Indemnitees" shall have the meaning specified in Section 9.2.

"Significant Customers" shall have the meaning specified in Section 4.17.

"Significant Suppliers" shall have the meaning specified in Section 4.17.

"Target Current Assets" shall have the meaning specified in Section 3.2(c).

"Taxes" means all taxes of any kind, and all charges, fees, customs, levies, duties, imposts, required deposits or other assessments, including all federal, state, county, local or foreign net income, capital gains, gross income, gross receipt, real property, personal property, license, franchise, sales, use, excise, withholding, payroll, employment, social security, (or similar), worker's compensation, unemployment, occupation, capital stock, production, ad valorem, value added, single business, transfer, gains, severance, stamp, occupation, premium, windfall profits, environmental, disability, alternative, add-on, minimum, estimated, net worth, asset, transaction, and other taxes of any kind whatsoever, and any interest, penalties or additions to tax with respect thereto, imposed upon any Person by any taxing authority or other Governmental Body under applicable Law or foreign law.

"Tax Return" means any return, report or similar statement required to be filed with respect to any Tax (including any attached schedules), including, without limitation, any information return, claim for refund, amended return or declaration of estimated Tax.

"Third Party" means any Person not a party or an Affiliate of a party hereto.

"Tooling" means tools, jigs, dies, gauges, fixtures, test and assembly fixtures, cavities, molds, patterns, casting patterns, prototype tooling, engineering product testing tooling and similar items, and any supplies, materials or equipment relating to the foregoing (i) used primarily or held for use in connection with the Business, wherever located and (ii) such items owned by Seller and used by suppliers or outside processors, as the case may be, for the manufacture of sub-components and the like for products produced in the Business.

"Transfer Taxes" shall have the meaning specified in Section 6.14(d).

"Transferred Employees" shall have the meaning specified in Section 6.8.

A000049

"Transferred Leases" means the leases with respect to the Leased Real Property and the Leased Equipment.

"Unaudited Financials" shall have the meaning specified in Section 4.11.

1.2     Interpretation.

(a)     Whenever the words "include," "includes" or "including" are used in this Agreement they shall be deemed to be followed by the words "without limitation."

(b)     Words denoting any gender shall include all genders. Where a word or phrase is defined herein, each of its other grammatical forms shall have a corresponding meaning.

(c)     A reference to any party to this Agreement or any other agreement or document shall include such party's successors and permitted assigns.

(d)     A reference to any legislation or to any provision of any legislation shall include any modification or re-enactment thereof, any legislative provision substituted therefor and all regulations and statutory instruments issued thereunder or pursuant thereto.

(e)     All references to "$" and dollars shall be deemed to refer to United States currency.

(f)     All references to any financial or accounting terms shall be defined in accordance with GAAP.

(g)     The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(h)     The meanings given to terms defined herein shall be equally applicable to both singular and plural forms of such terms.

(i)     Buyer and Seller hereby acknowledge that (i) Buyer and Seller jointly and equally participated in the drafting of this Agreement and all other agreements contemplated hereby, (ii) Buyer and Seller have been adequately represented and advised by legal counsel with respect to this Agreement and the transactions contemplated hereby, and (iii) no presumption shall be made that any provision of this Agreement shall be construed against either party by reason of such role in the drafting of this Agreement and any other agreement contemplated hereby.

(j)     The headings of the Articles and Sections herein are inserted for convenience of reference only and are not intended to be a part of, or to affect the meaning or interpretation of, this Agreement.

-9-

A000050

## ARTICLE 2

### TRANSFER OF ASSETS

2.1    Assets to be Acquired. At the Closing, and upon the terms and conditions set forth herein and subject to the approval of the Bankruptcy Court pursuant to Sections 105 and 363 of the Bankruptcy Code, Seller shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from Seller, all right, title and interest, free and clear of all Liens other than Permitted Liens and Liabilities other than Assumed Liabilities, in each and all of the Acquired Assets. For purposes of this Agreement, the term "Acquired Assets" shall mean all assets, properties and rights primarily used, held for use or intended to be used by Seller primarily in the conduct or operation of the Business, whether tangible or intangible, including, but not limited to, the assets set forth or described below (except, in each case, for the Excluded Assets), whether or not any such assets have value for accounting purposes:

(a)    all (i) equipment, machinery, Tooling, furniture, furnishings, fixtures, supplies, computers, cars, trucks, fork lifts, other industrial vehicles and other items of personal property owned by Seller or any of its Affiliates and either (1) located on the Leased Real Property or (2) not located on the Leased Real Property, but primarily used or held for use by Seller or its Affiliates in the operation or conduct of the Business, including any listed on Schedule 2.1(a) ("Owned Equipment") and (ii) rights to the warranties, express or implied, licenses received from manufacturers and sellers of the Owned Equipment, and any related claims, credits, rights of recovery and setoff with respect to such items;

(b)    all (i) inventories owned by Seller and either (1) located on the Leased Real Property or (2) not located on the Leased Real Property, but primarily used or held for use by Seller or its Affiliates in the operation or conduct of the Business, including raw materials, works in process, recycled materials, finished products, goods, spare parts, inventoriable supplies, replacement and component parts, including those listed on Schedule 2.1(b) (the "Inventory") and (ii) rights to the warranties, express or implied, received from suppliers and any related claims, credits, rights of recovery and setoff with respect to such Inventory;

(c)    all Business Records;

(d)    the Contracts, including the Transferred Leases, together with all of Seller's deposits (other than deposits described in Section 2.2(g)) thereunder, including as set forth on Schedule 2.1(d) (collectively, the "Assigned Contracts"). At any time prior to the date which is five (5) days prior to the date scheduled by the Bankruptcy Court for the Sale Hearing, Buyer, in its sole discretion by written notice to Seller, may elect to exclude any Executory Contract as an Assigned Contract, in which case such Executory Contract shall no longer be deemed an Assigned Contract and shall constitute an "Excluded Contract" under this Agreement. Each Executory Contract that is deemed to be an Excluded Contract as of the Prior Agreement Date is set forth under the heading "Excluded Contract" on Schedule 2.1(d) attached hereto. Upon Buyer's request, Seller shall provide additional detailed information as to the obligations under any Executory Contract sufficient for Buyer to make an informed assessment whether to include or exclude any Executory Contract from the Assigned Contracts;

-10-

A000051

       (e)    the Licenses, including as listed and described on <u>Schedule 2.1(e)</u>;

       (f)    the Governmental Permits, including the Governmental Permits listed and described on <u>Schedule 2.1(f)</u>;

       (g)    the Accounts Receivable (including the RIG Accounts Receivable and any proceeds solely in respect of the RIG Accounts Receivable received by Seller on or after the Agreement Date);

       (h)    all Prepaid Items, including as listed and described on <u>Schedule 2.1(h)</u>;

       (i)    all Intellectual Property;

       (j)    all goodwill associated with the Business or the Acquired Assets;

       (k)    all interest in and to any refund of Taxes relating to the Business to the extent such Taxes are for, or applicable to, any taxable period (or portion thereof) beginning on or after the Closing Date;

       (l)    all rights, claims and credits (including proceeds, benefits or claims) under insurance policies and all rights in the nature of insurance, indemnification or contribution to the extent related to the Acquired Assets;

       (m)    all capital stock or other ownership interests in any subsidiary of Seller;

       (n)    all of Seller's rights and interests in Customer Owned Tooling, including as listed and described on <u>Schedule 2.1(n)</u>; and

       (o)    all rights to any names used in connection with the Business, including, without limitation, "Rockford Products Corporation" and "Rockford Products".

    2.2    <u>Excluded Assets</u>. Notwithstanding anything in <u>Section 2.1</u> to the contrary, the Acquired Assets shall not include, and Seller is not selling, transferring, assigning, conveying or delivering to Buyer, and Buyer is not purchasing, acquiring or accepting from Seller, (i) the rights, properties or assets specifically set forth in this <u>Section 2.2</u> or (ii) any rights, claims or credits of Seller or any of its Affiliates to the extent related to any of the rights, properties or assets specifically set forth in this Section 2.2 the "<u>Excluded Assets</u>"):

       (a)    the Purchase Price (subject to the terms of the Escrow Agreement, in the case of the Escrow Amount);

       (b)    all rights and claims of Seller under this Agreement;

       (c)    any cash, cash equivalents, short-term investments, bank deposits or similar cash items, lines of credit, all bank accounts, all lockboxes and all banking facilities of Seller or its Affiliates (other than any cash proceeds received by Seller in respect of the RIG Accounts Receivable on or after the Agreement Date);

-11-

A000052

(d)     the minute books, stock records and corporate seals of Seller and its Affiliates;

(e)     any claim, right or interest of Seller or any Affiliate of Seller in or to any refund, rebate, abatement or other recovery for Taxes or other charges of a Governmental Body, together with any interest due thereon or penalty rebate arising there from, except to the extent any such claim, right or interest relates to Acquired Assets or the Business and to any period (or portion thereof) on or after the Closing Date;

(f)     the Excluded Contracts and the Non-assignable Assets;

(g)     any rights, claims or causes of action of Seller against Third Parties relating to the assets, properties, business or operations of Seller arising out of transactions occurring on or prior to the Closing Date;

(h)     any and all insurance policies, including without limitation, any officer and director insurance policies, and any related refunds;

(i)     any claims, rights or causes of action arising under Sections 544 through 553, inclusive, of the Bankruptcy Code, provided that no such claims, rights or causes of action shall be asserted, brought or otherwise prosecuted by Seller or by any Person on Seller's behalf against any of the Purchased Assets;

(j)     all refundable operating deposits made by Seller with Third Parties after commencement of the Chapter 11 Case; and

(k)     any claims, rights or causes of action against interested buyers of the Acquired Assets other than Buyer.

2.3     Assumed Liabilities. Effective as of the Closing, and from and after the Closing, Buyer shall accept, assume and agree to pay, perform or otherwise discharge when due, in accordance with the respective terms and subject to the respective conditions thereof, the liabilities and obligations of Seller, pursuant to and under the Assumed Liabilities. For purposes of this Agreement, the term "Assumed Liabilities" shall mean only those liabilities and obligations of Seller set forth or described in paragraphs (a), (b), (c) and (d) below.

(a)     the Liabilities and obligations arising after the Closing Date under the Licenses listed on Schedule 2.1(e), the Assigned Contracts listed on Schedule 2.1(d) and the Governmental Permits listed on Schedule 2.1(f); provided that Buyer shall not assume or agree to pay, discharge or perform any Liabilities arising out of any breach by Seller of any provision of any Assigned Contract, License or Governmental Permit, including liability for breach, misfeasance or under any other theory relating to Seller's conduct prior to Closing (other than the Cure Costs for any Assigned Contracts which shall be treated as a reduction to the Purchase Price as provided in Sections 3.2(b) and 6.12) and provided further that Buyer shall not assume nor shall Buyer be obligated to pay, discharge or perform any Liability in respect of any Non-assignable Asset;

-12-

A000053

(b)     with respect to the Business, any warranty Liability arising from sales of products manufactured by Buyer following the Closing; provided that Buyer shall not assume any Liability arising out of or relating to Seller's defective design of products which products are manufactured or sold by Buyer after the Closing Date;

(c)     any and all Liabilities relating to the Acquired Assets that first arise on or after the Closing Date; and

(d)     accrued payroll expense, accrued vacation and holiday pay and accrued medical benefits of the Seller as of the Closing Date.

2.4     Excluded Liabilities.  Notwithstanding any provisions of this Agreement to the contrary, other than the Assumed Liabilities, Buyer shall not assume or in any way be liable or responsible for, any Liabilities whatsoever (including Liabilities relating to the conduct of the Business or to the Acquired Assets (and the use thereof) at any time on or prior to the Closing Date), whether relating to or arising out of the Business or the Acquired Assets or otherwise, whether direct or indirect, known or unknown, fixed or contingent or otherwise, liquidated, choate or inchoate, due or to become due, including warranty, tort and product liability claims (the "Excluded Liabilities").  In furtherance of the foregoing and not in limitation thereof, except for the Assumed Liabilities, in no event shall Buyer be liable or responsible for:

(a)     All Liabilities relating to or arising, whether before, on or after the Closing, out of, or in connection with, any of the Excluded Assets.

(b)     All Liabilities that arise (whether under the Assigned Contracts, Licenses, Governmental Permits or otherwise) with respect to the Business or the Acquired Assets or the use of the Acquired Assets prior to the Closing, or relate to periods ending prior to the Closing, or are to be observed, paid, discharged or performed prior to the Closing (in each case, including any Liabilities that result from, relate to or arise out of warranty, tort or other product liability claims).

(c)     Liabilities relating to any environmental, health or safety matter (including any Liability or obligation arising under any Environmental Law) to the extent that they arise out of or relate to the ownership or operation of the Business, the leasing, ownership or operation of the Leased Real Property or any of the other Acquired Assets.

(d)     Litigation and related claims and Liabilities or any other claims against Seller or a Subsidiary involving or relating to facts, events or circumstances arising or occurring on or prior to the Closing, no matter when raised (including Liability for breach, misfeasance or under any other theory relating to Seller's or a Subsidiary's conduct, performance or non-performance, including the Cure Costs).

(e)     All Liabilities arising out of or relating to (i) the manufacture and sale of products manufactured or sold by Seller or an Affiliate prior to the Closing, (ii) warranty claims arising out of or relating to products manufactured or sold by Seller or an Affiliate prior to the Closing and (iii) any other claims arising out of or relating to the use of products manufactured or sold by Seller or an Affiliate prior to the Closing; and any Liability arising out of or relating to

-13-

A000054

products manufactured and sold by Buyer after the Closing, which Liability arises out of or relates to Seller's defective design of product.

      (f)    All Liabilities, claims and contingencies associated with any and all notes, loan agreements, credit agreements, indentures, bonds and other similar debt instruments or evidence of indebtedness for borrowed money and guarantees of Seller or an Affiliate.

      (g)    All Liabilities under, including any sponsorship or continuation of, any Benefit Plans.

      (h)    All Liabilities, claims or contingencies related to any employees or former employees of Seller or an Affiliate, including without limitation, claims resulting from the failure of Buyer to hire any employee of Seller or an Affiliate, arising or accruing on, before, or as the immediate result of the consummation of the transactions contemplated by this Agreement.

      (i)    All Liabilities of Seller or an Affiliate under any collective bargaining agreement, agreement with any labor union, employment agreement or severance agreement.

      (j)    All Excluded Taxes.

      (k)    All accounts payable of Seller (other than accrued payroll expense, accrued vacation and holiday pay and accrued medical benefits).

## ARTICLE 3

## CLOSING; PURCHASE PRICE

3.1    Closing; Transfer of Possession; Certain Deliveries.

      (a)    The consummation of the transactions contemplated herein (the "Closing") shall take place on November 16, 2007, or if the conditions set forth in Article 7 hereof are not satisfied or waived as of such date, on such other date as the parties hereto shall mutually agree (but in no event later than November 19, 2007). The Closing shall be held at the offices of Honigman Miller Schwartz and Cohn LLP, 2290 First National Building, 660 Woodward Avenue, Detroit, Michigan 48226, at 10:00 a.m., local time, unless the parties hereto otherwise agree. The actual date of the Closing is herein called the "Closing Date." For purposes of this Agreement, from and after the Closing, the Closing shall be deemed to have occurred at 12:01 A.M. on the Closing Date.

      (b)    At the Closing, Seller shall deliver to Buyer:

      (i)    duly executed bills of sale, in the form provided by Buyer, transferring the Acquired Assets to Buyer;

      (ii)    all other instruments of assignment, conveyance and transfer, in form provided by Buyer, as Buyer may reasonably request or as may otherwise be necessary to evidence and effect the sale, transfer, assignment, conveyance and delivery of the Acquired Assets to Buyer (and to put Buyer in actual possession or control of the

-14-

A000055

Acquired Assets), including, but not limited to, a landlord consent and approval, estoppel certificate and related documents in respect of the Leased Real Property; and

        (iii)     all consents, waivers or approvals theretofore obtained by Seller with respect to the sale of the Acquired Assets or the consummation of the transactions contemplated by this Agreement.

        (c)     At the Closing, Buyer shall deliver to Seller, the Purchase Price in accordance with Section 3.2(b) hereof.

### 3.2    Purchase Price; Allocation.

        (a)     In consideration of the Acquired Assets, and subject to the terms and conditions of this Agreement, Buyer shall (i) assume the Assumed Liabilities and (ii) pay, as provided in Section 3.2(b), the Purchase Price as set forth in this Section 3.2, as adjusted pursuant to Section 3.3. On or before that date which is two (2) Business Days prior to the Closing Date, Buyer and Seller shall agree upon a good faith estimate and calculation of the Purchase Price as calculated in accordance with Section 3.2(b) below.

        (b)     At the Closing, (1) Buyer shall deliver to the Escrow Agent the Escrow Amount pursuant to the terms of the Escrow Agreement and (2) Buyer shall pay to Seller cash in an amount equal to: (i) $21,666,421.00 less (ii) the Escrow Amount, less (iii) accrued payroll expense, accrued vacation and holiday pay and accrued medical benefits as of the Closing, less (iv) the aggregate Cure Costs, plus (or minus) (v) the amount, if any, by which Estimated Closing Date Current Assets is greater than (or less than) Target Current Assets (the "Purchase Price"), by wire transfer of immediately available funds to an account or accounts designated in writing by Seller. The parties further agree that on the Closing Date the Purchase Price shall be increased or decreased, as the case may be, on account of any prorations required pursuant to Section 6.14 of this Agreement.

        (c)     Seller and Buyer agree that, for legal, accounting, regulatory, tax or other purposes, they shall not take positions with respect to the allocation of the Purchase Price that are inconsistent with the allocations agreed to pursuant to this Agreement.

        (d)     As used in this Section 3.2,

        "Closing Date Current Assets" shall mean an amount equal to the sum of (x) the book value of the Accounts Receivable (other than the RIG Accounts Receivable) and (y) the book value of Inventory, in each case as of the Closing Date and determined in accordance with GAAP.

        "Estimated Closing Date Current Assets" shall mean Buyer and Seller's mutual good faith estimate of the Closing Date Current Assets, delivered to Buyer two (2) Business Days prior to the Closing Date.

        "Target Current Assets" shall mean $23,641,062.39.

        (e)     At or prior to the Closing Date, Buyer and Seller shall allocate the Purchase Price, the Assumed Liabilities of Seller, and all other relevant items (including, for

-15-

A000056

example and without limitation, any adjustments or additions to the Purchase Price pursuant to Section 3.3), in accordance with Section 1060 of the Code (and any similar provision of state, local or foreign law, as appropriate) (the "Purchase Price Allocation"). A schedule setting forth the parties' agreement on such Purchase Price Allocation shall be delivered by the Seller and Buyer at Closing. In the event that, after the Purchase Price Allocation is determined, the Purchase Price is adjusted (including adjustments in accordance with Section 3.3), the Purchase Price Allocation shall also be adjusted. To the extent permitted by the Code or other applicable tax law, any adjustments to the Purchase Price shall be allocated, to the extent possible, to the classes of assets that were the subject of the adjustments to the Purchase Price. The Purchase Price Allocation, including any adjustments thereto, will be binding on Buyer and Seller. Each of the Parties shall file all Tax Returns (including amended returns, claims for refunds, and IRS Form 8594) in a manner consistent with the Purchase Price Allocation, including any adjustments thereto. No Party will take any position (whether in audits or similar proceedings, Tax Returns, refund claims, or otherwise) that is inconsistent with such allocation, except as required to do so by applicable Law. Each of Buyer and Seller (and Seller's Affiliates, as applicable) will use its commercially reasonable best efforts to sustain such allocation in any subsequent audit, similar proceeding, appeal, or court proceeding.

3.3    Purchase Price Adjustment.

(a)    Within ten (10) days following the Closing Date, Buyer shall prepare and deliver to Seller a balance sheet of the Business as of the Closing Date (the "Closing Date Balance Sheet") and a statement of the Closing Date (the "Closing Date Statement"), each prepared in a manner consistent with the Latest Balance Sheet and GAAP. The parties further agree that, on the day before the Closing Date, Seller shall take physical inventory at the Leased Real Property for purposes of preparing the Closing Date Balance Sheet and Closing Date Statement, provided that Buyer shall be entitled to have a representative present while Seller takes the physical inventory. Seller shall have a period (the "Review Period") of sixty (60) days from the delivery of the Closing Date Balance Sheet and Closing Date Statement to review such documents. In connection therewith, from and after the Closing, Buyer shall provide Seller and its representatives with reasonable access to all records and work papers necessary to compute and verify the Closing Date Balance Sheet and the Closing Date Statement. If as a result of such review, Seller disagrees with the Closing Date Statement, Seller shall deliver to Buyer a written notice of disagreement (a "Dispute Notice") prior to the expiration of the Review Period setting forth in detail the basis for such dispute and the specific amounts in dispute and Seller's alternative calculation of the Closing Date Statement.

(b)    In the event that Seller agrees with the Closing Date Statement, Seller shall, during the Review Period, deliver to Buyer a written notice accepting the Closing Date Statement, in which case the amount of the Closing Date Current Assets contained in the Closing Date Statement shall be final and binding upon the Parties.

(c)    If Seller delivers a Dispute Notice to Buyer in a timely manner, then Seller and Buyer shall attempt in good faith to resolve such dispute within thirty (30) days from the date of such Dispute Notice. If Seller and Buyer cannot reach agreement within such thirty (30) day period (or such longer period as they may mutually agree), then the dispute shall be promptly referred to a nationally recognized certified public accounting firm (the "Neutral

-16-

A000057

Accountant") as may be jointly selected by Buyer and Seller. The parties agree to cooperate with one another in the engagement of the Neutral Accountant for such purposes. Each party shall thereupon furnish to the Neutral Accountant such reasonable work papers and other documents and information relating to the calculation of the Closing Date Statement as that party may desire or as the Neutral Accountant may request, and each party will be afforded the opportunity to present information to the Neutral Accountant and to discuss the determination of the Closing Date Statement with the Neutral Accountant. The Neutral Accountant shall resolve such dispute as promptly as may be reasonably practicable and shall deliver a written opinion setting forth a final determination. The determination of the Neutral Accountant shall be final and binding on Seller and Buyer and shall be used in computing the amount of any adjustment pursuant to this Section 3.3. All fees and expenses of the Neutral Accountant shall be shared equally between Seller and Buyer.

(d) If (i) the Closing Date Current Assets exceed (ii) the Estimated Closing Date Current Assets, then Buyer shall, within five Business Days of the determination date, pay to Seller the amount of such difference, such payment to be made by wire transfer of immediately available funds to such bank accounts as Seller may designate (or in the absence of any such designation, by corporate check mailed to Seller).

(e) If (i) the Estimated Closing Date Current Assets exceeds (ii) Closing Date Current Assets, then the Seller shall, within five Business Days of the determination date, cause the Escrow Agent to pay to Buyer from the Escrow Amount the amount of such difference, such payment to be made by wire transfer of immediately available funds to such bank accounts as Buyer may designate from the Escrow Amount (and the Escrow Amount shall be the sole source of recourse against the Seller under this Section 3.3(e) and in respect of Seller's indemnification obligations under Section 9.1(a)).

3.4    Deposit. Upon execution of the Prior Agreement, Buyer shall set aside out of the Purchase Price otherwise due to Seller at Closing and deposit an amount equal to $250,000 (the "Deposit Amount") in an interest bearing escrow account at Dewey & LeBoeuf LLP (the "Deposit Agent") pursuant to the terms of an escrow agreement in substantially the form attached hereto as Exhibit C (the "Deposit Escrow Agreement"). The Deposit shall be released in accordance with the following procedures:

(a)    Deposit Instructions. At Closing, Seller and Buyer shall jointly instruct the Deposit Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by Seller in the Deposit Escrow Agreement (and such amount shall be applied towards the payment of the Purchase Price). The costs and expenses of the Deposit Agent will be paid from and borne solely by the Deposit Amount.

(b)    Termination of Agreement. Upon any failure by Buyer to consummate the transactions contemplated hereby pursuant to this Agreement (i) by operation of Section 8.1(c) hereof (after the application of all applicable cure periods) or (ii) on or prior to November 19, 2007 (other than due to any breach of this Agreement by Seller), the Deposit Agent shall deliver the Deposit Amount, in accordance with the terms of the Deposit Escrow Agreement, by wire transfer of immediately available funds, to an account designated by Seller in the Deposit Escrow Agreement, to be retained by Seller. Any such payment shall constitute Seller's sole

-17-

A000058

recourse in the event Buyer fails to consummate the transactions contemplated hereby pursuant to this Agreement by operation of Section 8.1(c) hereof (after the application of all applicable cure periods); provided, however that Seller shall not be deemed limited to recovery of the Deposit Amount to the extent such failure to consummate arises from the bad faith or willful misconduct of Buyer.

(c)    Other Reason.    Upon termination of this Agreement for any other reason or upon the failure by Seller to consummate the transactions contemplated hereby pursuant to this Agreement if and as required by Article 8, Seller and Buyer shall jointly instruct the Deposit Agent to deliver the Deposit Amount, by wire transfer of immediately available funds, to an account designated by Buyer in the Deposit Escrow Agreement, to be retained by Buyer.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Buyer that, as of the Prior Agreement Date, the Agreement Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date), as follows:

4.1    Due Organization.    Seller is a corporation, duly organized under the laws of its jurisdiction of formation, with full power and authority to conduct its business as presently conducted and to own or use its properties and assets. Seller is duly qualified to do business and in good standing under the Laws of each jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification, except where the failure to be so qualified and in good standing would not reasonably be expected to have a Material Adverse Effect.

4.2    Authorization; Validity.    Seller has the requisite power and authority to execute and deliver this Agreement and the other documents and instruments to be executed and delivered by it pursuant hereto and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement by Seller and the other agreements to be executed and delivered by Seller pursuant hereto, and the performance by Seller of its obligations hereunder, including the consummation of the transactions contemplated hereby, have been duly authorized by all necessary corporate action on the part of Seller, including by any action or required approval of the equityholder or equityholders of Seller. This Agreement has been duly and validly executed and delivered by Seller and constitutes, and each of the other agreements to be executed and delivered by Seller pursuant hereto upon Seller's execution and delivery will constitute, valid and legally binding obligations of Seller enforceable against Seller in accordance with its respective terms.

4.3    No Violation.    Subject to receipt of the Sale Procedures Order and Sale Order, the execution, delivery and performance by Seller of this Agreement and the transactions contemplated hereby do not and will not: (a) conflict with or result in, with or without the giving of notice or lapse of time or both, any violation of or constitute a breach or default, or give rise to any right of acceleration, payment, amendment, cancellation or termination, under (i) the articles

-18-

A000059

of incorporation or other formation documents of Seller, (ii) any order, judgment, decree, rule or regulation of any court or any other Governmental Body having jurisdiction over the Business, the Acquired Assets or Seller or any mortgage, deed of trust, conveyance to secure debt, note, loan, indenture, lien, lease, agreement, instrument, order, judgment, decree or other arrangement or commitment to which Seller or the applicable Affiliate of Seller is a party or by which it is bound and which relates to the Business or the Acquired Assets; or (b) result in the creation of any Lien upon any of the Acquired Assets.

4.4   Third Party Approvals.   Schedule 4.4 sets forth a true and complete list of each order, consent, approval, waiver or authorization of any Governmental Body or Third Party that is required in connection with the execution, delivery and performance by Seller of this Agreement and the other documents and instruments to be executed and delivered by Seller pursuant hereto and the transactions contemplated hereby and thereby, including (i) orders, consents, approvals, waivers or authorizations of, or declarations or filings with, the Bankruptcy Court and (ii) any consents required from Seller's pre-petition and post-petition secured lenders under the applicable credit documents and the DIP Order (collectively, the "Required Consents").

4.5   Title to and Sufficiency of Assets.

(a)   Seller has good and valid title to each of the Acquired Assets, free of any Liens other than Liens listed on Schedule 4.5 (such Liens referred to as "Permitted Liens").

(b)   Except as set forth on Schedule 4.5, each Acquired Asset, with a book value (determined in accordance with GAAP) in excess of $20,000, is in good operating condition, ordinary wear and tear excepted, for the purposes for which it is currently being used, but is otherwise being transferred on a "where is" and, as to condition, "as is" basis.

(c)   The Acquired Assets, the Business Employees and the rights to be acquired under this Agreement include all tangible and intangible assets, personnel and rights that are primarily used or held for use by Seller in the operation or conduct of the Business, and are sufficient in all respects for the conduct by Buyer of the Business immediately following the Closing in substantially the same manner as conducted by Seller prior to the Closing.

4.6   Permits, Licenses.   Except as set forth on Schedule 2.1(f), there are no Governmental Permits, or applications for Governmental Permits, necessary for or used by Seller to operate or conduct the Business as currently operated or conducted, or which Governmental Permits or applications for Governmental Permits are required by currently effective Laws. All Governmental Permits held by Seller in connection with the Business are in full force and effect, no violations or defaults have occurred with respect to any of such Governmental Permits, and no revocation, termination, limitation, withdrawal or inability to renew any of such Governmental Permits is pending or, to Seller's Knowledge, threatened or will be caused by the consummation of the transactions contemplated by this Agreement or the compliance with the terms and provisions of this Agreement. All appropriate filings and registrations where necessary for obtaining, renewing, or reissuing such Governmental Permits to Seller have been timely submitted to the appropriate Governmental Bodies. To Seller's Knowledge, no fact, condition, or violation exists which could cause such Governmental Permits to not be renewed,

-19-

A000060

or to be renewed with materially different terms, by the appropriate Governmental Bodies in the ordinary course. All of such Governmental Permits shall be in full force and effect on the Closing Date.

4.7     Real Property.

(a)     Seller does not own any Real Property. Schedule 4.7 sets forth the address of each leased parcel of real property used in the Business (the ("Leased Real Property") and a list of all leases (including all amendments, extensions, renewals, guaranties and other agreements with respect thereto) for each Leased Real Property ("Leases"). Seller has delivered to Buyer a true and complete copy of each such Lease document set forth in Schedule 4.7. Except as set forth on the attached Schedule 4.7, with respect to each of the Leases: (i) such Lease is legal, valid, binding, enforceable and in full force and effect; (ii) neither Seller nor the lessor under the Lease is in breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, passage of time or both, would constitute such a breach or default or permit the termination, modification or acceleration of rent under such Lease; (iii) there are no disputes with respect to such Lease; and (iv) Seller has not assigned, subleased, mortgaged, deeded in trust or otherwise transferred or encumbered such Lease or any interest therein.

(b)     Seller has no Knowledge of any and has not received any notice of the existence of any pending or contemplated condemnation or eminent domain proceeding with respect to the Leased Real Property.

(c)     The current use of the Leased Real Property does not violate in any material respect any instrument of record or agreement affecting the Leased Real Property. There is no violation of any covenant, condition, restriction, easement, agreement or order of any governmental authority having jurisdiction over the Leased Real Property that affects the use or occupancy thereof.

(d)     The Leased Real Property constitutes all of the real property owned, leased, occupied or otherwise utilized by Seller. The Leases will demise all of the real property leased, occupied or otherwise utilized in connection with the Business.

(e)     Seller's possession and quiet enjoyment of the Leased Real Property under the Leases has not been disturbed and there are no disputes with respect to the Leases or the Leased Real Property.

(f)     Neither Seller nor any other party to any Lease is in breach or default under such Lease, and no event has occurred or circumstance exists which, with the delivery of notice, the passage of time or both, would constitute such a breach or default, or permit the termination, modification or acceleration of rent under such Lease.

(g)     No security deposit or portion thereof deposited with respect to such Lease has been applied in respect of a breach or default under such Lease which has not been re-deposited in full.

-20-

A000061

(h)    The other parties to the Leases are not Affiliates of, and otherwise does not have any economic interest in, Seller or Seller's Affiliates.

(i)    Seller has not subleased, licensed or otherwise granted any party the right to use or occupy the Leased Real Property or any portion thereof, and Seller is not obligated, and has not agreed or committed, to do any of the foregoing.

4.8    Brokers and Finders.    No broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission from Buyer in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Seller.

4.9    Compliance with Laws.    The Business and the Acquired Assets have been operated in compliance in all material respects with all applicable Laws and all applicable governmental judgments, decrees, injunctions or similar orders, writs, ruling directives or other requirements (collectively, the "Governmental Orders" and each a "Governmental Order") including, without limitation, those relating to the safe conduct of the Business, consumer protection, equal opportunity, discrimination, health and occupation safety; provided that Seller has not been in compliance with Code and ERISA requirements regarding contributions to its pension plan. There are no claims, lawsuits, demands, suits, inquiries, hearings, investigations, notice of violations, litigation, proceedings, arbitrations, or other disputes, whether civil, criminal, administrative or otherwise pending against Seller, or, to Seller's Knowledge, threatened, nor, with the exception of matters relating to its pension plan, has Seller received any written notice, regarding any material violations of any applicable Laws or Governmental Orders.

4.10    Environmental Matters.

(a)    Except as set forth on Schedule 4.10, the Business and the Acquired Assets are and have been operated and conducted in compliance in all material respects with all Environmental Laws. Seller has not received any notice that is now unresolved with respect to the Business, the Acquired Assets or Leased Real Property from any Governmental Body or Third Party alleging that Seller or any aspect of the Business, the Acquired Assets or any Leased Real Property is in violation in any material respect of any Environmental Law. There has been no Release of Hazardous Materials on, at or from any Leased Real Property. With regard to Environmental Laws or Hazardous Materials, there are no claims, lawsuits, demands, suits, inquiries, hearings, investigations, notice of violations, litigations, proceedings, or arbitrations, whether civil, criminal, judicial or administrative pending against Seller in connection with the Business, or, to Seller's Knowledge, threatened.

(b)    Seller has no knowledge or information of any Release of Hazardous Materials on, at or from any Leased Real Property or property in the vicinity of the Leased Real Property.

(c)    Seller has provided to Buyer true and complete copies of all reports, data, correspondence, records and other documents pertaining to the current or past environmental

-21-

A000062

condition of the Leased Real Property and the current or past compliance of the Business with Environmental Laws.

(d)     Except as set forth on Schedule 2.1(f), to Seller's Knowledge, there are no Governmental Permits, or applications for Governmental Permits, necessary for or used by Seller to operate or conduct the Business as currently operated or conducted, which Governmental Permits or applications for Governmental Permits are required by currently effective Environmental Laws.

4.11    Financial Statements. Seller has delivered to Buyer (a) financial schedules setting forth the unaudited balance sheet, statement of operations and statement of cash flows of the Business for the fiscal years ending the December 31, 2004, December 31, 2005 and December 31, 2006 (the "Historical Financial Schedules") and (b) the interim unaudited balance sheet (the "Latest Balance Sheet"), statement of operations and statement of cash flows for the nine-month period ended as of September 23, 2007 (the "Latest Financials", and together with the Historical Financial Schedules, the "Unaudited Financials"). The Unaudited Financials are in accordance with, and consistent with, Seller's books and records, and are true, complete and accurate in all material respects, and fairly and accurately reflect the assets and liabilities of the Business on a consolidated basis as of the date thereof, and the results of operations and cash flows of the Business on a consolidated basis for the fiscal periods then ended and were prepared in accordance with GAAP, subject to the absence of footnotes and normal, recurring year end audit adjustments. A copy of the Unaudited Financials are attached hereto as Schedule 4.11.

4.12    Employee Benefits Compliance.

(a)     Schedule 4.12 lists each Benefit Plan that Seller or any ERISA Affiliate sponsors, maintains, is a party to, contributes to or has any obligation to contribute to, or under which or with respect to which Seller or any ERISA Affiliate has any Liability or potential Liability relating to Business Employees.

(b)     Except as disclosed on Schedule 4.12, neither Seller nor any ERISA Affiliate maintains, sponsors, contributes to, has any obligation to contribute to, or has any Liability or potential Liability under or with respect to, any "multiemployer plan" (as such term is defined in ERISA Sections 3(37) or 4001(a)(3)) or any "employee pension benefit plan" (as such term is defined in ERISA Section 3(2)) subject to ERISA Section 302 or Title IV of ERISA, or otherwise has any Liability or potential Liability under Title IV of ERISA.

(c)     Except as set forth on Schedule 4.12, there is no lien pursuant to Section 4068 of ERISA or Section 412(n) of the Internal Revenue Code in favor of the Pension Benefit Guaranty Corporation or any Benefit Plan with respect to any of the Acquired Assets.

(d)     The requirements of COBRA have been met with respect to each Benefit Plan subject to COBRA that is sponsored or maintained by the Seller, any of its subsidiaries, or any ERISA Affiliate.

(e)     With respect to each Benefit Plan disclosed on Schedule 4.12, Seller has delivered to Buyer correct and complete copies of the Benefit Plan documents (including

-22-

amendments thereto), any summary plan descriptions (including summaries of material modifications thereto), and any other written materials describing the current terms and features of the Benefit Plan.

4.13   Litigation. Except as set forth on Schedule 4.13 and for the Chapter 11 Case and any claims filed therein, there are no actions, claims, causes of action, proceedings, suits, arbitrations, mediations or investigations pending or, to the Knowledge of Seller, threatened against Seller in connection with the Acquired Assets or the Business or which could give rise to or increase an Assumed Liability. Neither Seller nor any of the Acquired Assets is subject to any order, judgment, decree, rule or regulation of any court or any other Governmental Body having jurisdiction over Seller or the Acquired Assets. Seller is fully insured with respect to each of the matters set forth on Schedule 4.13.

4.14   Taxes. Except as set forth on Schedule 4.14, Seller has duly, timely and properly filed, or caused to be filed, with the appropriate Governmental Body all Tax Returns required to be filed. All such Tax Returns are true, correct and complete in all material respects. All Taxes owed by Seller (whether or not shown on any Tax Return) have been timely paid in full, and there are no Liens for Taxes on any of the Purchase Assets, except for Taxes which are being contested in good faith in accordance with appropriate proceedings (and which are disclosed on Schedule 4.14). No claim has ever been made by an authority in a jurisdiction where Seller does not file Tax Returns that it is or may be subject to taxation by that jurisdiction. Except as set forth on Schedule 4.14, Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any Business Employee, independent contractor, creditor, member, shareholder, or other third party.

4.15   Accounts Receivable.

(a)   Schedule 4.15(a) is a complete and accurate list, as of the Prior Agreement Date, of the Accounts Receivable, including an aging of all such Accounts Receivable showing amounts due in thirty (30) day aging categories, other than any Accounts Receivable constituting Excluded Assets. Seller has provided adequate reserves for the Accounts Receivable in accordance with GAAP on its Latest Balance Sheet, consistently applied.

(b)   The Accounts Receivable arose from bona fide business transactions in the ordinary course of business, and are expected by Seller to be collectible within the earlier of (i) sixty (60) days of the date of the invoice giving rise thereto (or, in the case of any note receivables, the due date), or (ii) within the terms contained in the invoices, at their respective face amount, and not subject to any valid counterclaims or setoffs, of any kind or nature, except to the extent of the reserves referenced above and specifically set forth on Schedule 4.15(b).

4.16   Labor Matters.

(a)   Schedule 4.16 sets forth the name, position, and tenure of all Business Employees.

(b)   Except as disclosed on Schedule 4.16, (i) there are no claims or proceedings pending or, to the Knowledge of the Seller threatened, against the Seller and relating

-23-

A000064

to any Business Employees, (ii) Seller is neither party to, nor bound by, any labor or collective bargaining agreement or any other agreement with a labor union pertaining to any Business Employees, nor are any such employees represented by any labor organization with respect to their employment with Seller; and (iii) no labor organization or group of the Business Employees has made a pending demand for recognition or certification, and, to the Knowledge of Seller, no labor union is seeking to organize any Business Employees. There are no strikes, slowdowns, work stoppages, lockouts, or, to the Knowledge of Seller, threats thereof, by or with respect to any Business Employees. Seller has complied with its obligations under the WARN Act, based on the transaction contemplated by this Agreement (including, without limitation, Buyer's proposal to employ and retain certain of Seller's employees from and after the Closing Date).

4.17    Customers and Suppliers.    Schedule 4.17 sets forth a list of the Significant Customers and Significant Suppliers. "Significant Customers" are the ten (10) customers that have purchased the most, in terms of dollar value, products or services sold by the Business during the prior nine month period ending September 30, 2007. "Significant Suppliers" are the ten (10) suppliers that have sold the most, in terms of dollar value, products or services to the Business during the prior nine month period ending September 30, 2007. Except as previously disclosed in writing to Buyer, from September 30, 2007 through the Closing Date, no Significant Customer or Significant Supplier has reduced the level of business conducted with Seller, including as a result of obtaining product from a source other than Seller (other than ordinary course of business volume fluctuations not resulting from one or more Significant Customers obtaining product from a source other than Seller), nor has any Significant Customer or Significant Supplier given Seller notice terminating, canceling or materially reducing, or threatening to terminate, cancel or materially reduce, any Contract (including the cancellation, or reduction in delivery of, any purchase orders or releases).

4.18    Inventory.    Schedule 4.18 is a complete and accurate list, as of the Prior Agreement Date, of the Inventory. The Inventory included in the Acquired Assets and the Latest Balance Sheet has been valued at the lower of cost or market in accordance with GAAP. The Inventory included in the Acquired Assets and the Latest Balance Sheet consists of good quality, usable and merchantable Inventory, except to the extent of any inventory reserves set forth on the Latest Balance Sheet or the Closing Date Statement, as the case may be. Except as set forth on Schedule 4.18, The quantities of Inventory included in the Acquired Assets and the Latest Balance Sheet are not excessive, but shall be sufficient, in all respects, to operate the Business on and after the Closing Date, on not less than the level of operation existing on the Closing Date.

4.19    Contracts.

(a)    A list of all Contracts, including the Transferred Leases, are set forth on Schedule 4.19, and a list of all Excluded Contracts as of the Prior Agreement Date is set forth under the heading "Excluded Contracts" on Schedule 4.19.

(b)    Each Contract is a legal, valid and binding obligation of Seller, and, to Seller's Knowledge, the other parties thereto, and is enforceable against Seller, and, to Seller's Knowledge, the other parties thereto, in all material respects in accordance with the Contracts' respective terms, except as the same may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights

-24-

A000065

generally and general equitable principles regardless of whether such enforceability is considered in a proceeding at law or equity.

(c)     Except as set forth on Schedule 4.19, Seller has not violated in any material respect any of the terms and conditions of any Contract and, to Seller's Knowledge, all of the covenants to be performed by any other party thereto have been performed in all respects, and there are, to Seller's Knowledge, no claims for breach or indemnification or notice of default or termination under any Contract.

(d)     No event has occurred which constitutes, or with notice or the expiration of any grace period, or other period, would constitute, a default by Seller under any Contract and no such event has occurred which, to Seller's Knowledge, constitutes or would constitute a default by any other party thereto.

(e)     From and after September 30, 2007, Seller has not received any written notice that any Person is canceling, modifying or terminating or intends to cancel, modify or terminate any Contract, or to exercise or not to exercise any option thereunder.

(f)     True and complete copies of all Contracts set forth on Schedule 4.19, including all related material written amendments, supplements and modifications, have been provided to Buyer.

4.20    Tooling.

(a)     A list of all Owned Tooling is set forth on Schedule 4.20(a). Seller has good and valid title to all Owned Tooling free and clear of all Liens.

(b)     No Customer-Owned Tooling exists.

(c)     A list of all Prepaid Tooling is set forth on Schedule 4.20(c).

4.21    Intellectual Property. The Intellectual Property constitutes all of the intellectual property necessary for Seller or its Affiliates to operate the Business as currently conducted and constitutes all of the intellectual property necessary for Buyer to operate the Business after the Closing as it is being operated as of the Execution Date. Except as set forth on Schedule 4.21, all of the registered Intellectual Property is registered in Seller's or its Affiliates' name. None of the registered Intellectual Property is involved in any interference, reissue, reexamination, or opposition proceeding. To Seller's Knowledge, there is no intellectual property of any Third Party that interferes with or infringes on any of the Intellectual Property. None of the Intellectual Property or any of the products manufactured or sold by Seller or its Affiliates, nor any equipment, process or know how used by Seller or its Affiliates infringes, or to Seller's Knowledge, is alleged to infringe, any intellectual property right of any Third Party.

4.22    Insurance. Schedule 4.22 contains a description of each insurance policy maintained by the Seller with respect to its properties, assets and businesses, and each such policy is in full force and effect as of the Closing. Seller is not in default with respect to its obligations under any insurance policy maintained by it. The insurance coverage of Seller is of a

-25-

A000066

kind and type routinely carried by corporations of similar size engaged in similar lines of business. Seller has no self-insurance or co-insurance programs.

4.23    Product Warranties. All products manufactured, sold or delivered by Seller have been in conformity with all applicable contractual commitments and all express and implied warranties, and Seller has no liability (and there is no reasonable basis for any present or future action, suit, proceeding, hearing, investigation, charge, complaint, claim or demand against it giving rise to any such liability) for replacement or repair thereof or other damages in connection therewith. No products manufactured, sold or delivered by Seller is subject to any guaranty, warranty or other indemnity beyond the applicable standard terms and conditions of such sale (including as a result of any course of conduct between Seller and any Person or as a result of any statements in any of Seller's product or promotional literature). Seller has not been notified of any claims for any extraordinary product returns or warranty obligations. There have been no product recalls, withdrawals or seizures with respect to any products manufactured, sold or delivered by Seller.

4.24    Completeness of Disclosure. No representation or warranty of Seller in this Agreement or any schedule or certificate furnished to Buyer pursuant hereto contains any untrue statement of material fact or omits to state a material fact required to be stated herein or therein or necessary to make any statement herein or therein not misleading. Seller shall be under an obligation to continually update all schedules from the Agreement Date through the Closing Date.

**EXCEPT AS SET FORTH ABOVE, (A) ALL THE ACQUIRED ASSETS SHALL BE TRANSFERRED ON AN AS IS, WHERE IS BASIS, AND (B) SELLER MAKES NO FURTHER REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, IN RESPECT OF THE PHYSICAL CONDITION OF THE ACQUIRED ASSETS, AND ANY SUCH REPRESENTATION AND WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED.**

### ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Seller, as of the Prior Agreement Date, the Agreement Date and as of the Closing Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date), as follows:

5.1    Due Organization. Buyer is a limited liability company validly existing and in good standing under the laws of the state of its formation and has the requisite company power and authority and, as of the Closing shall possess all licenses, permits, authorizations or approvals to acquire and own the Acquired Assets.

5.2    Authority; Validity. Buyer has the requisite power and authority to execute and deliver this Agreement and the other documents and instruments to be executed and delivered by Buyer pursuant hereto and to perform its obligations hereunder and thereunder. The execution

-26-

A000067

and delivery of this Agreement and the other agreements to be executed and delivered by Buyer pursuant hereto, and the consummation by Buyer of the transactions contemplated hereby and thereby, have been duly authorized by all necessary company action on the part of Buyer. This Agreement has been duly and validly executed and delivered by Buyer and constitutes, and each of the other agreements to be executed and delivered by Buyer pursuant hereto upon its execution and delivery by Buyer will constitute, valid and legally binding obligations of Buyer enforceable against Buyer in accordance with its terms.

5.3 No Violation. The execution, delivery and performance by Buyer of this Agreement and the transactions contemplated hereby, do not and will not conflict with or result in, with or without the giving of notice or lapse of time or both, any violation of or constitute a breach or default, or give rise to any right of acceleration, payment, amendment, cancellation or termination, under (a) the certificate of formation, limited liability company agreement or other formation documents of Buyer, (b) any mortgage, indenture, lease, contract or other agreement to which Buyer is a party or by which Buyer or any of its properties or assets is bound or subject, or (c) any law or order to which Buyer is bound or subject.

5.4 Brokers and Finders. No broker, investment banker, financial advisor or other Person is entitled to any broker's, finder's, financial advisor's or other similar fee or commission from Seller in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Buyer.

5.5 Availability of Funds. As of the Closing Date, Buyer shall have cash available or have existing borrowing facilities sufficient to enable it to consummate the purchase of the Acquired Assets on the Closing Date.

## ARTICLE 6

## COVENANTS OF THE PARTIES

6.1 Conduct of Business Pending the Closing. During the period from the Prior Agreement Date and continuing until the earlier of the termination of this Agreement in accordance with its terms or the Closing, Seller shall cause the Business to be conducted only, and Seller shall not take any action, except as expressly approved by the Bankruptcy Court, outside the ordinary course of business, consistent with Seller's past custom and practice, including (1) the payment of all trade payables and other liabilities relating to the Business, (2) the maintenance of Tooling (and spare parts, supplies and replacement and component parts in respect thereof) at a level consistent with levels for prior periods, and (3) the preservation of (a) the present organization of the Business, (b) the Acquired Assets, (c) relationships with customers of the Business and (d) relationships with employees. Without limiting the generality of the first sentence of this Section 6.1, during the period from the Prior Agreement Date through the Closing Date, Seller shall not, without the prior written consent of Buyer: (i) lease, license, surrender, relinquish, sell, transfer, convey, assign or otherwise dispose of any Acquired Assets or any part of the Business (other than the sale of inventory in the ordinary course of business); (ii) mortgage, pledge or subject to Liens, any Acquired Assets; or (iii) compromise or settle any Liability in excess of $5,000 relating to the Acquired Assets or the business prior to the Closing.

-27-

A000068

6.2    Bankruptcy Court Orders.

(a)    Following the Prior Agreement Date, Seller filed with the Bankruptcy Court an application or motion seeking approval of the Sale Procedures Order in the form attached as Exhibit A, which amended and, to the extent applicable, superseded the terms of any prior order approving procedures related to the sale of the Acquired Assets. This Agreement represents the highest and best bid for the Acquired Assets as determined in accordance with the procedures set forth in the Sale Procedures Order (and any other applicable order regarding the procedures for the sale of the Acquired Assets), and Seller shall present a Sale Order in a form that is in accordance with Section 7.1(b) at the hearing to approve a sale of the Acquired Assets. The Sale Procedures Order provided that the Sale will be conducted in accordance with the bidding procedures more fully described therein and any other applicable order of the Bankruptcy Court regarding sale of the Acquired Assets (the "Sale Procedures").

(b)    As and when provided by the Sale Procedures, Seller will file with the Bankruptcy Court a motion and supporting papers seeking the entry of the Sale Order providing for the approval of the transaction contemplated by this Agreement. The Sale is subject to competitive bidding as set forth in the Sale Procedures and approval by the Bankruptcy Court at a hearing under Sections 363 and 365 of the Bankruptcy Code (the "Sale Hearing").

(c)    The Sale Order, to the extent permitted under the Bankruptcy Code or other applicable Law, shall be binding upon and shall govern the acts of all entities, including, but not limited to, all taxing authorities, filing agents, filing officers, title agents, title companies, recorders and/or registrars of mortgages, recorders and/or registrars of deeds, administrative agencies, governmental agencies or departments, secretaries of state, federal, state and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file register or otherwise record or release any documents or instruments, or who may be required to report or insure as to title or state of title in or to any of the Acquired Assets.

6.3    Access.  From the Prior Agreement Date until the Closing Date, Seller shall give Buyer and its officers, employees, accountants, auditors, counsel and other representatives ("Representatives") reasonable access during normal business hours to the books and records, offices, properties, officers, employees, accountants, auditors, counsel and other representatives, books and records of Seller, including without limitation all files and papers, whether in hard copy or electronic format, relating to the Business or the Acquired Assets. Seller shall and shall cause its Affiliates to assist Buyer in making such investigation and shall cause its counsel, accountants, engineers, consultants and other non-employee representatives to be reasonably available to Buyer for such purposes. Until the earlier of the second anniversary of the Closing Date or the dissolution of Seller, Seller and Buyer shall, and shall cause their respective Affiliates to, provide to each other and to their respective officers and employees, upon request (subject to any limitations that are reasonably required to preserve any applicable attorney-client privilege or Third Party confidentiality obligation), access for inspection and copying of all Business Records, Governmental Permits, Licenses, Contracts and any other information existing as of the Closing Date and relating solely to the Business or the Acquired Assets, and shall make their respective personnel reasonably available for interviews, depositions and testimony in any legal matter concerning transactions contemplated by this Agreement, the

-28-

A000069

operations or activities relating to the Business or the Acquired Assets and as otherwise may be necessary or desirable to enable the party requesting such assistance to: (i) comply with any reporting, filing or other requirements imposed by any Governmental Body; (ii) assert or defend any claims or allegations in any litigation or arbitration or in any administrative or legal proceeding, other than claims or allegations that one party to this Agreement has asserted against the other; or (iii) subject to clause (ii) above, perform its obligations under this Agreement. The party requesting such information or assistance shall reimburse the other party for all reasonable and necessary out-of-pocket costs and expenses incurred by such party in providing such information and in rendering such assistance. The access to files, books and records contemplated by this Section 6.3 shall be during normal business hours and upon reasonable prior notice and shall be subject to such reasonable limitations as the party having custody or control thereof may impose to preserve the confidentiality of information contained herein.

6.4     Public Announcements.    Seller will consult with Buyer before issuing, and provide Buyer the opportunity to review and comment upon, any press release, any court filing or pleading filed with the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby, or other public statements with respect to the transactions contemplated by this Agreement. Neither Buyer nor Seller shall issue any such press release or make any public statement regarding the terms of this Agreement or the transactions contemplated hereby without the prior approval of the other party, in each case except as may be required by law or court process.

6.5     Best Efforts; Supplements and Amendments.

(a)     Seller and Buyer will use their commercially reasonable best efforts to take, or cause to be taken, all actions necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated by this Agreement, including, in the case of Seller, using reasonable commercial efforts to accomplish the following: (i) the taking of all acts necessary to cause the conditions to Closing to be satisfied as promptly as practicable, (ii) the obtaining of all necessary actions or nonactions, waivers, consents and approvals from Governmental Bodies and the making of all necessary registrations and filings, (iii) the obtaining of all necessary consents, approvals or waivers from Third Parties, and (iv) the execution and delivery of any additional instruments necessary to consummate the transactions contemplated by, and to fully carry out the purposes of, this Agreement.

(b)     From time to time prior to the Closing, in order to make the information contained in any disclosure schedule hereto timely, complete and accurate, Seller or Buyer shall amend or supplement any schedule; provided that any such amendment or supplement will neither constitute an admission of nor cure any breach of a representation or warranty made by Seller or Buyer, as the case may be.

6.6     Further Assurances.

(a)     From time to time following the Closing Date until the earlier of (1) the second anniversary of the Closing Date and (2) the date of dissolution of Seller, Seller shall, and shall cause its Affiliates to, execute, acknowledge and deliver to Buyer such bills of sale,

-29-

A000070

endorsements, assignments and other good and sufficient instruments of assignment, transfer and conveyance, in form and substance reasonably satisfactory to Buyer, as shall be necessary to fully to assure Buyer and its respective successors or assigns, all the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement, and otherwise to make effective the transactions contemplated hereby and thereby.

(b)     Neither this Agreement nor the consummation of the transactions contemplated hereby shall be construed as an attempt or agreement to assign any Acquired Asset, including any Contract, Intellectual Property, License, Governmental Permit, third party software, certificate, approval, authorization or other right, which is non-assignable under the Bankruptcy Code or other Law without the consent of a Governmental Body or a Third Party, as the case may be, or is cancelable by a Third Party in the event of an assignment ("Non-assignable Assets") unless and until such consent shall have been obtained. Seller shall use reasonable commercial efforts to cooperate with Buyer at its request in endeavoring to obtain such consents promptly. Seller shall not, without the Buyer's consent, agree to amend or modify any Acquired Asset in order to obtain consent to assignment.

(c)     From time to time following the Closing Date until the earlier of (1) the second anniversary of the Closing Date and (2) the date of dissolution of Seller, Seller shall take or cause to be taken at Seller's expense reasonable commercial efforts in its name or otherwise as Buyer may reasonably request so as to provide Buyer with the benefits of the Non-assignable Assets.

6.7     No Solicitation. Seller shall work exclusively with Buyer and shall not solicit bids for the sale of the Business or the Acquired Assets until application is made to the Bankruptcy Court for the entry of the Sale Procedures Order, provided that that Seller and their agents and representatives shall have the right to respond to and pursue any unsolicited offers for an Alternative Transaction (as defined below). Upon the entry of the Sale Procedures Order, Seller and each of its advisers and representatives may consider, solicit, engage in negotiations regarding or accept an Alternative Transaction as permitted by the Sale Procedures Order, any other applicable orders of the Bankruptcy Court regarding sale of the Acquired Assets and as may otherwise be reasonable in the discharge of Seller's fiduciary duties.

6.8     Business Employees. As of the Closing Date, Buyer shall make offers of employment to all Business Employees. Business Employees who accept Buyer's offer of employment, as of the effective date of their employment with Buyer, are referred to as "Transferred Employees". Employment with Buyer of Transferred Employees shall be effective as of the day following the close of business on the Closing Date, except that the employment of Business Employees receiving short-term disability benefits or on approved leave of absence on the Closing Date will become effective as of the date they present themselves for work with Buyer if such date is within 30 days after the Closing Date or the duration of the approved leave of absence. Seller will provide Buyer with employee, spouse, and dependent information reasonably necessary for Buyer's design and implementation of any employee benefit plan it may offer to Transferred Employees, and as to its administration of any COBRA requirements as to any "M&A qualified beneficiaries" (as that term is defined under Treas. Regs. Section 54.4980B-9, Q&A 4(a)) that may apply to Buyer post-Closing.

-30-

A000071

6.9     Transition of Plan Loans.  With respect to the Benefit Plan known as the Rockford Products Corporation Savings and Retirement Plan (the "Seller 401(k) Plan"), Seller will, to the extent not already provided for under the Seller 401(k) Plan, amend the Seller 401(k) Plan's loan provisions (or, as the case may be, the Seller 401(k) Plan loan procedures) to provide for a "grace period" of at least 60 days for terminated employees to repay their outstanding loans and not have such loans defaulted and offset from their Seller 401(k) Plan account balances. As soon as possible after the Closing Date and after the Buyer establishes a tax-qualified defined contribution plan with a plan loan feature for the Transferred Employees (the "Buyer 401(k) Plan"), Buyer will permit the Transferred Employees with outstanding loans under the Seller 401(k) Plan to rollover their entire Seller 401(k) accounts, including outstanding loans, to the Buyer 401(k) Plan.

6.10    Contacts with Suppliers, Employees and Customers.  Notwithstanding any other provision hereof, prior to the Closing, Buyer may, with the consent of Seller (which consent shall not be unreasonably withheld), contact, on a confidential basis, any suppliers to, or customers of, the Business in connection with or pertaining to any subject matter of this Agreement. Notwithstanding any other provision hereof, prior to the Closing, Buyer may, upon prior notice to the Seller contact, on a confidential basis, any Business Employees in connection with or pertaining to any subject matter of this Agreement.

6.11    No Interference with Chapter 11 Case.  So long as the motion for the Sale Procedures Order shall be pending and Buyer has not terminated this Agreement, none of Seller or their respective Affiliates shall acquire from any Third Party, whether directly or indirectly, any claim against or other similar liability of Seller or the Business or any Acquired Assets nor cooperate with, induce or support any Person (other than Seller) in the acquisition of any claim against or other similar liability of any Seller, in the formation of a plan of reorganization in the Chapter 11 Case, in the objection to the Sale Order, or in seeking the appointment of a Chapter 11 trustee or examiner or the conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code.

6.12    Accounts Receivable.  At the Closing, to the extent that Seller has received proceeds of RIG Accounts Receivable on or after the Prior Agreement Date and prior to the Closing, Seller shall remit to Buyer any such proceeds (or, at the election of Buyer, any such proceeds shall be deducted from the Purchase Price and Seller shall be entitled to retain such proceeds).  From time to time after the Closing, to the extent Seller receives proceeds of Accounts Receivable (to the extent not constituting Excluded Assets), Seller shall remit promptly to Buyer any such proceeds no less frequently than on a weekly basis, by wire transfer of immediately available funds to such account or accounts as are specified in writing by Buyer. If, at any time after the Closing, Seller comes into the possession of Buyer's accounts receivable other than Accounts Receivable, Seller shall remit immediately such accounts receivable, in the form received, to Buyer.

6.13    Cure Costs.  Subject to the prior approval of the Bankruptcy Court, Buyer will, on or prior to the Closing, pay all Cure Costs (and receive a corresponding reduction to the Purchase Price) such that Seller may assume the Assigned Contracts in the Chapter 11 Case and assign to Buyer the Assigned Contracts in accordance with the provisions of the Bankruptcy Code and this Agreement.  Cure Costs paid by Buyer shall be for the account of Seller and shall be deducted

-31-

from the amount to be paid by Buyer under Section 3.2(b). If the Cure Costs are determined to be in excess of $100,000, then Buyer shall either (a) bear any Cure Costs in excess of $100,000 (and such amounts in excess of $100,000 will not be deducted from the amount to be paid by Buyer under Section 3.2(b)) or (b) have the right to terminate this Agreement pursuant to Section 8.1(b) hereof (without the application of any cure period therein). Schedule 6.13 sets forth the Cure Costs that the Seller reasonably believes due and payable pursuant to all Contracts.

### 6.14   Notice of Breach; Disclosure.

(a)   Seller shall promptly notify Buyer of (a) any event, condition or circumstance of which Seller becomes aware after the Prior Agreement Date and prior to the Closing Date that would constitute a violation or breach of this Agreement by Seller (or a breach of any representation or warranty made by Seller and contained in this Agreement) or, if the same were to continue to exist as of the Closing Date, would constitute the Seller's non-satisfaction of any of the conditions set forth in Article 8 or (b) any event, occurrence, transaction, or other item of which Seller becomes aware which Seller would have been required to disclose on any schedule attached hereto had such event, occurrence, transaction or item existed as of the Prior Agreement Date. It is acknowledged and understood that no notice given pursuant to this Section 6.14(a) shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of the conditions contained herein or liability for breach thereof.

(b)   Buyer shall promptly notify Seller of (i) any event, condition or circumstance of which Buyer becomes aware after the Prior Agreement Date and prior to the Closing Date that would constitute a violation or breach of this Agreement by Buyer (or a breach of any representation or warranty made by Buyer contained in this Agreement) or, if the same were to continue to exist as of the Closing Date, would constitute Buyer's non-satisfaction of any of the conditions set forth in Article 8 or (ii) any event, occurrence, transaction, or other item of which Buyer becomes aware which Buyer would have been required to disclose on any schedule attached hereto had such event, occurrence, transaction or item existed as of the Prior Agreement Date. It is acknowledged and understood that no notice given pursuant to this Section 6.14(b) shall have any effect on the representations, warranties, covenants or agreements contained in this Agreement for purposes of determining satisfaction of the conditions contained herein or liability for breach thereof.

### 6.15   Proration of Taxes and Certain Charges; Cooperation.

(a)   Except as otherwise expressly provided in this Agreement, all real property Taxes, personal property Taxes, or similar ad valorem Taxes levied with respect to the Acquired Assets that relate to a Tax period that includes the Closing Date shall be prorated between Seller and Buyer as of 12:01 A.M. on the Closing Date and Seller, on the one hand, and Buyer, on the other hand, shall each be responsible for their respective proportionate share of such Taxes (which proportionate shares shall be determined based on the number of days in such Tax period prior to the Closing Date, on the one hand, and the remaining number of days in such Tax period, on the other hand). Notwithstanding the preceding sentence, (i) if any such Taxes that are due and payable in the Tax period that includes the Closing Date have been determined but have not been paid by Seller before Closing, Seller shall be charged at Closing an amount

-32-

A000073

equal to that portion of such Taxes that relates to the portion of the Tax period before the Closing Date (which portion shall be determined in accordance with the proration method described in the preceding sentence) and Buyer shall timely pay the Taxes (with any refund prorated) and (ii) if any such Taxes that are due and payable in, or relate to, a Tax period that includes the Closing Date have not been determined before Closing, Seller and Buyer shall mutually agree in good faith to an estimate of the amount of such Taxes, Seller shall be charged at Closing an amount equal to that portion of such Taxes that relates to the portion of the Tax period before the Closing Date (which portion shall be determined in accordance with the proration method described in the preceding sentence) and Buyer shall timely pay the Taxes (with any refund prorated). All real property Taxes, personal property Taxes or similar ad valorem Taxes that are levied with respect to the Acquired Assets and that relate to Tax periods beginning on or after the Closing Date shall be the responsibility of Buyer.

(b)    Except as otherwise expressly provided in this Agreement, all installments of special assessments or other charges on or with respect to the Acquired Assets which are customarily prorated in connection with the sale of similar assets including, without limitation, base rent, common area maintenance, royalties, all municipal, utility or authority charges for water, sewer, electric or gas charges, garbage or waste removal, and cost of fuel, shall be apportioned as of the Closing Date and each party shall pay its proportionate share promptly upon the receipt of any bill, statement or other charge with respect thereto. If such charges or rates are assessed either based upon time or for a specified period, such charges or rates shall be prorated as of 12:01 A.M. on the Closing Date. If such charges or rates are assessed based upon usage of utility or similar services, such charges shall be prorated based upon meter readings taken on the Closing Date.

(c)    Except as otherwise expressly provided in this Agreement, all amounts due pursuant to the terms of the Assigned Contract, for any period in which the Closing Date shall occur shall be prorated as of 12:01 A.M. on the Closing Date.

(d)    All transfer, documentary, sales, use, value-added, gain, excise or other similar Taxes arising in connection with the transfer of the Business or the Acquired Assets, and all registration, recording, filing and similar fees (collectively, "Transfer Taxes"), that may be imposed by reason of the sale, transfer, assignment or delivery of the Acquired Assets shall be paid in equal parts by Seller and Buyer. The Transfer Taxes shall be calculated assuming that no exemption from payment thereof is available, unless otherwise indicated in the Bankruptcy Court's approval of the transactions contemplated by this Agreement or, at Closing, Seller or Buyer, as appropriate, provides an appropriate resale exemption certificate or other evidence acceptable to Buyer or Seller, as appropriate, of exemption from payment of such Transfer Taxes. Seller and Buyer shall cooperate to timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any Transfer Taxes. Each party hereto shall furnish or cause to be furnished to the other, upon the other's reasonable request, as promptly as practicable, such information and assistance relating to the Acquired Assets and the Business as may be reasonably necessary for the filing of any Tax Return, including any claim for exemption or exclusion from the application or imposition of any Taxes or making of any election related to Taxes, the

-33-

A000074

preparation for any audit or examination by any Governmental Body and the prosecution or defense of any claim, suit or proceeding relating to any Tax or Tax Return.

(e)     Each of Seller and Buyer agree to (i) furnish or cause to be furnished to the other party, as promptly as practicable, such information and assistance relating to the Business or Acquired Assets as is reasonably necessary for the preparation and filing of any Tax Return, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution or defense of any suit or other proceeding relating to Tax matters and for the answer of any governmental or regulatory inquiry relating to Tax matters, (ii) retain and provide to the other party all records (or copies thereof) and other information that may be reasonably relevant to any such Tax Return, audit, or examination, proceeding, or determination, and (iii) provide to the other party with any final determination of any such audit, or examination, proceeding, or determination that affects any amount required to be shown on any Tax Return of Buyer for any Tax period.  Without limiting the generality of the foregoing, Seller will retain, until the expiration of the applicable statute of limitation (including any extensions thereof) copies of all Tax Returns (other than income, franchise or similar Tax Returns), and any supporting work schedules and other records, relating to the Acquired Assets for any Pre-Closing Tax Period.

6.16    Name.  Seller understands that, subsequent to the Closing, Buyer shall own the names "Rockford Products Corporation" and "Rockford Products" and that such names are included in the Acquired Assets hereunder.  From and after the Closing, Seller shall not use the names "Rockford Products Corporation", "Rockford Products" or any other name, variation, combination or derivative likely to cause confusion therewith.

## ARTICLE 7

## CONDITIONS TO OBLIGATIONS OF THE PARTIES

7.1     General Conditions.  The respective obligations of Buyer and Seller to effect the Closing of the transactions contemplated hereby are subject to the fulfillment, at or prior to the Closing Date, of each of the following conditions:

(a)     No Injunction.  No preliminary or permanent injunction or other order nor any Law shall be in effect which declares this Agreement invalid or unenforceable in any respect or which materially delays, restrains, enjoins or otherwise prohibits or seeks to restrain, enjoin or otherwise prohibit the transactions contemplated hereby.

(b)     Sale Procedures Order.  The Bankruptcy Court shall have entered the Sale Procedures Order and the Sale Order on terms acceptable to Buyer, Seller and Agents as determined by each of them, respectively, in the exercise of their reasonable discretion (provided, that, in all events, the Sale Order shall provide that all proceeds of the Acquired Assets will be paid to the Agents and applied on a final basis to their claims against Seller, and for a release of Agents for liability on any postpetition claims of any creditors of Seller or its estate), and neither of such orders have been reversed, stayed, modified or amended.

-34-

A000075

(c)     Governmental Consents.  The consents from Governmental Bodies set forth on Schedule 7.1(c) (if any) shall have been obtained.

7.2     Conditions Precedent to Obligations of Buyer.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Buyer in Buyer's sole discretion) at or prior to the Closing Date of each of the following conditions:

(a)     Accuracy of Representations and Warranties.  Each of the representations and warranties of Seller contained herein shall be true and correct in all respects (with respect to representations and warranties qualified or limited by materiality or Material Adverse Effect) or in all material respects (with respect to representations and warranties not so qualified or limited), in each case on the Prior Agreement Date, the Agreement Date and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date.

(b)     Performance of Obligations.  Seller shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it on or prior to the Closing Date.

(c)     Officer's Certificates.  Buyer shall have received certificates, dated the Closing Date, of an executive officer of Seller to the effect that the conditions specified in Sections 7.2(a) and (b) above have been fulfilled.

(d)     Contracts.  All of the Contracts and Licenses necessary in Buyer's sole discretion to operate the Business as currently conducted (other than Contracts, Licenses and arrangements with the customers of the Business) shall be (i) in full force and effect and assignable to and assumable by Buyer without the consent of the other party thereto unless consent thereto shall have been obtained, or, alternatively, (ii) Buyer shall have entered into arrangements with the parties to such Contracts on terms and conditions acceptable to Buyer in its sole discretion.

(e)     Title Policy.  A title insurance company acceptable to Buyer in its sole discretion shall have issued, at Buyer's cost and expense, an ALTA Lessee's Policy of Title Insurance for any Leased Real Property that is leased by Seller, with an endorsement providing "extended coverage" over the standard exceptions contained in such form of Policies of Title Insurance, insuring the interest to be acquired by Buyer in each such property, and in each case in an amount reasonably acceptable to Buyer.

(f)     No Material Adverse Effect shall have occurred since the Prior Agreement Date.

(g)     Seller shall have obtained all Required Consents and such other consents set forth on Schedule 7.2(g).

(h)     Buyer shall be satisfied in its discretion with (a) the results of an environmental compliance audit that it will conduct in respect of the Business and/or the Leased

-35-

A000076

Real Property and (b) the results of its Phase I and Phase II Environmental Site Assessments that it will conduct in respect of the Leased Real Property.

(i)     Seller shall not have caused any of its customers to shut down at any time prior to Closing.

7.3     Conditions Precedent to the Obligations of Seller. The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction (or waiver by Seller) at or prior to the Closing Date of each of the following conditions:

(a)     Accuracy of Representations and Warranties. The representations and warranties of Buyer contained herein shall be true and correct in all respects (with respect to representations and warranties qualified or limited by materiality) or in all material respects (with respect to representations and warranties not so qualified or limited), in each case on the Prior Agreement Date, the Agreement Date and as of the Closing Date, with the same force and effect as though such representations and warranties had been made on and as of the Closing Date.

(b)     Performance of Obligations. Buyer shall have performed in all material respects all obligations and agreements contained in this Agreement required to be performed by it prior to or on the Closing Date.

(c)     Officer's Certificate. Seller shall have received a certificate, dated the Closing Date, of an officer of Buyer to the effect that the conditions specified in Sections 7.3(a) and (b) above have been fulfilled.

## ARTICLE 8

## TERMINATION

8.1     Termination of Agreement. This Agreement may be terminated and the transactions contemplated hereby abandoned at any time prior to the Closing:

(a)     by written agreement of Seller and Buyer;

(b)     Buyer may terminate this Agreement by giving written notice to Seller in the event (i) Seller is in material breach of any representation, warranty or covenant in this Agreement and (ii) such breach has not been cured within three (3) Business Days following the delivery of written notice thereof to Seller; provided that Buyer is not then in breach of this Agreement.

(c)     Seller may terminate this Agreement by giving written notice to Buyer in the event (i) Buyer is in material breach of any representation, warranty or covenant contained in this Agreement and (ii) such breach has not been cured within three (3) Business Days following the delivery of written notice thereof to Buyer; provided that Seller is not then in breach of this Agreement.

-36-

A000077

(d)     Buyer or Seller may terminate this Agreement if the Bankruptcy Court denies the motion for entry of the Sale Procedures Order or fails to enter the Sale Procedures Order (in the form of Exhibit A attached hereto).

(e)     Seller may terminate this Agreement if (i) any of the conditions set forth in Section 7.1 shall have become incapable of fulfillment, or (ii) any of the conditions set forth in Section 7.3 shall have become incapable of fulfillment or cure by Buyer and shall not have been waived by Seller, provided that Seller is not then in breach of this Agreement.

(f)     Buyer may terminate this Agreement if (i) any of the conditions set forth in Section 7.1 shall have become incapable of fulfillment or (ii) any of the conditions set forth in Sections 7.2 shall have become incapable of fulfillment or cure by Seller and shall not have been waived in writing by Buyer; provided that Buyer is not then in breach of this Agreement.

(g)     Buyer or Seller may terminate this Agreement if Seller is concurrently entering into an agreement with respect to an Alternative Transaction or files a plan of reorganization which shall be funded by an Alternative Transaction. For purposes hereof, an "Alternative Transaction" shall mean any transaction relating to the Business that involves (i) any asset sale, stock sale, merger, debt for equity swap, joint venture, financing, reorganization, recapitalization, funding of a plan of reorganization in the Bankruptcy Case, (ii) transfer of any convertible debt, convertible equity or warrants the effect of which, individually or in the aggregate, is the direct or indirect transfer of any material part of the Acquired Assets, (iii) any similar transaction that does not involve a sale of all of the Acquired Assets to Buyer or (iv) a credit bid under Section 363(k) of the Bankruptcy Code involving all or a portion of the Acquired Assets.

(h)     Buyer or Seller may terminate this Agreement if a motion to dismiss the Chapter 11 Case or a motion to convert the Chapter 11 Case to a Case under Chapter 7 of the Bankruptcy Code or the appointment of a trustee, receiver, liquidator or other similar person for the purpose of liquidating any of the Acquired Assets other than pursuant to this Agreement has been granted in the Chapter 11 Case.

(i)     Buyer or Seller may terminate this Agreement if Seller files any plan of reorganization or liquidation that does not permit for the separate sale of the Business and Acquired Assets as a going concern.

(j)     Either Buyer or Seller may terminate this Agreement if the Closing shall not have occurred by November 16, 2007.

(k)     Buyer or Seller may terminate this Agreement if the conditions contained in Section 7.1(b) are not satisfied on or before November 5, 2007.

(l)     Buyer may terminate this Agreement if the condition contained in Section 7.2(d) is not satisfied on or before November 14, 2007.

-37-

A000078

8.2    Consequences of Termination

If either Party terminates this Agreement pursuant to this Article 8, this Agreement shall become void and have no effect, and all obligations of the Parties hereunder shall terminate without any liability on the part of any Party or its directors, officers or stockholders except for the obligations of the Parties hereto in Sections 8.3, 10.1, 10.2, 10.9, 10.10, 10.11, and this Section 8.2. Nothing in this Section 8.2 shall be deemed to release either party from any liability for any willful and material breach of this Agreement. If this Agreement is terminated as provided herein, all filings, applications and other submissions made pursuant to this Agreement, to the extent practicable, shall be withdrawn from the agency or other Person to which they were made.

8.3    Break-Up Fee.

In the event that this Agreement is terminated pursuant to Section 8.1(g) or (i), Seller shall pay to Buyer the Break-Up Fee (as defined in the Sale Procedures Order) within two (2) Business Days of the applicable termination subject to and pursuant to the terms of the Sale Procedures Order. Any Break-Up Fee payable to Buyer pursuant to this Section 8.3 shall be paid as an administrative expense claim of Seller under Section 503(b)(1) of the Bankruptcy Code.

8.4    Extension; Waiver.

At any time prior to the Closing, Seller, on the one hand, or Buyer, on the other hand, may (a) extend the time for the performance of any of the obligations or acts of the other party, (b) waive any inaccuracies in the representations and warranties of the other party contained herein or in any document delivered pursuant hereto, (c) waive compliance with any of the agreements of the other party contained herein or (d) waive any condition to its obligations hereunder. Any agreement on the part of Seller, on the one hand, or Buyer, on the other hand, to any such extension or waiver shall be valid only if set forth in writing.

## ARTICLE 9

## INDEMNIFICATION

9.1    Indemnification of Buyer.  Seller agrees to indemnify and hold harmless Buyer, its officers, directors, employees, agents and Affiliates (the "Buyer Indemnitees") from and against, and pay or reimburse the Buyer Indemnitees for, any and all Liabilities, losses, claims, damages, punitive damages, causes of action, lawsuits, administrative proceedings (including informal proceedings), investigations, audits, demands, assessments, adjustments, judgments, settlement payments, deficiencies, penalties, fines, interest (including interest from the date of such damages) and costs and expenses (including without limitation reasonable attorneys' fees and disbursements of every kind, nature and description) (collectively, "Losses") resulting from or arising out of:

(a)    the inaccuracy of any representation or warranty made by Seller herein or in any certificate delivered pursuant to this Agreement;

-38-

A000079

(b) any failure of Seller to perform any covenant or agreement hereunder or to fulfill any other obligation in respect hereof; and

(c) any Excluded Liability.

9.2 Indemnification of Seller. Buyer hereby agrees to indemnify and hold harmless Seller, its officers, directors, employees, agents and Affiliates (the "Seller Indemnitees") from and against, and pay or reimburse the Seller Indemnitees for, any and all Losses resulting from or arising out of:

(a) the inaccuracy of any representation or warranty made by Buyer herein or in any certificate delivered pursuant to this Agreement;

(b) any failure of Buyer to perform any covenant or agreement made or contained in this Agreement or to fulfill any other obligation in respect hereof; and

(c) any Assumed Liability.

9.3 Survival of Representations and Warranties. The representations and warranties made in this Agreement shall survive until the date that is six months after the Closing Date and shall not be extinguished by the Closing or any investigation made by or on behalf of any party hereto.

9.4 Limitations on Indemnification. Seller shall not be liable for Losses under Sections 3.3(c) and 9.1(a) in excess of the Escrow Amount. Buyer shall not be liable for Losses under Section 9.2(a) above in excess of $1,000,000.

## ARTICLE 10

## MISCELLANEOUS

10.1 Expenses. Except as set forth in this Agreement, the Sale Procedures Order or the Sale Order (including the Breakup Fee set forth in Section 8.3 hereof), and whether or not the transactions contemplated hereby are consummated, each party hereto shall bear all costs and expenses incurred or to be incurred by such party in connection with this Agreement and the consummation of the transactions contemplated hereby.

10.2 Assignment. Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Seller without the prior written consent of Buyer; provided that Seller may assign any of its rights and obligations under this Agreement to any of its lenders without Buyer's consent. Neither this Agreement nor any of the rights or obligations hereunder may be assigned by Buyer without the prior written consent of Seller; provided that Buyer may assign any of its rights and obligations under this Agreement to any of its Affiliates or to any of its lenders without Seller's consent. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

-39-

A000080

10.3   Parties in Interest. This Agreement shall be binding upon and inure solely to the benefit of Seller and Buyer, and nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any rights, benefits or remedies of any nature whatsoever under or by reason of this Agreement except as expressly set forth herein.

10.4   Notices.   All notices, demands, requests, consents, approvals or other communications (collectively, "Notices") required or permitted to be given hereunder or that are given with respect to this Agreement shall be in writing and shall be personally served, delivered by a nationally recognized overnight delivery service with charges prepaid, or transmitted by hand delivery, or facsimile, addressed as set forth below, or to such other address as such party shall have specified most recently by written Notice. Notice shall be deemed given on the date of service or transmission if personally served or transmitted by facsimile with confirmation of receipt; provided, that if delivered or transmitted on a day other than a Business Day or after normal business hours, notice shall be deemed given on the next Business Day.   Notice otherwise sent as provided herein shall be deemed given on the next Business Day following timely deposit of such Notice with an overnight delivery service:

If to Seller:          Rockford Products Corporation
                       707 Harrison Avenue
                       Rockford, Illinois 61104
                       Attention: Douglas D. Wells
                       Fax: 815.229.4339

If to Buyer:           Rockford Acquisition, LLC
                       c/o BlackEagle Partners, LLC
                       6905 Telegraph Road, Suite 205
                       Bloomfield Hills, MI 48301
                       Attention: Garrett P. Kanehann
                               J.W. Henry Watson
                       Fax: 313.922.2934

Rejection of or refusal to accept any Notice, or the inability to deliver any Notice because of changed address of which no Notice was given, shall be deemed to be receipt of the Notice as of the date of such rejection, refusal or inability to deliver.

10.5   Choice of Law. This Agreement shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with the substantive laws of the State of Michigan, without giving effect to any provision thereof that would require the application of the substantive laws of any other jurisdiction, except to the extent that such laws are superseded by the Bankruptcy Code.

10.6   Entire Agreement; Amendments and Waivers.   This Agreement and all agreements entered into pursuant hereto and all certificates and instruments delivered pursuant hereto and thereto constitute the entire agreement between the parties hereto pertaining to the subject matter hereof and supersede all prior agreements, understandings, negotiations, and discussions, whether oral or written, of the parties.   This Agreement may be amended,

-40-

A000081

supplemented or modified, and any of the terms, covenants, representations, warranties or conditions may be waived, only by a written instrument executed by the Buyer and Seller, or in the case of a waiver, by the party waiving compliance. No waiver of any of the provisions of this Agreement shall be deemed or shall constitute a waiver of any other provision hereof (whether or not similar), and no such waiver shall constitute a continuing waiver unless otherwise expressly provided.

10.7 Counterparts. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument. Counterparts to this Agreement may be delivered via facsimile.

10.8 Invalidity. If any one or more of the provisions contained in this Agreement or in any other instrument referred to herein, shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, the parties shall use their reasonable efforts, including the amendment of this Agreement, to ensure that this Agreement shall reflect as closely as practicable the intent of the parties hereto on the date hereof.

10.9 Exclusive Jurisdiction. Without limiting any party's right to appeal any order of the Bankruptcy Court and except as otherwise provided herein, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all claims, actions, causes of action, suits and proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive Notices at such locations as indicated in Section 10.4.

10.10 Enforcement; Remedies. The parties hereto agree that irreparable damage would occur in the event that any provision of this Agreement were not performed in accordance with its specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the terms and provisions hereof, this being in addition to all other remedies available at law or in equity. All rights and remedies of each party under this Agreement shall be cumulative and in addition to all other rights and remedies which may be available to that party from time to time, whether under any other agreement, at law, or in equity.

10.11 **WAIVER OF RIGHT TO TRIAL BY JURY. SELLER AND BUYER HEREBY WAIVE TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).**

[Remainder of Page Intentionally Left Blank]

-41-

A000082

IN WITNESS WHEREOF, this First Amended and Restated Asset Purchase Agreement
has been duly executed and delivered by the duly authorized officers of Seller and Buyer as of
the date first above written.

Seller:

ROCKFORD PRODUCTS CORPORATION

By:_____
Name:_____
Title:_____

Buyer:

ROCKFORD ACQUISITION, LLC

By:_____
Name: _____
Title: _____

-42-

A000083

IN WITNESS WHEREOF, this First Amended and Restated Asset Purchase Agreement has been duly executed and delivered by the duly authorized officers of Seller and Buyer as of the date first above written.

Seller:

ROCKFORD PRODUCTS CORPORATION

By: _____
Name: _____R. TERY WOOD_____
Title: ___Chairman & President___

Buyer:

ROCKFORD ACQUISITION, LLC

By: _____
Name: _____
Title: _____

A000084

LIST OF SCHEDULES

| | |
|---|---|
| Schedule 2.1(a) | Owned Equipment |
| Schedule 2.1(b) | Inventory |
| Schedule 2.1(d) | Assigned Contracts |
| Schedule 2.1(e) | Licenses |
| Schedule 2.1(f) | Governmental Permits |
| Schedule 2.1(h) | Prepaid Items |
| Schedule 2.1(m) | Customer Owned Tooling |
| Schedule 4.4 | Third Party Approvals |
| Schedule 4.5 | Title to Assets; Liens |
| Schedule 4.7 | Leased Real Property |
| Schedule 4.10 | Environmental Matters |
| Schedule 4.11 | Unaudited Financials |
| Schedule 4.12 | Benefit Plans |
| Schedule 4.13 | Litigation |
| Schedule 4.14 | Taxes |
| Schedule 4.15 | Accounts Receivable |
| Schedule 4.16 | Labor Matters |
| Schedule 4.17 | Customers and Suppliers |
| Schedule 4.18 | Inventory |
| Schedule 4.19 | Contracts |
| Schedule 4.20 | Tooling |
| Schedule 4.21 | Intellectual Property |
| Schedule 6.13 | Anticipated Cure Costs |
| Schedule 7.1(c) | Governmental Consents |

A000085

Schedule 7.2(g)      Required Consents

A000086

EXHIBIT A

FORM OF SALE PROCEDURES ORDER

A000087

**UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| ROCKFORD PRODUCTS CORPORATION, *et al.*, | ) Case No. 07 B 71768 |
| | ) Jointly Administered |
| | ) |
| _____ Debtors | ) Hon. Manuel Barbosa |

**FIRST AMENDED ORDER PURSUANT TO BANKRUPTCY CODE**
**SECTIONS 105 AND 363 AND BANKRUPTCY RULES 2002 AND 6004 (A)**
**APPROVING SALE PROCEDURES, (B) APPROVING THE FORM**
**AND MANNER OF SHORTENED NOTICE, (C) SCHEDULING**
**A SALE HEARING, AND (D) GRANTING RELATED RELIEF**

Upon the motion (the "Emergency Motion") [Docket No. 216], dated November 2, 2007 of Rockford Products Corporation ("Rockford Products" or the "Seller"), and Rockford Products Global Services, Inc. ("Rockford Global"), chapter 11 debtors and debtors-in-possession (each a "Debtor" and collectively, the "Debtors"), by and through their attorneys, Dewey & LeBoeuf LLP to amend the Order (the "Sale Procedures Order")[1], [Docket No. 211], dated October 31, 2007, (A) Approving Sale Procedures in Connection with the Sale of Certain of the Debtors' Assets (the "Assets"), (B) Approving the Form and Manner Of Shortened Notice, (C) Scheduling a Sale Hearing, and (D) Granting Related Relief; and the Court having reviewed the Emergency Motion and conducted a hearing to consider the relief requested therein; and the Court having considered the statements of counsel and arguments presented at the hearing to approve the First Amended Sale Procedures Order;

**THE COURT HEREBY FINDS THAT:**

---

[1]     Unless otherwise stated, all capitalized terms not defined herein shall have the same meaning as set forth in the Sale Procedures Order.

A000088

A.    This Court has jurisdiction over the Emergency Motion pursuant to 28 U.S.C. § 1334. This proceeding is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this proceeding and this Emergency Motion is proper in this District and in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.    The statutory predicates for the relief requested in the Emergency Motion are (1) sections 105(a) and 363of the title 11 of the United States Code (the "Bankruptcy Code"); and (2) Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

C.    Notice of the Emergency Motion, having been given to (1) all parties on the Master Service List, (2) all persons or entities known or reasonably believed to have asserted a Lien on any of the Assets, (3) all counterparties to any executory contracts or unexpired leases that the Debtors seek to assume and assign as part of the Sale, and (4) all persons or entities known or reasonably believed to have expressed an interest in acquiring the Assets, is sufficient in light of the circumstances and the nature of the relief requested in the Emergency Motion.

D.    The Debtors have articulated good and sufficient reasons for, and the best interests of their estates will be served by, this Court granting certain of the relief requested in the Emergency Motion.

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.    The Emergency Motion is GRANTED to the extent provided herein.

2.    Any and all objections to the Emergency Motion are hereby overruled.

3.    Objections to the Sale Order, if any, shall also be served upon counsel for Rockford Acquisition, LLC, Honigman Miller Schwartz and Cohn LLP, 2290 First National Building, 660 Woodward Avenue, Detroit, Michigan 48226-3506, Attn: Tricia A. Sherick, in

2

A000089

addition to the other parties required to receive service thereof pursuant to the Sale Procedures Order.

4.    In addition to the Sale Procedures, Debtors are authorized (a) to execute the asset purchase agreement (the "Stalking Horse APA") with Rockford Acquisition, LLC (the "Stalking Horse") regarding the Sale of the Assets to constitute a "stalking horse" at the Auction, a draft of which Stalking Horse APA is attached to the Emergency Motion at Exhibit E, and (b) without further order of the Court, to provide the Stalking Horse with (i) a break-up fee not to exceed 3% of the net cash purchase price of the Stalking Horse APA, payable to the Stalking Horse pursuant to and in accordance with the terms of the Stalking Horse APA (the "Break-Up Fee"), which Break-Up Fee the Debtors estimate to be in a range between $475,000 and $525,000, and (ii) bid protection providing that the initial competing bid (after taking into account all applicable deductions and adjustments provided by such competing bid) at the Auction must equal at least the net cash purchase price of the Stalking Horse APA, plus the Break-Up Fee, plus $100,000. Such Break-Up Fee shall be paid to the Stalking Horse within two (2) Business Days following the Debtors closing an Alternative Transaction (as defined in the Stalking Horse APA). Notwithstanding anything in this Order or the Sale Procedures to the contrary, if the Stalking Horse is not the Highest Bidder (as defined in the Sale Procedures) at the Auction, the Stalking Horse will not constitute a Back-Up Bidder (as defined in the Sale Procedures) for any purposes under the Sale Procedures.

5.    The Sale Procedures attached to the Sale Procedures Order shall be deemed amended and replaced in their entirety by the procedures attached to this Order as **Schedule 1**, which are incorporated herein.

3

6.  Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 7062, 9014 or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

7.  Except as expressly amended hereby, the terms of the Sale Procedures Order entered on October 31, 2007 shall govern.

DATE: November 6, 2007

UNITED STATES BANKRUPTCY JUDGE

4

A000091

**SCHEDULE 1**

**SALE PROCEDURES**

A000092

**UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| IN RE: | ) Chapter 11 |
| | ) |
| ROCKFORD PRODUCTS CORPORATION, *et al.*, | ) Case No. 07 B 71768 |
| | ) Jointly Administered |
| | ) |
| Debtors | ) Hon. Manuel Barbosa |

### SALE PROCEDURES

By motion (the "Sale Motion"), dated October 29, 2007, Rockford Products Corporation ("Rockford Products" or the "Debtors"), and Rockford Products Global Services, Inc. ("Rockford Global"), chapter 11 debtors and debtors-in-possession (each a "Debtor" and collectively, the "Debtors"), sought, among other things, approval of the process and procedures for the sale (the "Sale") of substantially all of their assets (the "Assets"). On October 31, 2007, the United States Bankruptcy Court for the Northern District of Illinois (the "Bankruptcy Court") entered an order (as amended from time to time, the "Sale Procedures Order"), which among other things, authorizes and directs the Debtors to market the Assets through the Sale Procedures (the "Sale Procedures") described below. By motion (the "Emergency Motion") dated November 2, 2007, the Debtors sought, among other things, amendment to the Sale Procedures and the Sale Procedures Order pursuant to an asset purchase agreement (the "Stalking Horse APA") between the Debtor and Rockford Acquisition, LLC (the "Stalking Horse"). As part of the Sale Procedures, the Bankruptcy Court has scheduled a hearing (the "Sale Hearing") on **November 15, 2007 at 1:00 p.m.** to approve the Sale of the Assets.

### I.    Important Dates

The Debtors shall, in consultation with the Official Committee of Unsecured Creditors (the "Creditors' Committee") and the Debtors' pre and postpetition lenders (the "Agents"):

(a)    Assist each interested party or entity (a "Potential Bidder") in conducting their respective due diligence investigations and accept Bids (as defined herein) no later than **Monday, November 12, 2007 at 9:00 a.m. (Central Time).**

(b)    To the extent of multiple bids, negotiate with Qualified Bidders (as defined below) in preparation for an auction (the "Auction") to be held on **Monday, November 12, 2007 starting at 12:00 p.m. (Central Time).**

(c)    Select the Highest Bidder (as defined herein) at the conclusion of the Auction and seek authority to sell Assets to such Highest Bidder(s) at the Sale Hearing to be held by the Bankruptcy Court on **Thursday, November 15, 2007 at 1:00 p.m. (Central Time).**

**II.**    **Qualified Bidder.** Unless otherwise ordered by the Bankruptcy Court or as otherwise determined by Debtors, in consultation with the Agents and Creditors' Committee, in order to participate in the bidding process, each Potential Bidder, other than the Stalking Horse and the Agents[2], must deliver (unless previously delivered) to Debtors a copy of an executed confidentiality agreement in form and substance satisfactory to Debtors.

A Potential Bidder that delivers an executed confidentiality agreement described above is a "Qualified Bidder." Notwithstanding the foregoing, the Stalking Horse and the Agents constitute Qualified Bidders for purposes of the bidding process.

**III.**    **Due Diligence.** Until the Auction (as defined below), Debtors will afford each Qualified Bidder due diligence access to the Assets. Due diligence access may include access to data rooms, on site inspections and such other matters which a Qualified Bidder may request and as to which Debtors, in their sole discretion, may agree. Debtors will designate an employee or other representative to coordinate all reasonable requests for additional information and due diligence access from Qualified Bidders. Debtors may, in their discretion, coordinate diligence efforts such that multiple Qualified Bidders have simultaneous access to due diligence materials and/or simultaneous attendance at site inspections. Neither Debtors nor any of their representatives are obligated to furnish any information relating to Assets to any person other than Qualified Bidders who make an acceptable preliminary proposal.

**IV.**    **Bid Deadline.** A Qualified Bidder, other than Agents, that desires to make a bid shall deliver written copies of its bid to (a) Dewey & LeBoeuf LLP, Two Prudential Plaza, 180 North Stetson Avenue, Suite 3700, Chicago, IL  60601, Attn.: Mohsin N. Khambati, Tel: (312) 794-8052, Fax (312) 792-6552, Email: mkhambati@dl.com, (b) counsel for the Official Committee of Unsecured Creditors at Greenberg Traurig, LLP, 77 W. Wacker Drive, Suite 2500, Chicago, IL 60601, Attn: Nancy A. Peterman, and (c) counsel for the Agents at Goldberg, Kohn, Bell, Block, Rosenbloom & Moritz, Ltd., 55 E. Monroe Street, Suite 3300, Chicago, Illinois 60603, Attn: Andrew R. Cardonick, so as to be received no later than **9:00 a.m. (Central Time), on Monday, November 12, 2007** (the "Bid Deadline").

**V.**    **Determination of "Qualified Bid" Status.** In order to participate in the bidding process each Qualified Bidder (other than the Agents) must deliver to Debtors, a written offer (a "Qualified Bid"), so as to be received by no later than **9:00 a.m. (Central Time), on Monday, November 12, 2007,** that complies with each of the following:

> (a)    states such Qualified Bidder (1) offers to purchase all or a portion of the Assets, as identified in the Stalking Horse APA, upon the terms and conditions substantially as set forth in the Stalking Horse APA or, alternatively, (2) is prepared to enter into a legally binding purchase and sale agreement or similar agreement for the acquisition of the Assets on terms and conditions no less favorable to the Debtors than the terms and conditions contained in the Stalking Horse APA (the "Modified Agreement") (as determined by the Debtors in their reasonable business judgment in consultation with the Agents and the Committee) and such

---

[2]    Capitalized terms not defined herein shall have the meaning set forth in the Sale Motion.

2

A000094

Qualified Bidder's terms relating to the assumption of any executory contracts or unexpired leases relating to the Assets;

(b) is accompanied by a clean and duly executed Modified Agreement and to the extent applicable, a marked Modified Agreement reflecting any variations from the Stalking Horse APA;

(c) states that the purchase price for the Assets shall be paid in full in cash upon closing;

(d) states that, unless otherwise agreed to by the Agents, the purchase price for the Assets (net of all adjustments and deductions thereto) shall be sufficient to pay all "Aggregate Debt" (as defined in the Final Cash Collateral/Financing Order) of the Agents, in full, in cash, at closing of the Sale, after also taking into account any senior claims or liens, or amounts the Agents have otherwise agreed to pay pursuant to or in connection with the Final Cash Collateral/Financing Order;

(e) states that, unless otherwise agreed to by Agents, the closing of the Sale shall occur on or before November 16, 2007;

(f) states such Qualified Bidder is financially capable of consummating the transactions contemplated by the Modified Agreement;

(g) contains such financial and other information that will allow Debtors, in consultation with the Agents and the Committee, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transactions contemplated by the Modified Agreement;

(h) states that such Qualified Bidder's offer is irrevocable until the closing of the purchase of the Assets if such Qualified Bidder is the Highest Bidder or the Back-Up Bidder, as discussed below;

(i) fully discloses the identity of each entity that will be bidding for the Assets or otherwise participating in connection with such Qualified Bid, and the complete terms of any such participation;

(j) fully discloses the terms of the proposed employment of any of Debtors' employees, management, or officers in connection with such bid;

(k) (1) does not contain any due diligence or financing contingencies of any kind; and (2) contains evidence that such Qualified Bidder has readily available financial resources sufficient in the aggregate to finance the purchase of the Assets, which evidence is reasonably satisfactory to Debtors in consultation with the Agents and the Committee;

(l) includes evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body) with respect

3

A000095

to the submission, execution, delivery and closing of the Modified Agreement; and

(m)     results, if closed, in a cash payment to the Debtors, in the Debtors' reasonable judgment after consultation with its financial and legal advisors, the Agents and the Committee, that is at least equal to the aggregate of the value of the sum of: (A) the net cash purchase price, plus (B) the amount of the Break-Up Fee (as defined in the Stalking Horse APA); plus (C) $100,000 (the "Initial Minimum Overbid"). Upon request, the Debtors will provide to any Potential Bidder the Debtors' estimation of the net cash purchase price under the Stalking Horse APA.

(n)     is accompanied by a cash deposit in the amount of $250,000 (the "Good Faith Deposit").

A competing bid meeting the above requirements constitutes a "Qualified Bid." Notwithstanding the foregoing, the Stalking Horse and the Agents are Qualified Bidders, and the Stalking Horse APA and any credit bid by the Agents are Qualified Bids, for all purposes in connection with the bidding process, the Auction, and the Sale. If Debtors do not receive any Qualified Bids other than the Stalking Horse APA and/or a credit bid received from the Agents, Debtors will report the same to the Bankruptcy Court and will proceed with the Sale, subject to the rights of any parties in interest, including, without limitation the Creditors' Committee, to object to such proposed sale.

**VI.     Bid Protection.**   Recognizing the Stalking Horse's expenditure of time, energy and resources, the Debtors have agreed to provide certain bidding protections to Stalking Horse. Specifically, the Debtors have determined that the Stalking Horse APA will further the goals of the Sale Procedures by setting a floor that all other Potential Bids must exceed. As a result, the Debtors have agreed that if the Stalking Horse is not the Highest Bidder, the Debtors must, in certain circumstances enumerated in the Stalking Horse APA and described in Section XII below, pay to the Stalking Horse the Break-Up Fee. The payment of the Break-Up Fee shall be governed by the provisions of the Stalking Horse APA and the Sale Procedures Order.

**VII.     Auction, Bidding Increments and Bids Remaining Open.**   The Debtors will conduct an auction (the "Auction") of the Assets upon notice to all Qualified Bidders who have submitted Qualified Bids, with such Auction starting at **12:00 p.m. (Central Time) on Monday, November 12, 2007**, at the offices of Dewey & LeBoeuf LLP, Two Prudential Plaza, 180 North Stetson Avenue, Suite 3700, Chicago, IL 60601, or such later time or other place as Debtors shall notify all Qualified Bidders who have submitted Qualified Bids, in accordance with the following procedures:

(a)     Only the Debtors, the Stalking Horse, any representative of the Creditors' Committee, the Agents (and the legal and financial advisers to each of the foregoing), and any Qualified Bidder who has timely submitted a Qualified Bid may attend the Auction, and only the Stalking Horse, the Agents and the other Qualified Bidders may make any subsequent Qualified Bids (a "Subsequent Bid") at the Auction.

4

A000096

(b)     All Qualified Bidders who have submitted a Qualified Bid shall be entitled to be present for all Subsequent Bids with the understanding that the true identity of each bidder shall be fully disclosed to all other bidders and that all material terms of each Subsequent Bid will be fully disclosed to all other bidders throughout the entire Auction.

(c)     Debtors may employ and announce at the Auction additional procedural rules, after consultation with the Agents and the Creditors' Committee and subject to their respective rights to object to such additional procedural rules, that are reasonable under the circumstances (e.g., the amount of time allotted to make Subsequent Bids) for conducting the Auction, provided that such rules are not inconsistent with these Sale Procedures, the Bankruptcy Code or any order of the Bankruptcy Court entered in connection herewith.

(d)     Bidding at the Auction shall begin with the highest or otherwise best Qualified Bid and continue in minimum increments of at least $50,000 higher than the previous bid or bids. The Auction shall continue in one or more rounds of bidding and shall conclude after each participating bidder has had the opportunity to submit an additional Subsequent Bid with full knowledge and written confirmation of the then-existing highest bid or bids.   For the purpose of evaluating the value of the consideration provided by Subsequent Bids (including any Subsequent Bid by the Stalking Horse), the Debtors must give effect to any Break-Up Fee that may be payable to the Stalking Horse under the Stalking Horse APA.

(e)     At the conclusion of the Auction, or as soon thereafter as practicable, Debtors, in consultation with their financial advisors, the Agents and the Creditors' Committee, shall: (1) review each Qualified Bid on the basis of financial and contractual terms and the factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale; and (2) identify the highest or otherwise best offer(s) for the Assets received at the Auction (the "Highest Bid(s)" the bidder(s) making such bid, the "Highest Bidder(s)").

**VIII.   Acceptance of Highest Bid.**   If at the conclusion of the Auction, the Debtors deem the Stalking Horse to be the Highest Bidder, the Debtors and the Stalking Horse shall proceed with the Sale under the Stalking Horse APA.  If, after an Auction in which the Stalking Horse: (1) bids an amount in excess of the consideration presently provided for in the Stalking Horse APA with respect to the transactions contemplated under the Stalking Horse; and (2) is the Highest Bidder, it shall, at the Closing under the Stalking Horse APA, pay, in full satisfaction of the Highest Bid, an amount equal to: (a) the amount of the Highest Bid; less (b) the Break-Up Fee.

If the Stalking Horse is not the Highest Bidder, the Debtors and the Highest Bidder shall enter into an asset purchase agreement (the "Successful APA") no later than **Tuesday, November 13, 2007**. Debtors shall sell the Assets pursuant to the Stalking Horse APA or the Successful APA upon the approval of such Stalking Horse APA or Successful APA by the Bankruptcy Court after

5

A000097

the hearing (the "Sale Hearing"). Debtors' presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute Debtors' acceptance of the bid. Debtors will be deemed to have accepted a bid only when the bid has been approved by the Bankruptcy Court at the Sale Hearing and the Stalking Horse APA or the Successful APA has been executed.

IX.     **Notice and Filing of Successful APA.**  The Debtors propose to file with the Court, no later than **Tuesday, November 13, 2007,** each of: (i) a copy of the executed Stalking Horse APA or the Successful APA entered into by and between the Debtors and the successful bidder; (ii) a notice (the "Assumption Notice") of executory contracts, licenses, and unexpired leases that the Debtors will seek to assume and assign to the successful bidder, which will identify the amounts, if any, that the Debtors believe they owe to such contract or lease counterparty to cure defaults under each respective executory contract, license, and unexpired lease; and (iii) a draft of the proposed Sale Order (collectively, the "Sale Materials").

The Debtors must serve copies of the Sale Materials, no later than **Tuesday, November 13, 2007,** by overnight delivery on each of: (a) the parties on the Master Service List; (b) all persons or entities known or reasonably believed to have asserted a Lien on any of the Assets; and (c) all counterparties to any executory contracts or unexpired leases that the Debtors seek to assume and assign as part of the Sale.

X.     **Objections.**  The deadline for objecting to the relief requested in the Sale Order, including the approval of the Sale free and clear of liens, claims, encumbrances and interests pursuant to section 363(f) of the Bankruptcy Code shall be **4:00 p.m. (Central Time) on Wednesday, November 14, 2007** (the "Objection Deadline")

Objections to the relief requested in the Sale Order, if any, shall also be served no later than **4:00 p.m. (Central Time) on Wednesday, November 14, 2007** upon (a) counsel to the Debtor, Dewey & LeBoeuf LLP, Two Prudential Plaza, 180 North Stetson Avenue, Chicago, Illinois, 60601, Attn: Mohsin N. Khambati; (b) counsel for the Official Committee of Unsecured Creditors at Greenberg Traurig, LLP, 77 W. Wacker Drive, Suite 2500, Chicago, IL 60601, Attn: Nancy A. Peterman; and (c) counsel for the Agents at Goldberg, Kohn, Bell, Block, Rosenbloom & Moritz, Ltd., 55 E. Monroe Street, Suite 3300, Chicago, Illinois 60603, Attn: Andrew R. Cardonick.

XI.     **Sale Hearing.**  The Sale Hearing will be held before the Honorable Jacqueline P. Cox or any other Judge sitting in her stead on **Thursday, November 15, 2007 at 1:00 p.m. (Central Time)** at the United States Bankruptcy Court for the Northern District of Illinois, located in Everett McKinley Dirksen United States Courthouse, 219 South Dearborn Street, Chambers 656, Chicago, Illinois 60604, but may be adjourned or rescheduled without further notice by an announcement of the adjourned date at the Sale Hearing.

XII.     **Break-up Fee.**  In the event the Stalking Horse APA is terminated under Sections 8.1(g) or (i) of the Stalking Horse APA, Debtors will pay to the Stalking Horse an amount equal to 3% of the net cash purchase price under the Stalking Horse APA (the "Break-Up Fee"), which Break-Up Fee the Debtors estimate to be in a range between $475,000 and $525,000, within two (2) Business Days of the Debtors closing an Alternative Transaction (as defined in the Stalking Horse APA), subject to the terms of the Stalking Horse APA and the Sale Procedures Order.

6

Any Break-up Fee payable to the Stalking Horse pursuant to the Stalking Horse APA shall be paid as an administrative expense claim of Seller under Section 503(b)(1) of the Bankruptcy Code. Upon request, the Debtors will provide to any Potential Bidder the Debtors' estimation of the net cash purchase price under the Stalking Horse APA.

**XIII.   Failure to Consummate Purchase.** If the Auction is conducted and after determining the Highest Bid, the Debtors, in consultation with the Creditors' Committee and the Agents, in the exercise of their business judgment, shall determine the next highest or otherwise best Qualified Bid (excluding for this purpose the Agents and the Stalking Horse), and such bidder shall be required to serve as a back-up bidder (the "Back-up Bidder") and keep such bid open and irrevocable until the earlier of 5:00 p.m. (prevailing Central time) on the date which is five (5) days after the date of the Sale Hearing (the "Outside Back-up Date") or the closing of the Sale with the Highest Bidder. Following the Sale Hearing, if the Highest Bidder fails to consummate the closing of the Sale because of a breach or failure to perform on the part of such Highest Bidder, the Back-up Bidder (other than the Stalking Horse or the Agents) will be deemed to be the new Highest Bid, and the Debtors will be authorized, but not required, to consummate the Sale with the Back-up Bidder without further order of the Bankruptcy Court, upon at least 24 hours notice to the Creditors' Committee and Agents. In such case, the defaulting Highest Bidder's deposit shall be forfeited to the Debtors. Additionally, the Debtors reserve the right to seek all available damages from the defaulting Highest Bidder. Notwithstanding anything to the contrary in this Section XIII, in no event shall the Stalking Horse or the Agents constitute a Back-up Bidder, and none of the provisions of this Section XIII shall apply to the Agents or the Stalking Horse.

**XIV.   Modification of Procedures.** The Debtors may amend these Sale Procedures or the sale process without prior Court approval (and only after consultation with: (a) the Agents; (b) the Creditors' Committee; and (c) if such amendment is proposed prior to the Auction in any event or if such amended is proposed after the Auction if the Stalking Horse is the Highest Bidder, the Stalking Horse), with the Agents, Creditors' Committee and Stalking Horse retaining any and all rights to object to such proposed modifications) at any time in any manner that will best promote the goals of the sale process, including extending or modifying any of the dates described herein.

**XV.   Return of Good Faith Deposit.** The Good Faith Deposits of all Qualified Bidders (except for the Highest Bidder) shall be held in an interest-bearing escrow account with a national bank. Notwithstanding the foregoing, the Good Faith Deposit, if any, submitted by the Highest Bidder, together with interest thereon, shall be applied against the payment of Purchase Price upon closing of the Sale to the Highest Bidder. Except as otherwise provided herein, all deposits shall be returned to each bidder not selected by the Debtors as the Highest Bidder or the Back-up Bidder by no later than the fifth (5th) business day following the conclusion of the Auction. The deposit of the Back-up Bidder shall be held by the Debtors until the earlier of 24 hours after (a) the closing of the sale transaction with the Highest Bidder and (b) the Outside Back-up Date.

7

Dated: November 5, 2007

/s/Thomas J. Augspurger
Lewis S. Rosenbloom (ARDC No. 2386321)
Mohsin N. Khambati (ARDC No. 6272526)
Thomas J. Augspurger (ARDC No. 6284657)
DEWEY & LEBOEUF LLP
Two Prudential Plaza
180 North Stetson Avenue, Suite 3700
Chicago, IL 60601
Telephone: (312) 794-8000
Facsimile: (312) 794-8100
Lewis S. Rosenbloom
Mohsin N. Khambati
Counsel for the Debtors
and Debtors in Possession

A000100

EXHIBIT B

FORM OF ESCROW AGREEMENT

A000101

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT (this "Agreement") is made as of [_____], 2007, by and among RPC Acquisition Corporation, a Delaware corporation ("Buyer"), Rockford Products Corporation, an Illinois corporation ("Seller"), and LaSalle Bank National Association, a national banking association, as escrow agent (the "Escrow Agent"). Buyer and Seller are sometimes collectively referred to herein as the "Parties" and individually as a "Party." Capitalized terms used and not otherwise defined herein shall have the respective meanings ascribed to such terms in the Purchase Agreement (as defined below).

WHEREAS, the Parties are parties to that certain Asset Purchase Agreement, dated as of [_____], 2007 (as the same may be amended, modified or supplemented from time to time in accordance with its terms, the "Purchase Agreement"), providing for the purchase and sale of certain assets of Seller;

WHEREAS, pursuant to the terms of the Purchase Agreement and as part of the transactions contemplated thereby, the Parties agreed to enter into this Agreement and deposit a portion of the Purchase Price with the Escrow Agent for the purposes set forth herein;

WHEREAS, pursuant to the terms of the Purchase Agreement, the Parties agreed that the Escrow Funds (as defined below) shall provide a source of funds for satisfaction of amounts owing from Seller to Buyer Indemnitees under the Purchase Agreement during the term of this Agreement;

WHEREAS, the Parties desire to create an escrow account for the Escrow Amount (as defined below), and appoint the Escrow Agent as the escrow agent for such account upon the terms and conditions set forth below; and

WHEREAS, the execution and delivery of this Agreement is a condition to the obligations of the Parties to effect the transactions contemplated by the Purchase Agreement.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

1.       Appointment of Escrow Agent. Buyer and Seller hereby appoint the Escrow Agent as the escrow agent under and pursuant to the terms, conditions and provisions of this Agreement, and the Escrow Agent hereby accepts such appointment and agrees to perform the duties thereof subject to the terms, conditions and provisions of this Agreement. The Escrow Agent acknowledges receipt of an executed copy of this Agreement.

2.       Escrow Deposit. Simultaneously with the execution of this Agreement, Buyer has deposited with the Escrow Agent cash in the amount of $1,000,000 in accordance with Section 3.2(b) of the Purchase Agreement (the "Escrow Amount"). The Escrow Agent hereby acknowledges receipt of the Escrow Amount and agrees to hold the Escrow Amount, together with all products and proceeds thereof (including all interest, dividends, gains and other income earned with respect thereto) (collectively, the "Escrow Funds"), in a separate and distinct account (the "Escrow Account"), subject to the terms and conditions of this Agreement. The Escrow

A000102

Agent shall not distribute or release the Escrow Funds except in accordance with the express terms and conditions of this Agreement.

3.   Permitted Investments. The Escrow Agent hereby agrees to establish and maintain the Escrow Funds in the Escrow Account and shall invest the Escrow Funds as directed by Buyer and Seller, from time to time, in writing, in money market accounts and money market mutual funds (including those of the Escrow Agent), treasury bills, treasury notes or any other direct obligations issued by or guaranteed in full as to principal and interest by the United States of America and certificates of deposit issued by a commercial bank having capital, surplus and undivided profits of not less than $100,000,000 (including the Escrow Agent and its affiliates), (collectively, the "Permitted Investments"). Neither the Escrow Agent nor any Party shall be liable or responsible in any manner for any loss or depreciation resulting from any such Permitted Investment or any liquidation thereof, or for any costs in connection therewith, and all of said losses and costs shall be borne by the Escrow Account. The Escrow Agent shall have no power or authority to invest or reinvest any Escrow Funds except in Permitted Investments as instructed by Seller; provided, that in the event the Escrow Agent shall receive joint written instructions signed by Seller and Buyer directing the Escrow Agent to invest Escrow Funds in an investment other than a Permitted Investment, the Escrow Agent shall invest such Escrow Funds in the manner specified in such joint written instructions. The Parties acknowledge that regulations of the Comptroller of the Currency grant the Parties the right to receive brokerage confirmations of the security transactions as they occur. The Parties specifically waive such notification to the extent permitted by law and will receive periodic cash transaction statements which will detail all investment transactions.

4.   Release of Escrow Funds. The Escrow Funds shall be held and disposed of by the Escrow Agent as follows:

(a)   Joint Written Instructions. The Escrow Agent shall disburse the Escrow Fund as Buyer and Seller at any time mutually direct in writing to the Escrow Agent.

(b)   Payment Claims. At any time and from time to time prior to the Distribution Date (as defined below), if any Buyer Indemnitee makes a claim (i) pursuant Section 3.3(e) of the Purchase Agreement or (ii) pursuant to Section 9.1 of the Purchase Agreement, Buyer shall deliver to the Escrow Agent and Seller a written notice (a "Payment Notice") setting forth the amount of such claim for payment pursuant to Section 3.3(e) or 9.1, as applicable, of the Purchase Agreement (a "Payment Claim") and setting forth the applicable section of the Purchase Agreement under which such Payment Claim is made. Buyer shall also deliver to the Escrow Agent proof of delivery to Seller of a copy of such Payment Notice (which proof may consist of a photocopy of the registered or certified mail or overnight courier receipt or the signed receipt if delivered by hand). If the Escrow Agent has not received a written objection to such Payment Claim from Seller within 10 days following the Escrow Agent's receipt of such proof of delivery to Seller, then on the 11th day following such receipt, the Escrow Agent shall release, by wire transfer to an account or accounts designated by Buyer in the Payment Notice, an amount of Escrow Funds from the Escrow Account equal to the amount of such Payment Claim.

2

(c)     Disputes. If Seller in good faith delivers to the Escrow Agent and Buyer a written objection (a "Dispute Notice") to any Payment Claim or portion thereof within 10 days following the Escrow Agent's receipt of proof of delivery of such Payment Notice, then, except as otherwise provided in Section 4(c) below, the Escrow Agent shall not distribute to Buyer any Escrow Funds that are the subject of the Dispute Notice until the Escrow Agent receives either (i) joint written instructions signed by Seller and Buyer authorizing the release to Buyer of the Escrow Funds that are the subject of the Dispute Notice or (ii) a copy of a final decision of a court of competent jurisdiction or arbitrator directing the release to Buyer of the Escrow Funds that are the subject of the Dispute Notice. Upon receipt of such written instructions or a copy of such final decision, as the case may be, the Escrow Agent shall release to Buyer the Escrow Funds subject to dispute in accordance with such written instructions or final decision. In the event that Seller is the prevailing party in whole or in part in connection with any such dispute, the portion of the Escrow Funds that were the subject of such Dispute Notice and that are not released to Buyer as provided in the immediately preceding sentence shall remain in the Escrow Account and shall be available to satisfy subsequent Payment Claims until released as provided in Section 4(e) below. Seller agrees not to object to a Payment Claim unless it in good faith believes that all or a portion (as the case may be) of such Payment Claim is not payable to Buyer pursuant to the Purchase Agreement. Any Dispute Notice shall describe in reasonable detail the basis for any objection to the matters set forth in the Payment Notice and the portion of such Payment Claim (if less than all) which is the subject of such Dispute Notice. The Parties agree to negotiate in good faith to resolve as promptly as practicable any Payment Claim or portion thereof that is the subject of a Dispute Notice.

(d)     Partial Release. If any Dispute Notice includes an objection to only a portion of a Payment Claim, the Escrow Agent shall promptly release to Buyer an amount of Escrow Funds equal to the portion of the Payment Claim for which there is no objection; provided, that no such partial release by the Escrow Agent shall terminate or otherwise prejudice Buyer's rights with respect to the remainder of any Payment Claim set forth in a Payment Notice.

(e)     Release of Remaining Escrow Funds.

(i)     On the date that is six months from the date hereof (the "Distribution Date"), the Escrow Agent shall release to Seller the remaining balance of the Escrow Funds in the Escrow Account as of the Distribution Date, less the amount of all Unresolved Claims. For purposes of this Agreement, the term "Unresolved Claims" shall mean, as of the Distribution Date, the aggregate amount of all Payment Claims that are the subject of a Dispute Notice or that are otherwise unsatisfied as of the Distribution Date, including any Payment Claims for which an Payment Notice has been delivered but for which the 10-day objection period has not expired as of the Distribution Date.

(ii)     Promptly upon the Escrow Agent's receipt of the final determination of Buyer and Seller or the final determination of a court of competent jurisdiction or the arbitrator, as the case may be, of any Unresolved Claims that are the subject of a Dispute Notice or upon the expiration of the 10-day objection period for any Unresolved Claims for which no Dispute Notice has been delivered, the Escrow Agent shall release by wire transfer to an account or accounts designated by Buyer an amount of Escrow Funds equal to the amount of Escrow Funds to be released to Buyer pursuant to such final determination or the amount of such

3

Unresolved Claim for which no Dispute Notice has been delivered, as the case may be. After the resolution of all Unresolved Claims, any remaining Escrow Funds not distributed to Buyer pursuant to the immediately preceding sentence shall be released promptly thereafter by the Escrow Agent to Seller.

(f)    Termination. This Agreement shall terminate when all of the Escrow Funds in the Escrow Account have been released and distributed in accordance with this Section 4. Upon such termination this Agreement shall have no further force and effect, except that the provisions of this Section 4(f) and Sections 5, 6 and 7 and Sections 9 through 22 below shall survive such termination.

5.    Conditions to Escrow. The Parties agree that the Escrow Agent shall not assume any responsibility for the failure of the Parties to perform in accordance with the Purchase Agreement or this Agreement. The acceptance by the Escrow Agent of its responsibilities hereunder is subject to the following terms and conditions which the Parties agree shall govern and control with respect to the Escrow Agent's rights, duties and liabilities hereunder:

(a)    Documents. The Escrow Agent shall be protected in acting upon any written notice, request, waiver, consent, receipt or other paper or document furnished to it, not only as to its due execution and validity and the effectiveness of its provisions, but also as to the truth and accuracy of any information therein contained, which the Escrow Agent in good faith believes to be genuine and what it purports to be. Should it be necessary for the Escrow Agent to act upon any instructions, directions, documents or instruments issued or signed by or on behalf of any corporation, partnership, limited liability company, fiduciary or individual acting on behalf of another Party, it shall not be necessary for the Escrow Agent to inquire into such corporation's, partnership's, limited liability company's, fiduciary's or individual's authority. The Escrow Agent is also relieved from the necessity of satisfying itself as to the authority of the persons executing this Agreement in a representative capacity on behalf of any of the Parties.

(b)    Liability. The Escrow Agent shall not be liable for any act or omission taken or suffered in good faith with respect to this Agreement unless such act or omission is the result of the gross negligence, bad faith or willful misconduct of the Escrow Agent.

(c)    Legal Counsel. The Escrow Agent may consult with, and obtain advice from, legal counsel in the event of any question as to any of the provisions hereof or its duties hereunder, and it shall incur no liability and shall be fully protected in acting in good faith in accordance with the opinion and instructions of such counsel.

(d)    Limitation of Duties. The Escrow Agent shall have no duties except those which are expressly set forth herein and it shall not be bound by any agreement of the other Parties hereto (whether or not it has any knowledge thereof).

(e)    Resignation or Termination of Escrow Agent. The Escrow Agent shall have the right to resign at any time by giving written notice of such resignation to the Parties and the Parties shall have the right to terminate the services of the Escrow Agent hereunder at any time by giving written notice (with such written notice being signed by Buyer and Seller) of such termination to the Escrow Agent, in each case specifying the effective date of such resignation or

4

A000105

termination. Within 30 days after receiving or delivering either of the aforesaid notices, as the case may be, Buyer and Seller agree to appoint a successor Escrow Agent to which the Escrow Agent shall distribute the Escrow Funds less the amount of any fees owing to the Escrow Agent hereunder as of such date. If a successor Escrow Agent has not been appointed and has not accepted such appointment by the end of such 30-day period, the Escrow Agent may apply to a court of competent jurisdiction for the appointment of a successor Escrow Agent, and each of Buyer and Seller shall be liable for 50% of the costs, expenses and reasonable attorney's fees incurred by the Escrow Agent in connection with any such proceeding. Any successor escrow agent shall be a banking corporation or trust company having total assets in excess of $100,000,000. Except as otherwise agreed to in writing by the Parties, no Escrow Funds shall be released from the Escrow Account unless and until a successor Escrow Agent has (i) been appointed in accordance with this Section 5(e) and (ii) agreed, in writing, to be bound by the terms and conditions of this Agreement.

(f) Discharge of Escrow Agent. Upon delivery of all of the Escrow Funds pursuant to the terms of Section 4 above or to a successor Escrow Agent in accordance with Section 5(e), the Escrow Agent shall thereafter be discharged from any further obligations hereunder. The Escrow Agent is hereby authorized, in any and all events, to comply with and obey any and all final judgments, orders and decrees of any court of competent jurisdiction which may be filed, entered or issued, and all final arbitration awards and, if it shall so comply or obey, it shall not be liable to any other person by reason of such compliance or obedience.

6. Indemnification. Each of Buyer and Seller, severally and not jointly, hereby agree to indemnify the Escrow Agent for and to hold it harmless against any loss, liability or reasonable expense (including reasonable attorneys' fees and documented out-of-pocket expenses) incurred without gross negligence, willful misconduct or bad faith on the part of the Escrow Agent arising out of or in connection with its performance under this Agreement. Any indemnification payable to the Escrow Agent hereunder shall be payable one-half by Buyer and one-half by Seller.

7. Escrow Costs. The Escrow Agent shall be entitled to be paid a fee for its services pursuant to the attached Fee Schedule and to be reimbursed for its reasonable costs and documented out-of-pocket expenses incurred in connection with maintaining the Escrow Account hereunder, which fees, costs and documented out-of-pocket expenses shall be paid one-half by Buyer and one-half by Seller.

8. Limitations on Rights to Escrow Funds. None of the Parties shall have any right, title or interest in or to, or possession of, the Escrow Account and therefore shall not have the ability to pledge, convey, hypothecate or grant as security all or any portion of the Escrow Funds unless and until such Escrow Funds have been released pursuant to Section 4 above. Accordingly, the Escrow Agent shall be in sole possession of the Escrow Funds and shall not act as custodian of the Parties under this Agreement for the purposes of perfecting a security interest therein, and no creditor of any of the Parties shall have any right to have or to hold or otherwise attach or seize all or any portion of the Escrow Funds as collateral for any obligation and shall not be able to obtain a security interest in any of the Escrow Funds unless and until such Escrow Funds have been released pursuant to Section 4 above. Notwithstanding the foregoing, however, nothing herein shall restrict or otherwise limit the ability of Buyer's lenders to attach or obtain a

5

A000106

security interest in the right of Buyer to receive payments from the Escrow Account in accordance with the terms hereof and the Purchase Agreement.

9.     Notices. All notices, requests, claims, demands and other communications under this Agreement shall be in writing and shall be delivered by hand or overnight courier service or by facsimile to the Parties at the following addresses:

If to Buyer:

RPC Acquisition Corp.
c/o BlackEagle Partners, L.L.C.
6905 Telegraph Road, Suite 205
Bloomfield Hills, MI 48301
Facsimile No: (313) 922-2934
Attn:   Garrett P. Kanehann
        J.W. Henry Watson

If to Seller to:

Rockford Products Corporation
707 Harrison Avenue
Rockford, Illinois 61104
Facsimile No: (815) 229-4339
Attention: Douglas D. Wells

Escrow Agent:

LaSalle Bank National Association

_____
_____
_____

or to such other Persons, addresses or facsimile numbers as may be designated in writing by the Person entitled to receive such communication as provided above. Each such communication shall be effective (a) if delivered by hand, when such delivery is made at the address specified in this Section 9, (b) if delivered by overnight courier service, the next business day after such communication is sent to the address specified in this Section 9 or (c) if delivered by facsimile, when such facsimile is transmitted to the facsimile number specified in this Section 9 and appropriate confirmation is received.

10.     Entire Agreement; Amendments. This Agreement, together with the Purchase Agreement, contains the entire understanding of the Parties with respect to the subject matter hereof and supersedes any prior understandings or agreements by or among the Parties, whether written or oral, which may have related to the subject matter hereof in any way. This Agreement may be amended, or any provision of this Agreement may be waived, so long as such amendment or waiver is set forth in a writing executed by each of the Parties (a copy of which shall be promptly provided by Buyer to the Escrow Agent); provided, that if any such

6

amendment or waiver would have the effect of increasing or expanding the Escrow Agent's obligations or duties under this Agreement, the written consent of the Escrow Agent shall be required in addition to the written consent of the Parties. No course of dealing between or among the Parties shall be deemed effective to modify, amend or discharge any part of this Agreement of any rights or obligations of any Party under or by reason of this Agreement.

11. Assigns and Assignment. This Agreement and all actions taken hereunder shall inure to the benefit of and shall be binding upon all of the Parties and upon all of their respective successors and permitted assigns; provided, that the Escrow Agent shall not be permitted to assign its obligations hereunder except as provided in Section 5(c) above. Notwithstanding anything contained to the contrary herein, Buyer and the Escrow Agent acknowledge and agree that Seller has assigned its rights under this Agreement to Bridge Healthcare Finance, LLC and Bridge Opportunity Finance, LLC.

12. Taxation of Interest Earned on Investment of Escrow Amount. Seller hereby acknowledges that, for federal and state income tax purposes, the interest earned on the investment of the Escrow Amount shall be income of Seller. The Escrow Agent shall be responsible for reporting any interest earned to the Internal Revenue Service.

13. No Other Third Party Beneficiaries. Nothing herein expressed or implied is intended or shall be construed to confer upon or to give any person other than the Escrow Agent, the Parties (including Buyer Indemnitees) and their permitted assigns any rights or remedies under or by reason of this Agreement.

14. Interpretation. The headings in this Agreement are inserted for convenience of reference only and shall not be a part of or control or affect the meaning hereof.

15. No Waiver. No failure or delay by a Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof, and no single or partial exercise thereof shall preclude any right of further exercise or the exercise of any other right, power or privilege. The right of the Parties to receive all or a portion of the Escrow Funds under the circumstances described in Section 4 above is in addition to, and not in lieu of, any other remedies that any such Party may have against another Party pursuant to the Purchase Agreement in the event of a breach of the Purchase Agreement.

16. Severability. The Parties agree that (a) the provisions of this Agreement shall be severable in the event that for any reason whatsoever the provisions hereof are invalid, void or otherwise unenforceable, (b) such invalid, void or otherwise unenforceable provisions shall be automatically replaced by other provisions which are as similar as possible in terms to such invalid, void or otherwise unenforceable provisions, but are valid and enforceable, and (c) the remaining provisions shall remain enforceable to the fullest extent permitted by Law.

17. No Strict Construction. The language used in this Agreement shall be deemed to be the language chosen by the Parties to express their collective mutual intent, and no rule of strict construction shall be applied against any person. The term "including" as used herein shall be by way of example, and shall not be deemed to constitute a limitation of any term or provision

7

contained herein. Each defined term used in this Agreement has a comparable meaning when used in its plural or singular form.

18.   Releases on Non-Business Days.   In the event that a release of Escrow Funds hereunder is required to be made on a date that is not a business day, such release may be made on the next succeeding business day with the same force and effect as if made when required.

19.   Governing Law.   All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement shall be governed by, and construed in accordance with, the Laws of the State of Michigan without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Michigan or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Michigan. In furtherance of the foregoing, the internal Law of the State of Michigan shall control the interpretation and construction of this Agreement, even though under that jurisdiction's choice of law or conflict of law analysis, the substantive law of some other jurisdiction would ordinarily apply.

20.   Exclusive Jurisdiction.   Without limiting any party's right to appeal any order of the United States Bankruptcy Court for the Northern District of Illinois, Western Division (the "Bankruptcy Court") and except as otherwise provided herein, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all claims, actions, causes of action, suits and proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 9.

21.   Counterparts.   This Agreement may be executed by the Parties individually or in any combination, in one or more counterparts (including by means of telecopied signature pages), each of which shall be an original and all of which shall together constitute one and the same agreement.

22.   Automatic Succession.   Any company into which the Escrow Agent may be merged or with which it may be consolidated, or any company to whom Escrow Agent may transfer substantially all of its Escrow business, shall be the successor to the Escrow Agent without the execution or filing of any paper or any further act on the part of any of the parties, anything herein to the contrary notwithstanding.

23.   Patriot Act.   To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account. For a non-individual person such as a business entity, a charity, a trust or other legal entity, the Escrow Agent will ask for documentation to verify its formation and existence as a legal entity. The Escrow Agent may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

8

A000109

IN WITNESS WHEREOF, the parties hereto have executed this Escrow Agreement as of the date first written above.

RPC ACQUISITION CORP.

By:_____
Name:_____
Title:_____

ROCKFORD PRODUCTS CORPORATION

By:_____
Name:_____
Title:_____

LASALLE BANK NATIONAL ASSOCIATION

By:_____
Name:_____
Title:_____

A000110

**Fee Schedule**

DETROIT.2839379.3

A000111

EXHIBIT C

FORM OF DEPOSIT ESCROW AGREEMENT

DETROIT.2824972.19

A000112

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT, dated as of November 6, 2007 (this "Escrow Agreement"), is made by and among Rockford Acquisition, LLC, a Delaware limited liability company ("Buyer"), Rockford Products Corporation, an Illinois corporation ("Seller"), and Dewey & LeBoeuf LLP ("Escrow Agent").

## BACKGROUND

A.     Buyer and Seller are parties to that certain Asset Purchase Agreement, dated as of the date hereof (the "Purchase Agreement"). Capitalized terms used herein and not otherwise defined are defined in the Purchase Agreement.

B.     Pursuant to the Purchase Agreement, the Escrow Amount (as defined in Section 2 below) shall be held in escrow pending satisfaction of certain conditions contemplated in the Purchase Agreement.

C.     Buyer and Seller have selected Escrow Agent to act as the escrow agent hereunder to hold in escrow, pursuant to the terms of this Agreement, the Escrow Funds (as defined below) and to distribute the Escrow Funds only in accordance with the terms of this Escrow Agreement.

NOW THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, for themselves, their successors and assigns, hereby agree as follows:

1.     Appointment of and Acceptance by Escrow Agent. Buyer and Seller hereby appoint Escrow Agent to serve as escrow agent hereunder. Escrow Agent hereby accepts such appointment and, upon receipt by wire transfer of the Escrow Funds in accordance with Section 2 below, agrees to hold, invest and disburse the Escrow Funds in accordance with this Escrow Agreement.

2.     Deposit of Escrow Funds. Simultaneously with the execution of this Escrow Agreement, Buyer has deposited two hundred fifty thousand dollars ($250,000) with Escrow Agent in accordance with Section 3.4 of the Purchase Agreement (the "Escrow Amount"). Escrow Agent shall hold the Escrow Amount, including all interest, dividends, gains and other income earned with respect thereto (collectively, the "Escrow Funds") in a separate interest-bearing escrow account.

3.     Disbursements of Escrow Funds. The Escrow Funds shall be disbursed by Escrow Agent as described below or as otherwise set forth in Section 4 below.

COKP/908257.17

NYB 674939.3 99980 10010 11/2/2007 03:31pm

A000113

a. Release of Escrow Funds Upon Closing. Escrow Agent shall disburse the Escrow Funds on the Closing Date, upon delivery to the Escrow Agent of an instrument signed by Seller and Buyer directing Escrow Agent to disburse the Escrow Funds to Seller.

b. Release of Escrow Funds Upon Termination of Purchase Agreement Prior to Closing. Upon termination of the Purchase Agreement prior to the Closing, Escrow Agent shall disburse the Escrow Funds to Buyer or Seller, as specified below, upon receipt of a written certification from either party (which written certification shall be simultaneously provided to the other party), countersigned by the other party or not objected to in a writing delivered to Escrow Agent within 15 days after Escrow Agent's receipt of such written certification, specifying the provision of the Purchase Agreement under which the termination is effected and the clause of this Section 3(b) which governs the disbursement of the Escrow Funds. The Escrow Funds shall be disbursed pursuant to this Section 3(b) as follows:

(i) If the Purchase Agreement is terminated by Buyer, except as provided in clause (ii) below, the Escrow Fund shall be disbursed to Buyer.

(ii) If the Purchase Agreement is terminated by Seller in good faith pursuant to Section 8.1(c) of the Purchase Agreement, as a result of a material breach of a representation, warranty or covenant by Buyer, which breach is not cured within 10 Business Days following the delivery of written notice thereof to Buyer, and Seller is not otherwise in breach of the Purchase Agreement, the Escrow Fund shall be disbursed to Seller upon final resolution of the dispute between the parties as to whether the termination of the Purchase Agreement resulted from or constituted a material breach of a representation, warranty or covenant of the Purchase Agreement by Buyer, after which final resolution of the dispute, the Escrow Fund shall be promptly disbursed as directed by agreement of the parties pursuant to Section 3(c) below or as directed by a final order of a court of confident jurisdiction pursuant to Section 3(d) below.

c. Release of Escrow Funds Upon Joint Direction. Escrow Agent shall disburse the Escrow Funds as Buyer and Seller at any time shall jointly direct in writing.

d. Release of Escrow Funds as a Result of Court Order. In the event Escrow Agent receives from Buyer or Seller a certified copy of a final order by a court of competent jurisdiction from Buyer or Seller (as applicable), which states that the order presented to Escrow Agent is final and nonappealable, Escrow Agent shall proceed in accordance with the instructions contained in such final order. An order shall be deemed final upon (i) the expiration of the time allowed for appeal without Buyer or Seller having appealed such order; or (ii) the entry of such final order if no right of appeal exists.

All amounts to be disbursed to Buyer or Seller under this Agreement shall be disbursed to

-2-

CORP/908257.17

A000114

one or more accounts specified in writing by Buyer or Seller, as the case may be.

4.     Suspension of Performance; Disbursement Into Court.  If, at any time, (i) there shall exist any dispute with respect to the holding or disposition of all or any portion of the Escrow Funds or any other obligations of Escrow Agent hereunder, (ii) Escrow Agent is unable to determine, to Escrow Agent's sole satisfaction, the proper disposition of all or any portion of the Escrow Funds or Escrow Agent's proper actions with respect to its obligations hereunder, or (iii) Buyer and Seller have not, within 30 (thirty) days of the furnishing by Escrow Agent of a notice of resignation pursuant to Section 6 hereof, appointed a successor Escrow Agent to act hereunder, then Escrow Agent may, in its sole discretion, take either or both of the following actions:

a.     suspend the performance of any of its obligations (including without limitation any disbursement obligations) under this Escrow Agreement until such dispute or uncertainty shall be resolved to the sole satisfaction of Escrow Agent or until a successor Escrow Agent shall have been appointed (as the case may be).

b.     petition (by means of an interpleader action or any other appropriate method) any court of competent jurisdiction in any venue convenient to Escrow Agent, for instructions with respect to such dispute or uncertainty, and to the extent required or permitted by law, pay into such court, for holding and disposition in accordance with the instructions of such court, all Escrow Funds, after deduction and payment to Escrow Agent of all fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or expected to be incurred by Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder.

Escrow Agent shall have no liability to Buyer, Seller or their respective shareholders or members or any other person with respect to any such suspension of performance or disbursement into court, specifically including any liability or claimed liability that may arise, or be alleged to have arisen, out of or as a result of any delay in the disbursement of the Escrow Funds or any delay in or with respect to any other action required or requested of Escrow Agent.

5.     Investment of Funds.  Escrow Agent is hereby directed and instructed to deposit the Escrow Funds in its Escrow non-interest bearing IOLA Fund account.

6.     Resignation of Escrow Agent.  Escrow Agent may resign and be discharged from the performance of its duties hereunder at any time by giving ten (10) days prior written notice to Buyer and Seller, specifying a date when such resignation shall take effect. Upon any such notice of resignation, Buyer and Seller shall jointly appoint a successor Escrow Agent hereunder prior to the effective date of such resignation.  The retiring Escrow Agent shall transmit all records pertaining to the Escrow Funds and shall pay all Escrow Funds to the successor Escrow Agent, after making copies of such records as the retiring Escrow Agent deems advisable and after deduction and

-3-

A000115

payment to the retiring Escrow Agent of all fees and expenses (including court costs and attorneys' fees) payable to, incurred by, or expected to be incurred by the retiring Escrow Agent in connection with the performance of its duties and the exercise of its rights hereunder. After any retiring Escrow Agent's resignation, the provisions of this Escrow Agreement shall inure to its benefit as to any actions taken or omitted to be taken by it while it was Escrow Agent under this Escrow Agreement. Any corporation or association into which Escrow Agent may be merged or converted or with which it may be consolidated, or any corporation or association to which all or substantially all of the escrow business of Escrow Agent's corporate trust line of business may be transferred, shall be Escrow Agent under this Escrow Agreement without further act.

7.  Liability of Escrow Agent. Escrow Agent undertakes to perform only such duties as are expressly set forth herein and no duties shall be implied. Escrow Agent shall have no liability under and no duty to inquire as to the provisions of any agreement other than this Escrow Agreement. Escrow Agent shall not be liable for any action taken or omitted by it in good faith except to the extent that a court of competent jurisdiction determines that Escrow Agent's gross negligence or willful misconduct was the primary cause of any loss to Buyer and/or Seller. Escrow Agent's sole responsibility shall be for the safekeeping and disbursement of the Escrow Funds in accordance with the terms of this Escrow Agreement. Escrow Agent shall have no implied duties or obligations and shall not be charged with knowledge or notice of any fact or circumstance not specifically set forth herein. Escrow Agent may rely upon any notice, instruction, request or other instrument, not only as to its due execution, validity and effectiveness, but also as to the truth and accuracy of any information contained therein, which Escrow Agent shall believe to be genuine and to have been signed or presented by the person or parties purporting to sign the same. In no event shall Escrow Agent be liable for incidental, indirect, special, consequential or punitive damages (including, but not limited to lost profits), even if Escrow Agent has been advised of the likelihood of such loss or damage and regardless of the form of action. Escrow Agent shall not be obligated to take any legal action or commence any proceeding in connection with the Escrow Funds, any account in which Escrow Funds are deposited, this Escrow Agreement or the Purchase Agreement, or to appear in, prosecute or defend any such legal action or proceeding. Escrow Agent may consult legal counsel selected by it in the event of any dispute or question as to the construction of any of the provisions hereof or of any other agreement or of its duties hereunder, or relating to any dispute involving any party hereto, and shall incur no liability and shall be fully indemnified from any liability whatsoever in acting in accordance with the opinion or instruction of such counsel. Buyer and Seller shall each promptly pay, upon demand, 50% of the reasonable fees and expenses of any such counsel.

Escrow Agent is authorized, in its sole discretion, to comply with orders issued or process entered by any court with respect to the Escrow Funds, without determination by Escrow Agent of such court's jurisdiction in the matter. If any portion of the Escrow Funds is at any time attached, garnished or levied upon under any court order, or in case the payment, assignment, transfer, conveyance or delivery of any such property shall be stayed or enjoined by any court order,

-4-

CORP/908257.17

A000116

or in case any order, judgment or decree shall be made or entered by any court affecting such property or any part thereof, then and in any such event, Escrow Agent is authorized, in its sole discretion, to rely upon and comply with any such order, writ, judgment or decree which it is advised by legal counsel selected by it is binding upon it without the need for appeal or other action; and if Escrow Agent complies with any such order, writ, judgment or decree, it shall not be liable to any of the parties hereto or to any other person or entity by reason of such compliance even though such order, writ, judgment or decree may be subsequently reversed, modified, annulled, set aside or vacated.

8.    Indemnification of Escrow Agent. From and at all times after the date of this Escrow Agreement, Buyer and Seller shall jointly and severally, to the fullest extent permitted by law, defend, indemnify and hold harmless Escrow Agent and each director, officer, employee, attorney, agent and affiliate of Escrow Agent (collectively, the "Indemnified Parties") against any and all actions, claims (whether or not valid), losses, damages, liabilities, costs and expenses of any kind or nature whatsoever (including without limitation reasonable attorneys' fees, costs and expenses) incurred by or asserted against any of the Indemnified Parties from and after the date hereof, whether direct, indirect or consequential, as a result of or arising from or in any way relating to any claim, demand, suit, action or proceeding (including any inquiry or investigation) by any person, including without limitation Buyer or Seller, whether threatened or initiated, asserting a claim for any legal or equitable remedy against any person under any statute or regulation, including, but not limited to, any federal or state securities laws, or under any common law or equitable cause or otherwise, arising from or in connection with the negotiation, preparation, execution, performance or failure of performance of this Escrow Agreement or any transactions contemplated herein, whether or not any such Indemnified Party is a party to any such action, proceeding, suit or the target of any such inquiry or investigation; *provided, however,* that no Indemnified Party shall have the right to be indemnified hereunder for any liability finally determined by a court of competent jurisdiction, subject to no further appeal, to have resulted solely from the gross negligence or willful misconduct of such Indemnified Party. Each Indemnified Party shall, in its sole discretion, have the right to select and employ separate counsel with respect to any action or claim brought or asserted against it, and the reasonable fees of such counsel shall be paid upon demand by the Depositor. The obligations of Depositor under this Section 8 shall survive any termination of this Escrow Agreement and the resignation or removal of Escrow Agent.

9.    Representations and Warranties. Buyer and Seller each make the following representations and warranties to Escrow Agent:

a.    It is duly organized, validly existing, and in good standing under the laws of the state of its incorporation or organization, and has full power and authority to execute and deliver this Escrow Agreement and to perform its obligations hereunder.

-5-

CORP/908257.17

A000117

b.      This Escrow Agreement has been duly approved by all necessary action, including any necessary corporate or membership approval, as applicable, has been executed by its duly authorized officers, and constitutes its valid and binding agreement enforceable in accordance with its terms.

c.      The execution, delivery, and performance of this Escrow Agreement will not violate, conflict with, or cause a default under its articles of incorporation, articles of organization, bylaws, management agreement or other organizational document, as applicable, any applicable law or regulation, any court order or administrative ruling or decree to which it is a party or any of its property is subject, or any agreement, contract, indenture, or other binding arrangement to which it is a party or any of its property is subject.

d.      No party other than the parties hereto has, or shall have, any lien, claim or security interest in the Escrow Funds or any part thereof. No financing statement under the Uniform Commercial Code is on file in any jurisdiction claiming a security interest in or describing (whether specifically or generally) the Escrow Funds or any part thereof.

10.      Identifying Information. Buyer and Seller acknowledge that a portion of the identifying information set forth on Schedule A is being requested by Escrow Agent in connection with the USA Patriot Act, Pub.L.107-56 (the "Act"). To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. For a non-individual person such as a business entity, a charity, a trust, or other legal entity, we ask for documentation to verify its formation and existence as a legal entity. Escrow Agent may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

11.      Consent to Jurisdiction and Venue.  In the event that any party hereto commences a lawsuit or other proceeding relating to or arising from this Escrow Agreement, the parties hereto agree that the United States Bankruptcy Court for the Southern District of New York shall have the sole and exclusive jurisdiction over any such proceeding. This court shall be proper venue for any such lawsuit or judicial proceeding and the parties hereto waive any objection to such venue.  The parties hereto consent to and agree to submit to the jurisdiction of any of the courts specified herein and agree to accept service of process to vest personal jurisdiction over them in any of these courts.

12.      Notice. All notices, approvals, consents, requests, and other communications hereunder shall be in writing and shall be deemed to have been given when the writing is delivered if given or delivered by hand, overnight delivery service or facsimile transmitter (with confirmed receipt) to the address or facsimile number set forth on Schedule A hereto, or to such other address

-6-

CORP/908257.17

A000118

as each party may designate for itself by like notice, and shall be deemed to have been given on the date deposited in the mail, if mailed, by first-class, registered or certified mail, postage prepaid, addressed as set forth on Schedule A hereto, or to such other address as each party may designate for itself by like notice.

13.     Amendment or Waiver. This Escrow Agreement may be changed, waived, discharged or terminated only by a writing signed by Buyer, Seller and Escrow Agent. No delay or omission by any party in exercising any right with respect hereto shall operate as a waiver. A waiver on any one occasion shall not be construed as a bar to, or waiver of, any right or remedy on any future occasion.

14.     Severability. To the extent any provision of this Escrow Agreement is prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Escrow Agreement.

15.     Governing Law. This Escrow Agreement shall be construed and interpreted in accordance with the internal laws of the State of New York without giving effect to the conflict of laws principles thereof.

16.     Exclusive Jurisdiction. Without limiting any party's right to appeal any order of the United States Bankruptcy Court for the Northern District of Illinois, Western Division (the "Bankruptcy Court") and except as otherwise provided herein, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all claims, actions, causes of action, suits and proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.

17.     Entire Agreement. This Escrow Agreement constitutes the entire agreement between the parties relating to the holding, investment and disbursement of the Escrow Funds and sets forth in their entirety the obligations and duties of Escrow Agent with respect to the Escrow Funds.

18.     Binding Effect. All of the terms of this Escrow Agreement, as amended from time to time, shall be binding upon, inure to the benefit of and be enforceable by the respective successors and assigns of Buyer, Seller and Escrow Agent. Buyer and the Escrow Agent acknowledge and agree that Seller has assigned its rights under this Agreement to Bridge Healthcare Finance, LLC and Bridge Opportunity Finance, LLC.

-7-

CORP/908257.17

A000119

19.    Execution in Counterparts. This Escrow Agreement may be executed in two or more counterparts, which when so executed shall constitute one and the same agreement or direction.

20    Termination. Upon the disbursement of all amounts in the Escrow Funds pursuant to this Escrow Agreement shall terminate and Escrow Agent shall have no further obligation or liability whatsoever with respect to this Escrow Agreement or the Escrow Funds.

21.    Dealings. Escrow Agent and any member, partner, director, officer or employee of Escrow Agent may buy, sell, and deal in any of the securities of Buyer and Seller and become pecuniarily interested in any transaction in which Buyer and Seller may be interested, and contract and lend money to Buyer or Seller and otherwise act as fully and freely as though it were not Escrow Agent under this Agreement. Nothing herein shall preclude Escrow Agent from acting in any other capacity for Buyer, Seller or for any other entity.

22.    Escrow Agent's Representation of Seller. The Buyer and Seller acknowledge and agree that the Escrow Agent is acting as an accommodation to the parties and that the Escrow Agent may continue to represent the Seller in connection with the transactions contemplated by the Purchase Agreement or any other matter.

[remainder intentionally left blank]

-8-

CORP/908257.87

A000120

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be executed under seal as of the date first above written.

ROCKFORD ACQUISITION, LLC

By: _____

Title: _____

**ROCKFORD PRODUCTS CORPORATION**

By: _____

Title: _____

**DEWEY & LEBEOUF, LLC**

By: _____

Title: _____

-9-

CORP/903257.17

A000121

☑002

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be
executed under seal as of the date first above written.

**ROCKFORD ACQUISITION, LLC**

By: _____
Title: _____

**ROCKFORD PRODUCTS CORPORATION**

By: _____
Title: Chairman & President

**DEWEY & LEBEOUF, LLC**
By: _____
Title: _____

-9-

CORP/908257.17

A000122

IN WITNESS WHEREOF, the parties hereto have caused this Escrow Agreement to be executed under seal as of the date first above written.

ROCKFORD ACQUISITION, LLC

By: _____
Title: _____

ROCKFORD PRODUCTS CORPORATION

By: _____
Title: _____

DEWEY & LEBEOUF, LLC
By: _____
Title: Partner

-9-

CORP/908257.17

A000123

## SCHEDULE A

1.  Escrow Funds.

    Escrow Funds wiring instructions:
    See Schedule A-1

2.  Taxpayer Identification Numbers.

    Buyer:     26-1340034

    Seller:    36-3400114

3.  Investment Instructions

A-1

NYB 674929.3 99980 10010 11/2/2007 03:31pm

A000124

SCHEDULE A, continued

4.    Notice Addresses.

<table>
<tr><td></td><td></td><td>Principal Place of Business,<br>if different</td></tr>
<tr><td>If to Buyer at:</td><td>c/o BlackEagle Partners, LLC</td><td>_____</td></tr>
<tr><td>_____</td><td></td><td></td></tr>
<tr><td></td><td>6905 Telegraph Road, Suite 205<br>Bloomfield Hills, MI 48301<br>ATTN: Garrett P. Kanehann<br>Facsimile: 313-922-2934<br>Telephone: 313-647-5340<br>E-mail: gkanehann@blackeaglepartners.com</td><td>_____<br>_____<br>_____</td></tr>
</table>

<table>
<tr><td></td><td></td><td>Principal Place of Business,<br>if different</td></tr>
<tr><td>If to Seller at:</td><td>Rockford Products Corporation<br>707 Harrison Avenue<br>Rockford, IL 61104<br>ATTN: Douglas D. Wells<br>Facsimile: 815-229-4339<br>Telephone: _____<br>E-mail: _____</td><td>_____<br>_____<br>_____<br>_____</td></tr>
</table>

If to the Escrow
Agent at:

Dewey & LeBoeuf
Two Prudential Plaza
180 North Stetson Avenue
Suite 3700
Chicago, IL 60601-6710
Attn:   David Cleary

A-2

CORP/908257.17

NYB 674929.5 99980 10010 11/2/2007 03:31pm

A000125

### Schedule 2

### The Assumed Agreements

A000126

| | Counterparty/Address | Contract or Lease Name | Cure Amount |
|---|---|---|---|
| 1. | Euro Leasing LLC 2501 Landmeier Rd Elk Grove Village, IL 60007 | Master Lease and Security Agreement No. EL0107, between Rockford Products Corporation and Euro Leasing, LLC, dated 8-25-2004. | $0.00 |
| 2. | CitiCapital PO Box 740425 Atlanta, GA 30374-0425 | Master Lease Agreement and Equipment Schedule, between Rockford Products Corporation and Mellon US Leasing, a Division of Mellon Leasing Corp., dated 5-27-97 and Equipment Schedule dated as of 12-4-00. Re-leased by Letter (dated on 7-6-07) from CitiCapital Commercial Leasing Corporation Asset Management Group, successor to Mellon US Leasing, to Rockford Products Corporation Re: Expiration of Lease Agreement No. 014-0512929-000 and Option to Re-lease. | $0.00 |
| 3. | General Finance Group 2501 Landmeier Rd Elk Grove Village, IL 60007 | Master Lease and Security Agreement, No. 99010, between Rockford Products Corporation and General Finance Group, LLC, dated 3-14-05. | $0.00 |

| | Counterparty/Address | Contract or Lease Name | Cure Amount |
|---|---|---|---|
| 4. | Meridian Leasing 570 Lake Cook Road Deerfield, IL 60015 | Master Lease Agreement, between Rockford Products Corporation and Meridian Leasing Corporation, dated 12-15-2001. | $0.00 |
| | | Assumption of this Agreement excludes assumption of the following: | |
| | | All agreements and contractual obligations between Rockford Products Corporation and Meridian Leasing Corporation relating to UPG Aerovent Air Units, Acct. 7909008 - 07 | |
| | | All agreements and contractual obligations between Rockford Products Corporation and Meridian Leasing Corporation relating to Chiller, Plumbing, Electric Materials, Acct. 7909007 – 06 | |
| | | All agreements and contractual obligations Rockford Products Corporation and Meridian Leasing Corporation relating to Chiller, Plumbing, Electric Materials, Acct. 7909007 – 06 | |
| | | All agreements and contractual obligations between Rockford Products Corporation and Meridian Leasing Corporation relating to Armil Edothermic Generator, Acct. 7909006 – 05 | |
| | | All agreements and contractual obligations between Rockford Products Corporation and Meridian Leasing Corporation relating to Armil Edothermic Generator, Acct. 7909006 – 05 | |
| | | All agreements and contractual obligations between Rockford Products Corporation and Meridian Leasing Corporation relating to Tophats for Generator 2, Acct. 7909012 - 05-1 | |

A000128

| | Counterparty/Address | Contract or Lease Name | Cure Amount |
|---|---|---|---|
| 5. | Meridian Leasing 570 Lake Cook Road Deerfield, IL 60015 | Supplement No. 4 to Master Lease Agreement (dated 12-15-01), between Rockford Products Corporation and Meridian Leasing Corporation, dated 11-1-05. | $0.00 |
| 6. | Meridian Leasing 570 Lake Cook Road Deerfield, IL 60015 | Supplement No. 5 to Master Lease Agreement (dated 12-15-01), between Rockford Products Corporation and Meridian Leasing Corporation, dated 12-1-05. | $0.00 |
| 7. | Meridian Leasing 570 Lake Cook Road Deerfield, IL 60015 | Supplement No. 6 to Master Lease Agreement (dated 12-15-01), between Rockford Products Corporation and Meridian Leasing Corporation, dated 1-1-06. | $0.00 |
| 8. | Meridian Leasing 570 Lake Cook Road Deerfield, IL 60015 | Supplement No. 7 to Master Lease Agreement (dated 12-15-01), between Rockford Products Corporation and Meridian Leasing Corporation, dated 1-1-06 | $0.00 |
| 9. | Meridian Leasing 570 Lake Cook Road Deerfield, IL 60015 | Supplement No. MSF-13 to Master Lease Agreement (dated 12-15-01), between Rockford Products Corporation and Meridian Leasing Corporation, dated 9-30-06 | $0.00 |
| 10. | Enterprise Fleet Services 1955 Techny Rd, Ste 2 Northbrook, IL 60062 | Maintenance Agreement and Fleet Rental Agreement between Rockford Products Corporation and Enterprise Fleet Service, dated 3-13-06. | $0.00 |
| 11. | Enterprise Fleet Services 1955 Techny Rd, Ste 2 Northbrook, IL 60062 | Master Equity Lease Agreement between Rockford Products Corporation and Enterprise Fleet Service, dated 3-13-06 | $0.00 |
| 12. | Ryder Transportation 17060 S Lathrop Avenue Harvey, IL 60426 | Truck Lease & Service Agreement (11-13-00), Schedule A, between Rockford Products Corporation and Ryder Transportation Services, dated 2-27-02 | $10,373.13 |
| 13. | Euro Leasing LLC 2501 Landmeier Rd Elk Grove Village, IL 60007 | Master Lease and Security Agreement No. 100109, between Rockford Products Corporation and Euro Leasing, LLC, dated 5-23-06. | $0.00 |

A000129

| | Counterparty/Address | Contract or Lease Name | Cure Amount |
|---|---|---|---|
| 14. | General Electric Capital<br>PO Box 740425<br>Atlanta, GA<br>30374-0425 | Lease Agreement, Lease No. 4339443001, between Rockford Products Corporation and General Electric Capital Corp., dated 7-18-05. | $0.00 |
| 15. | General Electric Capital<br>PO Box 740425<br>Atlanta, GA<br>30374-0425 | Lease Agreement, Lease No. 4339443003, between Rockford Products Corporation and General Electric Capital Corp., dated 9-14-05. | $0.00 |
| 16. | General Electric Capital<br>PO Box 740425<br>Atlanta, GA<br>30374-0425 | Lease Agreement, Lease No. 4492374001, between Rockford Products Corporation and General Electric Capital Corp., dated 5-8-07. | $1,451.57 |
| 17. | Center Capital Corp<br>PO Box 330<br>Hartford, CT<br>06141-0330 | Master Lease Agreement No. 30857 between Rockford Products Corporation and Center Capital Corporation, dated 11-6-01 | $0.00 |
| 18. | Center Capital Corp<br>PO Box 330<br>Hartford, CT<br>06141-0330 | Lease Schedule 05 to Master Lease Agreement No. 30857 (dated 11-6-01), between Rockford Products Corporation and Center Capital Corporation, dated 6-1-05. | $242.00 |
| 19. | Center Capital Corp<br>PO Box 330<br>Hartford, CT<br>06141-0330 | Lease Schedule 06 to Master Lease Agreement No. 30857 (dated 11-6-01), between Rockford Products Corporation and Center Capital Corporation, dated 9-30-05. | $127.00 |
| 20. | Center Capital Corp<br>PO Box 330<br>Hartford, CT<br>06141-0330 | Lease Schedule 07 to Master Lease Agreement No. 30857 (dated 11-6-01), between Rockford Products Corporation and Center Capital Corporation, dated 1-6-06. | $0.00 |
| 21. | Center Capital Corp<br>PO Box 330<br>Hartford, CT<br>06141-0330 | Lease Schedule 08 to Master Lease Agreement No. 30857 (dated 11-6-01), between Rockford Products Corporation and Center Capital Corporation, dated 7-16-07. | $724.00 |

A000130

|  | Counterparty/Address | Contract or Lease Name | Cure Amount |
|---|---|---|---|
| 22. | Equilease Financial Services 50 Washington Street South Norwalk, CT 06854 | Equipment Lease, No. 063134-001, between Rockford Products Corporation and Equilease Financial Services, Inc., dated 5-18-06. | $1,980.00 |
| 23. | Equilease Financial Services 50 Washington Street South Norwalk, CT 06854 | Equipment Lease, No. 063134-002, between Rockford Products Corporation and Equilease Financial Services, Inc., dated 7-12-06, as amended by Amendment to Equipment Lease Agreement, Lease No. 063134-002, between Rockford Products Corporation and Equilease Financial Services, Inc., dated 8-21-06. | $4,852.00 |
| 24. | Equilease Financial Services 50 Washington Street South Norwalk, CT 06854 | Equipment Lease, No. 063134-003, between Rockford Products Corporation and Equilease Financial Services, Inc., dated 7-12-06. | $496.24 |
| 25. | National City 995 Dalton Avenue Cincinnati, OH 45203 | Lease Agreement, No. 7777700, between Rockford Products Corporation and National City Commercial Capital Corporation, dated 9-22-06. | $8,675.24 |
| 26. | National City 995 Dalton Avenue Cincinnati, OH 45203 | Lease Agreement, No. 92254000, between Rockford Products Corporation and National City Commercial Capital Corporation, dated 3-27-07. | $0.00 |
| 27. | National City 995 Dalton Avenue Cincinnati, OH 45203 | Lease Agreement, No. 92035000, between Rockford Products Corporation and National City Commercial Capital Corporation, dated 3-27-07. | $0.00 |
| 28. | Fitzgerald Equipment Co., Inc. 4650 Boeing Drive Rockford, IL 61109 | Equipment Schedule/Purchase Option to Lease Agreement Dated as of 9-20-1991, Schedule No. 8287593-128, between Rockford Products Corporation and Fitzgerald Equipment Co., Inc., dated 3-1-07. | $261.53 |

29

A000131

|     | Counterparty/Address | Contract or Lease Name | Cure Amount |
|-----|----------------------|------------------------|-------------|
| 29. | Fitzgerald Equipment Co., Inc. 4650 Boeing Drive Rockford, IL 61109 | Equipment Schedule/Purchase Option to Lease Agreement Dated as of 9-20-1991, Schedule No. 8287593-129, between Rockford Products Corporation and Fitzgerald Equipment Co., Inc., dated 3-1-07 | $212.15 |
| 30. | Fitzgerald Equipment Co., Inc. 4650 Boeing Drive Rockford, IL 61109 | Equipment Schedule/Purchase Option to Lease Agreement Dated as of 9-20-1991, Schedule No. 8287593-130, between Rockford Products Corporation and Fitzgerald Equipment Co., Inc., dated 3-1-07. | $414.84 |
| 31. | Fitzgerald Equipment Co., Inc. 4650 Boeing Drive Rockford, IL 61109 | Equipment Schedule/Purchase Option to Lease Agreement Dated as of 9-20-1991, Schedule No. 8287593-131, between Rockford Products Corporation and Fitzgerald Equipment Co., Inc., dated (unclear). | $212.16 |
| 32. | Fitzgerald Equipment Co., Inc. 4650 Boeing Drive Rockford, IL 61109 | Equipment Schedule/Purchase Option to Lease Agreement Dated as of 9-20-1991, Schedule No. 8287593-132, between Rockford Products Corporation and Fitzgerald Equipment Co., Inc., dated (unclear). | $202.91 |
| 33. | Fitzgerald Equipment Co., Inc. 4650 Boeing Drive Rockford, IL 61109 | Equipment Schedule/Purchase Option to Lease Agreement Dated as of 9-20-1991, Schedule No. 8287593-133, between Rockford Products Corporation and Fitzgerald Equipment Co., Inc., dated, 3-1-07 | $171.34 |

A000132

| | Counterparty/Address | Contract or Lease Name | Cure Amount |
|---|---|---|---|
| 34. | Ameritech Credit Corp 2000 W. SBC Center Dr Hoffman Estates, IL 60196 | Master Lease between Rockford Products Corporation and Ameritech Credit Corporation, dated 12-23-03.<br><br>Supplementary Schedule No. 001 to Master Lease Agreement No. 001-3471300, between Rockford Products Corporation and AT&T Capital Services, Inc., dated 1-25-07.<br><br>Supplementary Schedule No. 001-3471300-001, between Rockford Products Corporation and Ameritech Credit Corporation, dated 12-23-03, as amended by Addendum to Supplementary Schedule No. 001-3471300-001 to Master Lease (dated 12-23-03). | $0.00 |
| 35. | Mellon US Leasing 525 Market Street Suite 3500 San Francisco, CA 94105-2743 | Master Lease Agreement between Rockford Products Corporation and Mellon US Leasing, dated 5-27-97, as amended by Amendment No. 1, dated 5-27-97, as assigned to General Electric Capital Corporation.<br><br>Lease Renewal Amendment, No. 411473302, Amending Schedule No. 002 to Master Lease Agreement (dated 5-27-97), between Rockford Products Corporation and General Electric Capital Corporation, dated 2-2-07. | $0.00 |
| 36. | CitiCapital PO Box 740425 Atlanta, GA 30374-0425 | Letter (dated on 7-6-07) from CitiCapital Commercial Leasing Corporation Asset Management Group to Rockford Products Corporation Re: Expiration of Lease Agreement No. 014-0512929-000 Exercising Option to Re-lease | $0.00 |

31

A000133

|  | Counterparty/Address | Contract or Lease Name | Cure Amount |
|---|---|---|---|
| 37. | Delta Dental<br>801 Ogden Avenue<br>Lisle, IL 60532 | Delta Dental Plan of Illinois Capitation Program Employer Group Contract between Rockford Products Corporation and Delta Dental Plan of Illinois, dated 8-12-03, as renewed pursuant to the Delta Dental of Illinois Renewal Package for Rockford Products Corporation for the period beginning on 1-1-07 and ending on 12-31-07 | $0.00 |
| 38. | Midwest Security Administrators, Inc.<br>2700 Midwest Drive<br>Onalaska, WI 54650-8764 | Administrative Services Agreement between Rockford Products Corporation and Midwest Security Administrators, Inc., as renewed pursuant to Administrative Services Agreement Renewal Addendum, dated 1/23/07, for the period beginning on 1-1-07 and ending on 12-31-07 | $0.00 |
| 39. | Eflexgroup.com<br>2740 Ski Lane<br>Madison, WI 53713 | Cafeteria Plan Adoption Agreement, dated as of December 12, 2000, by and between Rockford Products Corporation and eflexgroup.com | $0.00 |
| 40. | Midwest Security Administrators, Inc.<br>2700 Midwest Drive<br>Onalaska, WI 54650-8764 | COBRA Administrative Services Agreement Non-MSA Administered Plans between Rockford Products and Midwest Security Administrators, Inc., dated 1-1-07. | $0.00 |
| 41. | Midwest Life & Health Group<br>3923 East State Street<br>Rockford, IL 61104 | Maintenance Agreement between Rockford Products Corporation and Midwest Health & Life Group, LLC, dated 12-8-05. | $0.00 |
| 42. | Qwest Communications<br>1801 California Street<br>Suite 900<br>Denver, Colorado 80202 | Qwest Total Express Agreement between Rockford Products and Qwest Communications, dated 6/25/07 | $2,812.21 |
| 43. | Harrison-Kishwaukee, LLC<br>6801 Spring Creek Rd.<br>Rockford, IL 61114 | Lease, dated as of December 22, 2006, between Harrison-Kishwaukee, L.L.C., and Rockford Products Corporation, relating to the premises located at 707 Harrison Ave., Rockford, IL 61104 | $0.00 |
| 44. | Aramark Uniform Services<br>PO Box 7177<br>Rockford, IL 61126 | Service Agreement between Rockford Products Corporation and Aramark Uniform Services, dated 6-1-06 | $0.00 |

A000134

| | Counterparty/Address | Contract or Lease Name | Cure Amount |
|---|---|---|---|
| 45. | Bergstrom China Group Partners, LLC PO BOX 6007 Rockford, IL 61125 | Management Services Agreement between Rockford Products Corporation and Bergstrom China Group Partners, LLC, dated 9-8-05 | $0.00 |
| 46. | Corporate Service 208 Kishwaukee St Rockford, IL 61108 | Agreement between Corporate Services, Inc (COMPANY) and Client between Rockford Products Corporation and Corporate Services, Inc., dated 2-12-07 | $0.00 |
| 47. | Foley & Lardner LLP Judy A. O'Neil One Detroit Center 500 Woodward Ave Suite 2700 Detroit, MI 48226-3489  Federal Mogul Corp. Attn: Senior VP & GC 26555 Northwestern Hwy Southfield, MI 48033 | Supply Agreement between Rockford Products Corporation and Federal Mogul, dated 12-6-04 | $0.00 |
| 48. | Health Conservation, Inc. 810 E State Street Rockford, IL 61104 | HCI Proposal for Hearing Conservation and Employee Health Services for Rockford Products Corporation by Health Conservation Inc., dated 1-24-06 | $0.00 |
| 49. | Roger Keas 2847 Chapman Court Marietta, GA 30060 | Agreement with Roger Keas Concerning Sales Representation in Territory #25 between Rockford Products Corporation and Component Sales, Inc., dated 12-1-05 | $0.00 |
| 50. | J & M Plating (Kish Plant) Mike Berg 4500 Kishwaukee Street Rockford, IL 61109 | Agreement between Rockford Products Corporation and J&M Plating, dated as of 6-8-07 | $0.00 |
| 51. | Rock River Training. 3134 11th St. Rockford, IL 61109 | On-The-Job Training Agreement between Rockford Products Corporation and Rock River Training Corporation Inc., dated 6-28-07, in respect of Milton Kimbrough II | $0.00 |

A000135

|  | Counterparty/Address | Contract or Lease Name | Cure Amount |
|---|---|---|---|
| 52. | AT&T 2000W AT&T Center drive Hoffman Estates, IL 60192-5000 | CompleteLink 2.0 Confirmation of Service Order between Rockford Products and AT&T Global Services, dated 3-20-07. | $0.00 |
| 53. | SBC Global Service, Inc PO Box 1838 Saginaw, MI 48605-1838 | ISDN Prime (PRI) Non-Standard Service Agreement between Rockford Products and SBC Global Services, Inc. dba AT&T Global Services on behalf of its affiliate, Illinois Bell Telephone Company dba SBC Illinois, dated 3-20-07 | $0.00 |
| 54. | SBC Global Service, Inc PO Box 1838 Saginaw, MI 48605-1838 | AT&T Metro Blitz DS1 Service Agreement between Rockford Products and SBC Global Services, Inc. dba AT&T Global Services on behalf of its affiliate, Illinois Bell Telephone Company dba SBC Illinois, dated 3-20-07. | $0.00 |
| 55. | SBC Global Service, Inc PO Box 1838 Saginaw, MI 48605-1838 | AT&T Special Access/FCC2 – Base Rate, Fractional DS1, DS1 and DS3 Services Confirmation of Service Order between Rockford Products Corporation and SBC Global Services, Inc. dba AT&T Global Services on behalf of its affiliates, dated 4-16-07. | $0.00 |
| 56. | SBC Global Service, Inc PO Box 1838 Saginaw, MI 48605-1838 | AT&T Metro Blitz DS1 Service Agreement between Rockford Products and SBC Global Services, Inc. dba AT&T Global Services on behalf of its affiliate, Illinois Bell Telephone Company dba SBC Illinois, dated 3-20-07. | $0.00 |
| 57. | Rockford de Mexico Calle 26 No. 2512 Zona Industrial CP 44940 Guadalajara, Jalisco Mexico | Equipment Use Agreement between Rockford Products Corporation and Rockford Products Corporation de Mexico, S.A. de C.V., dated 4-15-05 | $0.00 |
| 58. | Rockford de Mexico Calle 26 No. 2512 Zona Industrial CP 44940 Guadalajara, Jalisco Mexico | Gratuitous Bailment (Comodato) Agreement between Rockford Products Corporation and Rockford Products Corporation de Mexico, S.A. de C.V., dated 4-15-05. | $0.00 |

A000136

| | Counterparty/Address | Contract or Lease Name | Cure Amount |
|---|---|---|---|
| 59. | Total Forging<br>Calle26 No 2512 Zona<br>Guadalajara, Jalisco<br>44940 | Subassembly (Submaquila) Agreement between Total Forging, S.A. de C.V. and Rockford Products Corporation de Mexico, S.A. de C.V., dated 4-15-05 | $0.00 |
| 60. | Total Forging<br>Calle26 No 2512 Zona<br>Guadalajara, Jalisco<br>44940 | Warehousing Services Agreement between Rockford Products Corporation and Total Forging, S.A. de C.V., dated 7-6-05. | $0.00 |
| 61. | Total Forging<br>Calle26 No 2512 Zona<br>Guadalajara, Jalisco<br>44940 | Manufacturing Services Agreement between Rockford Products Corporation and Total Forging, S.A. de C.V., dated 7-6-05. | $0.00 |
| 62. | IBM<br>PO Box 643600<br>Pittsburgh, PA 15264-3600 | Statement of Work for Services, dated as of March 15, 2004, between Seller and International Business Machines Corporation | $0.00 |
| 63. | RB Distribution, Inc.<br>3400 East Walnut Street<br>Colmar, Pennsylvania<br>18915 | Trademark License Agreement between Rockford Products Corporation and RB Distribution, Inc. (undated). | $0.00 |
| 64. | SSA Global<br>Technologies Inc<br>36549 Eagle Way<br>Chicago, Illinois 60678-1365 | SSA Global Technologies Inc. Software License Agreement, dated November 14, 2006, between Seller and SSA Global Technologies Inc | $0.00 |
| 65. | Scott Brossard<br>80 Gordon Street<br>Elk Grove Village, IL<br>60007 | Financing Agreement, between Rockford Products Corporation and National Machine Tool Financial Corp., dated 3-14-07 | $0.00 |
| 66. | Scott Brossard<br>80 Gordon Street<br>Elk Grove Village, IL<br>60007 | Lease Agreement, Lease No. 92035000, between Rockford Products Corporation and National Machine Tool Financial Corp., dated 5-8-07, as amended by Notification of Assignment of Lease (dated 5-8-07) between Rockford Products Corporation and National Machine Tool Financial Corporation | $0.00 |

A000137

| | Counterparty/Address | Contract or Lease Name | Cure Amount |
|---|---|---|---|
| 67. | Larry Henwood Techman Sales, Inc. PO Box 3648 Mansfield, OH 44907 | Agreement with Techman Sales, Inc. Concerning Sales Representation in Mexico between Rockford Products Corporation and Techman Sales Inc., dated 6-1-07 | $0.00 |
| 68. | Boone/Winnebago Workforce Investment Board 3134 11th Street Rockford, IL 61109 | Training Program Application between Rockford Products Corporation, TechWorks and Boone/Winnebago Workforce Investment Board, dated 6-20-07. | $0.00 |
| 69. | Independent Capital Group, LLC 2501 Landmeier Road Elk Grove Village, IL 60007 | Equipment Lease Agreement, between Rockford Products Corporation and Independent Capital Group, LLC, dated 5-23-06. | $0.00 |
| 70. | Brewer Automotive Components 6 Baker Street Brewer, Main 04412 | Letter agreement between Rockford Products Corporation and Brewer Automotive Components, dated 9-21-05. | $0.00 |
| 71. | Calle 26 No. 2512 Zona Industrial C.P. 44940 Guadalajar, Julisco, MX | Lease Agreement between Rockford Products de Mexico and ACFILAC, S.A. de C.V., dated 2-1-05. | $0.00 |
| 72. | Textron, Inc. – Camcar Division 600 18th Avenue Rockford, Illinois 61104 | Camcar Standard Torx Plus Patent, Know-How and Trademark License Agreement, undated, by and between CAMCAR Division of Textron, Inc. and Seller. | $0.00 |

A000138

| | Counterparty/Address | Contract or Lease Name | Cure Amount |
|---|---|---|---|
| 73. | Samuel C. Wisotzkey Kohner, Mann & Kailas, S.C. Washington Building Barnabas Business Center 4650 N. Port Washington Road Milwaukee, WI 53212-1059 | Natural Gas Agreement dated July 27, 2007 including a Base Index Price Agreement dated July 28, 2004 and a Fixed Price Agreement dated August 22, 2006 between Rockford Products Corporation and Integrys Energy Services, Inc. as successor in interest to Peoples Energy Services Corporation | $17,565.09 |

(Cox)



**CORPORATION SERVICE COMPANY®**

## Notice of Service of Process

WCE / ALL
Transmittal Number: 8278112
Date Processed: 12/14/2010

| | |
|---|---|
| Primary Contact: | Ms. Marie Zacny<br>Honigman Miller Schwartz and Cohn LLP<br>2290 First National Building<br>660 Woodward Avenue<br>Detroit, MI 48226 |

| | |
|---|---|
| Entity: | Rockford Products, LLC<br>Entity ID Number 2659194 |
| Entity Served: | Rockford Acquisition, LLC n/k/a Rockford Products, LLC |
| Title of Action: | Harrison-Kishwaukee, LLC. vs. Rockford Acquisition, LLC n/k/a Rockford Products, LLC |
| Document(s) Type: | Summons/Complaint |
| Nature of Action: | Contract |
| Court/Agency: | Winnebago County Circuit Court, Illinois |
| Case/Reference No: | 10CH2390 |
| Jurisdiction Served: | Illinois |
| Date Served on CSC: | 12/13/2010 |
| Answer or Appearance Due: | 30 Days |
| Originally Served On: | CSC |
| How Served: | Personal Service |
| Sender Information: | Thomas J. Lester<br>815-490-4900 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**
*CSC is SAS70 Type II certified for its Litigation Management System.*
2711 Centerville Road  Wilmington, DE 19808  (888) 690-2882  |  sop@cscinfo.com

A000140

## STATE OF ILLINOIS
### IN THE CIRCUIT COURT OF THE 17th JUDICIAL CIRCUIT
### WINNEBAGO COUNTY

CC-45

HARRISON-KISHWAUKEE, L.L.C., an Illinois limited liability company

Plaintiff(s)

vs.

ROCKFORD ACQUISITION, LLC n/k/a ROCKFORD PRODUCTS, LLC, a Delaware limited liability company

No. 10CH2390

Defendant(s).

### SUMMONS

To each defendant: Rockford Products, LLC
c/o Illinois Corporation Service, Registered Agent
801 Adlai Stevenson Drive
Springfield, IL 62703

You are summoned and required to file an answer in this case, or otherwise file your appearance in the Office of the Clerk of this Court _____ Winnebago County Courthouse _____ building, room ____.

400 W. State Street, Rockford _____, Illinois within 30 days after service of this summons
(Address)          (City)

not counting the day of service. IF YOU FAIL TO DO SO, A JUDGEMENT OR DECREE BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF ASKED IN THE COMPLAINT.

To the officer:

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, summons shall be returned so endorsed.

This summons may not be served later than 30 days after its date.

(Seal of Court)

WITNESS December 6 2010
(Year)

Thomas Lester
(Clerk of the Circuit Court)

By: J. Campbell
(Deputy)

10-13-0

(Plaintiff's Attorney or Plaintiff if he is not represented by an Attorney)
Thomas J. Lester
Name  Hinshaw & Culbertson LLP
Attorney for  Plaintiff
Address  100 Park Avenue
City  Rockford, IL 61101
Telephone (815) 490-4900

American LegalNet, Inc.
www.USCourtForms.com

A000141

FILED

Date: 12-10-10

A. Klein

COPY

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
COUNTY OF WINNEBAGO

HARRISON-KISHWAUKEE, L.L.C., an )
Illinois limited liability company, )
)
Plaintiff, )
) No. 10CH 2390
v. )
)
ROCKFORD ACQUISITION, LLC n/k/a )
ROCKFORD PRODUCTS, LLC, a Delaware )
limited liability company, )
)
Defendants. )

## COMPLAINT FOR SPECIFIC PERFORMANCE AND OTHER RELIEF

NOW COMES the Plaintiff, HARRISON-KISHWAUKEE, L.L.C., an Illinois limited

liability company, by and through its attorneys, HINSHAW & CULBERTSON LLP, and for its

Complaint for Specific Performance and Other Relief against Defendant, ROCKFORD

ACQUISITION, LLC n/k/a ROCKFORD PRODUCTS, LLC, a Delaware limited liability

company, states as follows:

### COUNT I
### SPECIFIC PERFORMANCE

1.    Plaintiff, HARRISON-KISHWAUKEE, L.L.C., is an Illinois limited liability

company with its principal place of business located at 6801 Spring Creek Road, Rockford,

Winnebago County, Illinois.

2.    Plaintiff is the owner of the property commonly known as 707 Harrison Avenue,

Rockford, Illinois ("Leased Premises").

3.    Defendant, ROCKFORD ACQUISITION, LLC n/k/a ROCKFORD PRODUCTS,

LLC, is a Delaware limited liability company with its principal place of business located at 6905

Telegraph Road, Suite 205, Bloomfield Hills, Michigan and which maintains a facility in the

Leased Premises.

70662066v1 0838180 02866

A000142

Case No.

4.    On December 22, 2006, Plaintiff entered into a lease for the Leased Premises with Rockford Products Corporation.

5.    On November 16, 2007, Rockford Products Corporation assigned the lease entered into by Plaintiff and Rockford Products Corporation to Defendant.

6.    On November 16, 2007, Plaintiff and Defendant executed a first amendment to the lease entered into by Plaintiff and Rockford Products Corporation.

7.    The lease entered into by Plaintiff and Rockford Products Corporation, the assignment and assumption of lease executed by Rockford Products Corporation and Defendant, and the first amendment to the lease entered into by Plaintiff and Defendant are collectively referred to herein as the "Lease". A true and correct copy of the Lease is attached hereto as Group Exhibit A.

8.    Pursuant to Section 11.1 of the Lease, Defendant is responsible for keeping and maintaining all parts of the Leased Premises clean, in good repair, and in a tenantable condition during the term of the Lease. See Exhibit A.

9.    Pursuant to Section 11.3 of the Lease, Defendant is responsible for the repair and replacement of the roof and roof drainage systems. See Exhibit A.

10.    Pursuant to Section 13.1, Defendant shall be held in default of the Lease in the event the Defendant fails to perform any covenant or condition of the lease and such failure shall continue for 30 days after written notice to Defendant from Plaintiff. See Exhibit A.

11.    On June 10, 2010, Plaintiff sent written notice to the Defendant demanding Defendant perform its obligations to maintain and repair the Leased Premises, specifically requesting the Defendant replace and/or repair the roof that was leaking and in disrepair. A true

Page 2 of 4

70662066v1 0838180 02866

A000143

Case No.

and correct copy of the thirty day notice ("Notice") sent to Defendant by Plaintiff is attached

hereto as Exhibit B.

12.    Despite the Notice sent to the Defendant, Defendant refused and has continued to

refuse to replace and/or repair the leaking roof as is Defendant's obligation pursuant to the terms

of the Lease.

13.    Pursuant to Section 13.2.3 of the Lease, Plaintiff may enforce the provisions of

the Lease by a suit in equity or at law for the specific performance of any covenant or agreement

contained in the Lease. See Exhibit A.

14.    Pursuant to Section 13.3 of the Lease, in the event either party fails to comply

with any of the terms of the Lease and the other party commences legal proceedings to enforce

the terms of the Lease, the prevailing party in such proceedings shall receive from the non-

prevailing party the reasonable attorneys' fees and reasonable costs incurred in connection with

such enforcement action. See Exhibit A.

15.    Defendant has refused and continues to refuse to perform its obligations under the

terms of the Lease in refusing to replace and/or repair the leaking roof.

16.    The leaking roof has made portions of the Leased Premises untenantable.

17.    Further delay in replacing and/or repairing the roof will result in additional

damage to the Leased Premises.

18.    In accordance with the terms of the Lease, Plaintiff is entitled to the relief of

specific performance in the event Defendant is in default and fails to perform its obligations

under the Lease.

Page 3 of 4

70662066v1 08381B0 02866

\000144

Case No.

WHEREFORE, Plaintiff, HARRISON-KISHWAUKEE, L.L.C., respectfully requests
this Honorable Court enter an Order directing the Defendant to perform its obligations under the
Lease as follows:

A.    Directing Defendant to retain the services of a licensed roofer to replace and/or
repair the roof of the building located on the Leased Premises, in accordance with
the determination of said licensed roofer immediately;

B.    directing Defendant to take such further actions as are necessary to expedite the
completion of replacing and/or repairing the roof of the building located on the
Leased Premises; and

C.    awarding Plaintiff the reasonable attorneys' fees and costs incurred by the
Plaintiff in having to bring this action.

Dated: _12/3/10_                              Respectfully    submitted,    HARRISON-
                                              KISHWAUKEE, L.L.C., is an Illinois limited
                                              liability company,

                                              By: HINSHAW & CULBERTSON LLP

                                              By: _____
                                                   One of Their Attorneys

Thomas J. Lester
Matthew F. Logan
Hinshaw & Culbertson LLP
100 Park Avenue
P.O. Box 1389
Rockford, IL 61105-1389
Phone: 815-490-4900
Fax: 815-490-4901
Firm No. 695

Page 4 of 4

70662066v1 0838180 02866

\000145

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (the "Amendment") is entered into by and between HARRISON-KISHWAUKEE, L.L.C., an Illinois limited liability company, having an office at 6801 Spring Creek Rd., Rockford, IL 61114 ("Landlord") and ROCKFORD ACQUISITION, LLC, having an office at 6905 Telegraph Rd., Suite 205, Bloomfield Hills, MI 48301 ("Tenant"), effective this 16 day of November, 2007.

### WITNESSETH:

WHEREAS, Landlord, as landlord, and Rockford Products Corporation, an Illinois corporation, (the "Prior Tenant") entered into that certain Lease dated December 22, 2006, together with a Commencement Certificate dated December 28, 2006, and as assigned to Tenant by that certain Assignment of Lease dated November ___16___, 2007 (the "Assignment"), all relating to certain premises in Rockford, Illinois (collectively, the "Lease"); and

WHEREAS, Landlord and Tenant wish to amend the Lease as more particularly set forth herein.

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereto agree as follows:

1.   Landlord and Tenant hereby agree as follows, notwithstanding anything in the Lease or any other correspondence or agreement to the contrary:

a.   The Assignment has been approved and complies with the requirements of the Lease, including but not limited to the terms of Section 13.4 with respect to an assignment in connection with a tenant bankruptcy, or all such requirements have been waived by Landlord as to this Assignment.

b.   On or before the date of this Amendment, Tenant shall obtain an environmental insurance policy relating to existing matters (other than known conditions) for a term of 10 years and coverage of $1,000,000. Landlord shall bear the responsibility for any existing matters not covered by such insurance (e.g., due to an exclusion, exceeds policy limits, etc.). Execution of this Amendment by Landlord shall evidence Landlord's approval of such policy. Tenant shall extend such insurance to cover the remainder of the term of the Lease and any options prior to expiration of the current policy; provided, however, that if Tenant does not do so, such failure shall only result in Tenant being liable to Landlord for coverage that would have been provided if the policy was extended (i.e., failure to extend shall not result in a default or allow Landlord to exercise any of its rights or remedies for default or breach of the Lease).

c.   It is the intention of Landlord and Tenant that Tenant not be responsible for any environmental matters or conditions relating to the Property which existed, accrue or relate to the period of time prior to the effective date of the Assignment or otherwise due to the acts or omissions of the Prior Tenant. Therefore, in particular, Tenant's obligations for or relating to environmental matters under Sections 18.5 and 24.1 of the Lease shall not



\000146

relate to or arise from 'any matters or circumstances existing, arising or relating to the period of time on or prior to the effective date of the Assignment or the acts or omissions of the Prior Tenant.

d.     Landlord agrees to cooperate with Tenant and Tenant's lender in the event that Tenant's lender desires to place a leasehold mortgage on Tenant's leasehold interest under the Lease.  In furtherance thereof, Landlord agrees to execute a commercially reasonable form of Subordination, Non-disturbance and Attornment Agreement and shall transmit such request to its lender requesting it to enter into such agreements as Tenant's lender shall reasonably request, all at Tenant's sole cost and expense; including, but not limited to any fees charged by Landlord's lender in negotiating the terms of such document; provided that Tenant acknowledges that Landlord does not have control over Landlord's lender and as such cannot assure Tenant of Landlord's lender's cooperation or reasonableness.  Tenant shall deal directly with Landlord's lender in negotiation of acceptable terms and Landlord shall have no obligation to intervene in such negotiations.

2.     The Lease, as herein amended, is hereby ratified and confirmed and shall remain in full force and effect.

3.     This Amendment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

4.     This Amendment may be executed in one or more counterparts, by facsimile signature, which, taken together, shall constitute but one binding instrument.

[Signature Page Follows]



2

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands the day and year first above written.

**LANDLORD:**

**HARRISON-KISHWAUKEE, L.L.C.,**
an Illinois limited liability company
By: ROCKFORD INDUSTRIAL HOLDINGS, LLC, MEMBER

By: _____

Name: Sami Puri

Its: Member

**TENANT:**

**ROCKFORD ACQUISITION, LLC**

By: _____

Name: _____

Its: _____

**LANDLORD'S LENDER:**

Landlord's lender, Rockford Bank & Trust Company, being the "Lender" under that certain Subordination, Non-disturbance and Attornment Agreement dated December 22, 2006 by and among Lender, Landlord and Prior Tenant, executes this Amendment to evidence its consent and approval with respect to the Assignment and this Amendment.

**ROCKFORD BANK & TRUST COMPANY**

By: _____

Name: _____

Its: _____

OAKLAND.13752\0.3

3

\000148

**IN WITNESS WHEREOF,** the parties hereto have hereunto set their hands the day and year first above written.

**LANDLORD:**

**HARRISON-KISHWAUKEE, L.L.C.,**
an Illinois limited liability company

By: _____
Name: _____
　　　　Its: _____

**TENANT:**

**ROCKFORD ACQUISITION, LLC**

By: _____
Name: Barrett Ramchann
　　　　Its: President

**LANDLORD'S LENDER:**

Landlord's lender, Rockford Bank & Trust Company, being the "Lender" under that certain Subordination, Non-disturbance and Attornment Agreement dated December 22, 2006 by and among Lender, Landlord and Prior Tenant, executes this Amendment to evidence its consent and approval with respect to the Assignment and this Amendment.

**ROCKFORD BANK & TRUST COMPANY**

By: _____
Name: _____
　　　　Its: _____

OAKLAND:15752203.3

3

\000149

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands the day and year first above written.

LANDLORD:

HARRISON-KISHWAUKEE, L.L.C., an Illinois limited liability company

By: _____
Name: _____
Its: _____

TENANT:

ROCKFORD ACQUISITIONS LLC

By: _____
Name: _____
Its: _____

LANDLORD'S LENDER:

Landlord's Lender, Rockford Bank & Trust Company, being the "Lender" under that certain Subordination, Non-disturbance and Attornment Agreement dated December 22, 2006 by and among Lender, Landlord and Prior Tenant, executes this Amendment to evidence its consent and approval with respect to the Assignment and this Amendment.

ROCKFORD BANK & TRUST COMPANY

By: _Thomas A. Budd_
Name: _Thomas A. Budd_
Its: _President & CEO_

OAKLAND:13 KOR13

3

\000150

## ASSIGNMENT AND ASSUMPTION OF LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE ("Agreement") dated as of November 16, 2007, is entered into by and between ROCKFORD PRODUCTS CORPORATION, an Illinois corporation, ("Assignor") and ROCKFORD ACQUISITION, LLC, a Delaware limited liability company ("Assignee").

### RECITALS:

WHEREAS, Assignor is the lessee under that certain Lease dated December 22, 2006, together with a Commencement Certificate dated December 28, 2006 (collectively, the "Lease") with Harrison-Kishwaukee, L.L.C., an Illinois limited liability company ("Landlord"), as landlord, relating to certain premises in Rockford, Illinois ("Property"), which Property is more particularly described on **Exhibit A** attached hereto and incorporated herein by reference;

WHEREAS, pursuant to the Amended and Restated Asset Purchase Agreement dated as of November 13, 2007, Assignor agreed to assign its interest as lessee in the Lease to Assignee, and Assignee agreed to accept the assignment and to assume the lessee's obligations.

NOW, THEREFORE, in consideration of the promises and conditions contained herein, the parties hereby agree as follows:

1.    Assignor hereby assigns, transfers, grants and conveys to Assignee all of its right, title and interest in and to the Lease.

2.    Assignee hereby assumes all of Assignor's obligations under the Lease to the extent arising after the date hereof as modified by that certain First Amendment to Lease of even date herewith by and between Assignee and Landlord.

3.    This Agreement shall be binding upon and inure to the benefit of the parties hereto, their successors, successors in interest and assigns.

4.    This Agreement may be executed in any number of counterpart originals, each of which, when taken together, shall be deemed one and the same instrument. Executed copies of this Agreement may be exchanged via facsimile.

[END OF TEXT – SIGNATURES ON FOLLOWING PAGES]

\000151

SIGNATURE PAGE TO ASSIGNMENT AND ASSUMPTION OF LEASE

ASSIGNOR:

ROCKFORD PRODUCTS CORPORATION,
an Illinois corporation

By: _____
Name: _____
Its: _____

ASSIGNEE:

ROCKFORD ACQUISITION, LLC,
a Delaware limited liability company

By: _____
Name: _____
Its: _____

2

A000152

SIGNATURE PAGE TO ASSIGNMENT AND ASSUMPTION OF LEASE

**ASSIGNOR:**

ROCKFORD PRODUCTS CORPORATION,
an Illinois corporation

By: _____
Name: _____
Its: _____

**ASSIGNEE:**

ROCKFORD ACQUISITION, LLC,
a Delaware limited liability company

By: _____
Name: _____
Its: _____

2

\000153

**EXHIBIT A**

**Legal Description**

(to be attached from Lease)

OAKLAND.1381100.2

3

1000154

### Commencement Certificate

As of this 28th day of December, 2006, Landlord and Tenant certify to one another that the following facts are true and correct statements about the tenancy established by that certain lease (the "Lease") executed by and between Harrison-Kishwaukee, L.L.C. as Landlord and Rockford Products Corporation as Tenant, for the Premises described in said Lease. All capitalized words used in this certificate shall have the same meaning as that set forth in the Lease.

1.    <u>Commencement Date.</u> The Commencement Date is Friday, December 22, 2006.

2.    <u>Rentable Square Feet.</u> The Rentable Square Footage for the Premises is 581,170.

3.    <u>Term.</u> The initial Term commencing on the Commencement Date shown in paragraph 1 above continuing for 159 full calendar months from the first day of the first month following the Commencement Date, ending at midnight on March 31, 2020.

4.    <u>Base Rent.</u>    The prorated portion of Base Rent due from December 22, 2006 through December 31, 2006 is $14,060.56. The Base Rent under the Lease beginning January 1, 2007 is:

| Months | Monthly Rent | Annual Rent |
|--------|--------------|-------------|
| 7-12 | $43,587.75 | $523,053.00 |
| 13-24 | $43,587.75 | $523,053.00 |
| 25-36 | $44,895.00 | $538,740.00 |
| 37-48 | $46,240.00 | $554,880.00 |
| 49-61 | $47,630.00 | $571,560.00 |
| 61-72 | $49,060.00 | $588,720.00 |
| 72-84 | $50,530.00 | $606,360.00 |
| 85-96 | $52,045.00 | $624,540.00 |
| 97-108 | $53,605.00 | $643,260.00 |
| 109-120 | $55,215.00 | $662,580.00 |
| 121-132 | $56,870.00 | $682,440.00 |
| 133-144 | $58,580.00 | $702,960.00 |
| 145-156 | $60,335.00 | $724,020.00 |
| 157-159 | $62,145.00 | $745,740.00 |

5.    <u>Payment Information.</u> Unless otherwise notified in writing by Landlord, all Base Rent and Additional Rent payments shall be paid by Tenant to Harrison-Kishwaukee, L.L.C., 6801 Spring Creek Rd., Rockford, IL 61114.

LANDLORD:  Harrison-Kishwaukee, L.L.C.    TENANT: Rockford Products Corporation

By: _____    By: _____

Sunil Puri, one of its Members       DOUGLAS D. WILLIS

                                    Its: _____CEO_____

A000155

## LEASE

### between

### Harrison-Kishwaukee, L.L.C.,

### An Illinois limited liability company,

### Landlord,

### and

### Rockford Products Corporation,

### an Illinois Corporation,

### Tenant

December 22 , 2006

\000156

# TABLE OF CONTENTS

ARTICLE 1    VARIABLE INFORMATION ................................................... 6

1.1.    Landlord ......................................................................................... 6
    1.1.1.    Name ......................................................................................... 6
    1.1.2.    Address ..................................................................................... 6

1.2.    Tenant ............................................................................................. 6
    1.2.1.    Name ......................................................................................... 6
    1.2.2.    Address ..................................................................................... 6

1.3.    Lease Execution Date ...................................................................... 6

1.4.    Name and Location of Property ....................................................... 6
    1.4.1.    Name ......................................................................................... 6
    1.4.2.    Address ..................................................................................... 7

1.5.    Description of Premises ................................................................... 7
    1.5.1.    Rentable Square Footage ......................................................... 7
    1.5.2.    Tenant's Proportionate Share ................................................. 7

1.6.    Initial Lease Term ........................................................................... 7

1.7.    Commencement Date ....................................................................... 7

1.8.    Base Rent ........................................................................................ 7

1.9.    Permitted Uses ................................................................................ 7

1.10.    Sign ............................................................................................... 7

1.11.    Possession ..................................................................................... 8

ARTICLE 2    PREMISES ............................................................................. 8

ARTICLE 3    TERM ..................................................................................... 8

3.1.    Term ............................................................................................... 8

3.2.    Commencement Certificate ............................................................ 8

ARTICLE 4    RENT ..................................................................................... 8

4.1.    Base Rent ........................................................................................ 8

1000157

4.2.    Additional Rent.................................................................... 8

4.3.    Estimated Monthly Payments of Real Estate Taxes.......................... 9

ARTICLE 5   ALTERATIONS ........................................................ 9

ARTICLE 6   COVENANT AGAINST LIENS ...................................... 10

ARTICLE 7   DAMAGE OR DESTRUCTION BY FIRE OR CASUALTY...... 10

ARTICLE 8   INSURANCE............................................................ 11

8.1.    Fire and Other Casualty. ...................................................... 11
    8.1.1.    Property............................................................. 11
    8.1.2.    Deductible. ......................................................... 11
    8.1.3.    Waiver. .............................................................. 11

8.2.    Liability.............................................................................. 11

8.3.    Estimated Monthly Payments of Insurance .............................. 12

8.4.    Landlord's Rights to Procure Insurance .................................. 12

8.5.    Waiver of Subrogation. ......................................................... 12

8.6.    Dram Shop Insurance............................................................ 12

8.7.    Certification of Insurance. ..................................................... 13

ARTICLE 9   USE; QUIET ENJOYMENT............................................ 13

9.1.    Tenant's Use. ..................................................................... 13

9.2.    Use Restrictions................................................................ 13
    9.2.1.    Title Exceptions.................................................... 13

9.3.    Quiet Enjoyment. ............................................................... 13

ARTICLE 10   UTILITIES.............................................................. 14

10.1.    Water............................................................................. 14

10.2.    Electricity....................................................................... 14

10.3.    Failure or Delay of Service. ................................................. 14

10.4.    Utility Access. .................................................................. 14

ii

\000158

10.5.    Utility Measurement ............................................................................ 15

ARTICLE 11    MAINTENANCE AND REPAIRS; RIGHTS TO ENTER ...... 15

11.1.    Tenant's Duty. ..................................................................................... 15

11.2.    Landlord's Right to Enter. .................................................................. 15

11.3.    Structural Repairs. .............................................................................. 16

11.4.    Additional Rent. .................................................................................. 16

ARTICLE 12    CONDEMNATION ..................................................................... 16

12.1.    All or Part of Premises or Building. .................................................. 16

12.2.    Rent Apportioned. .............................................................................. 17

12.3.    Partial Taking Without Termination. ................................................ 17

ARTICLE 13    DEFAULT AND LANDLORD REMEDIES ............................. 17

13.1.    Tenant Default. ................................................................................... 17

13.2.    Remedies. ............................................................................................ 17
        13.2.1.    Lease Termination ............................................................. 18
        13.2.2.    Termination of Tenant's Right to Possession ................. 18
        13.2.3.    Legal Enforcement. ........................................................... 18

13.3.    Attorney Fees. .................................................................................... 19

13.4.    Bankruptcy. ........................................................................................ 19

13.5.    Landlord Default. ............................................................................... 20

13.6.    Waiver of Damages and Limitation of Recourse. ............................ 20

ARTICLE 14    SURRENDER OF POSSESSION ............................................. 20

14.1.    Tenant's Duty. .................................................................................... 20
        14.1.1.    Removal of Trade Fixtures ............................................... 20
        14.1.2.    Surrender of Possession .................................................... 20

14.2.    Landlord's Rights. .............................................................................. 21
        14.2.1.    Transfer of Title to Tenant's Trade Fixtures ................... 21
        14.2.2.    Disposal of Tenant's Trade Fixtures. ............................... 21

iii

A000159

ARTICLE 15    HOLDING OVER ......................................................... 21

ARTICLE 16    NON-DISTURBANCE AND ATTORNMENT ................ 21

16.1.    Attornment ................................................................... 21

16.2.    Mortgagee's Obligations ............................................. 22

16.3.    Binding Effect ............................................................ 22

16.4.    Subordination ............................................................. 22

ARTICLE 17    ESTOPPEL ............................................................. 22

ARTICLE 18    COMPLIANCE WITH LAWS ................................. 23

18.1.    Compliance ................................................................. 23

18.2.    Hazardous Or Toxic Materials ................................... 23

18.3.    Definition Of Hazardous Materials ............................ 23

18.4.    Covenants ................................................................... 23

18.5.    Indemnification ........................................................... 24

ARTICLE 19    CERTAIN RIGHTS RESERVED BY LANDLORD ........... 24

19.1.    Sign Maintenance ....................................................... 24

19.2.    Showing Premises ....................................................... 24

ARTICLE 20    ASSIGNMENT AND SUBLETTING .......................... 24

ARTICLE 21    NOTICE ............................................................... 25

ARTICLE 22    CONVEYANCE BY LANDLORD ............................. 25

ARTICLE 23    RECORDING ......................................................... 25

ARTICLE 24    INDEMNIFICATION .............................................. 26

24.1.    Landlord's Indemnification ......................................... 26

24.2.    Tenant's Indemnification ............................................ 26

A000160

ARTICLE 25    CONSTRUCTION .......................................... 26

25.1.    Landlord's Work ..................................................... 26

25.2.    Accepting Possession ............................................. 26

ARTICLE 26    RIGHT OF FIRST OFFER ......................... 26

ARTICLE 27    MISCELLANEOUS ...................................... 27

27.1.    Binding Effect .......................................................... 27

27.2.    Illinois Law Governs ............................................. 27

27.3.    Headings .................................................................. 27

27.4.    Severability ............................................................. 27

27.5.    Relationship of Parties .......................................... 27

27.6.    Rent .......................................................................... 27

27.7.    Consents and Waivers ............................................ 27

27.8.    Remedies Cumulative ............................................. 28

27.9.    Delay ........................................................................ 28

27.10.    Submission of Lease .............................................. 28

27.11.    Context .................................................................... 28

27.12.    Brokerage ................................................................ 28

27.13.    Authorship .............................................................. 28

27.14.    Interest .................................................................... 29

27.15.    Survival of Obligations ......................................... 29

27.16.    Accord and Satisfaction ........................................ 29

27.17.    Joint and Several Liability .................................... 29

27.18.    Independent Covenants ......................................... 29

27.19.    Specially Designated National ............................. 29

v

A000161

## LEASE

### ARTICLE 1    VARIABLE INFORMATION

1.1.    Landlord.

    1.1.1.    Name.

        HARRISON-KISHWAUKEE, L.L.C., an Illinois limited liability company

    1.1.2.    Address.

        6801 Spring Creek Rd.

        Rockford, IL 61114

        with a copy to

        General Counsel

        First Rockford Group, Inc.

        6801 Spring Creek Rd.

        Rockford, IL 61114

1.2.    Tenant.

    1.2.1.    Name.

        Rockford Products Corporation, an Illinois Corporation

    1.2.2.    Address.

        707 Harrison Ave.

        Rockford, Illinois 61104

1.3.    Lease Execution Date.

    _____, which date is the date that the last party to
sign will insert upon execution.

1.4.    Name and Location of Property.

    1.4.1.    Name.

        Rockford Products Building

A000162

1.4.2.    **Address.**

707 Harrison Ave.

Rockford, IL  61104

1.5.    **Description of Premises.**

1.5.1.    **Rentable Square Footage.**

Approximately 581,170 square feet

1.5.2.    **Tenant's Proportionate Share.**

100%

1.6.    **Initial Lease Term.**

159 full calendar months.

1.7.    **Commencement Date.**

The Commencement Date shall be the same as the Lease Execution Date

1.8.    **Base Rent.**

| Months | Monthly Rent | Annual Rent |
|--------|-------------|-------------|
| 1-12 | $43,587.75 | $523,053.00 |
| 13-24 | $43,587.75 | $523,053.00 |
| 25-36 | $44,895.00 | $538,740.00 |
| 37-48 | $46,240.00 | $554,880.00 |
| 49-61 | $47,630.00 | $571,560.00 |
| 61-72 | $49,060.00 | $588,720.00 |
| 72-84 | $50,530.00 | $606,360.00 |
| 85-96 | $52,045.00 | $624,540.00 |
| 97-108 | $53,605.00 | $643,260.00 |
| 109-120 | $55,215.00 | $662,580.00 |
| 121-132 | $56,870.00 | $682,440.00 |
| 133-144 | $58,580.00 | $702,960.00 |
| 145-156 | $60,335.00 | $724,020.00 |
| 157-159 | $62,145.00 | $745,740.00 |

1.9.    **Permitted Uses.**

Any lawful use not otherwise prohibited in this Lease.

1.10.    **Sign.**

Tenant shall be entitled to install building and pylon/monument signage at its sole cost and expense provided such does not exceed the maximum amount permitted under code without variance. Tenant shall be entitled to maintain its existing signage on the Premises.

\000163

4.3.    Real Estate Taxes.

Tenant shall be responsible for the payment of all Real Estate Taxes applicable to the Property on or before the date such payments are due. "Real Estate Taxes" shall include all taxes attributable to the improvements now or hereafter made to or upon the Premises, or attributable to any present or future installation in or on the Premises, fixtures, machinery, or equipment; all real estate taxes, assessments, or impositions; water and sewer rents; and other governmental impositions and charges of every kind or nature whatsoever, nonrecurring as well as recurring; special or extraordinary as well as ordinary; foreseen and unforeseen; and each and every installment thereof, which are levied, assessed or imposed, or become due and payable or become liens upon, or arise in connection with the use, occupancy or possession of, or any interest in, the Premises, during the Term. If because of any change in the taxation of real estate, any other tax, imposition or assessment (including without limitation, any franchise, income, profit, sales, use, occupancy, gross receipts or rental tax) is imposed on Landlord as the owner of the Premises, or on the occupancy, rents or income from either of the foregoing, in substitution for any taxes, such other tax or assessment will be deemed part of Real Estate Taxes. Tenant acknowledges Real Estate Taxes are paid in arrears. As such, a final reconciliation shall follow the expiration of the Lease Term.

Within ten (10) days of Landlord's receipt of the Real Estate Tax bill, Landlord shall furnish Tenant with a copy of the bill. Tenant shall provide Landlord with a copy of the paid receipt for the Real Estate Taxes within ten (10) days following the date of payment.

The Tenant, at its expense, may dispute and contest the Real Estate Taxes, and in such cases the disputed charge need not be paid until finally adjudged to be valid. At the conclusion of such contest, Tenant shall pay the charge contested to the extent it is held valid, together with all court costs, interest, penalties and other expenses relating thereto. Nothing herein contained, however, shall be construed as to allow such items to remain unpaid for such length of time as shall permit the Premises (or any part thereof) to be sold by governmental, city or municipal authorities for the nonpayment of the same. Tenant indemnifies Landlord against any loss or expenses, including attorney's fees, incurred as a result of such contest. Tenant shall take no action that creates criminal liability for Landlord or the right to contest the Taxes is cancelled.

ARTICLE 5:    ALTERATIONS

Tenant shall not, without the prior written consent of Landlord which shall not be unreasonably withheld or delayed, make any material alterations, installations, improvements, or additions to the Premises including, but not limited to, wall coverings, floor coverings, and special lighting installation. A "material" alteration shall be any alteration for which the cost exceeds $75,000.00. This limitation shall not apply to any re-painting of the Premises undertaken by Tenant during the Term of this Lease. In the event Tenant desires to make any material alterations, installments, improvements, or additions, Tenant shall first submit to Landlord plans and specifications therefore, including names of proposed design professionals and contractors to be involved in such work and obtain Landlord's written approval thereof (which shall not be unreasonably withheld or delayed) prior to commencing any such work. Such plans shall be deemed approved unless Landlord shall furnish to Tenant written objections to such plans within ten (10) days after the plans are received by Landlord. Notwithstanding the foregoing, Landlord shall have the right to withhold approval of structural changes to the Building in its reasonable discretion. Reasonable objections to structural changes shall include, but not be limited to, (1) any change that results in the isolation of any space within the Building from the loading docks or office spaces, (2) any change not prepared by a structural engineer licensed in the jurisdiction, (3) any change not architecturally consistent with the existing improvements, (4) any change that interferes with the drainage from or

\000164

through the Property, (5) any change that would result in a decrease in the parking or (6) any change that would reduce the square footage of the Building. All such work shall be done at Tenant's sole cost and expense, and in a good and workmanlike manner. If Tenant adds or removes walls or partitions, Tenant shall provide Landlord with record drawings of the changes immediately following their completion. Landlord shall be furnished with sworn statements and waivers of lien as may be deemed appropriate by Landlord. Except as to any trade fixtures, business equipment, or other removable personal property installed by Tenant, Tenant shall remove at the termination of this Lease (by lapse of time or otherwise) and for which Tenant shall repair all improvements damaged by the installation or removal of same, all alterations, installations, improvements, and additions (whether temporary or permanent in character) made by Tenant in or upon the Premises shall be the property of Tenant, but shall become Landlord's property and shall remain upon the Premises at the termination of this Lease, by lapse of time or otherwise, without compensation to Tenant. All construction work performed at Tenant's request in the Premises shall be done by contractors and subcontractors who have worker's compensation and employer's liability insurance meeting the following requirements: (1) in statutory amounts; (2) with reputable companies licensed to do business in the State of Illinois; and (3) showing Landlord and Landlord's lender or lenders as additional insureds. In addition, all such contractors and subcontractors shall have general public liability insurance coverage consistent with the specifications contained in Sections 8.2 and 8.5 of this Lease, provided however, the combined single limit for such coverage may be reduced to $1,000,000.00. Evidence of the insurance required herein shall be provided Landlord before any construction is begun.

Under no circumstances may Tenant place, attach or affix anything permanently or temporarily at or above the roofline without the consent of the Landlord, which shall not be unreasonably withheld or delayed.

### ARTICLE 6    COVENANT AGAINST LIENS

Nothing contained in this Lease shall authorize Tenant to do any act which shall in any way encumber Landlord's title to the Premises, nor in any way subject Landlord's title to any claims by way of lien or encumbrance whether claimed by operation of law or by virtue of any expressed or implied contract of Tenant, and any claim to a lien upon the Premises arising from any act or omission of Tenant shall attach only against Tenant's interest and shall in all respects be subordinate to Landlord's title to the Premises. If Tenant has not removed any such lien or encumbrance, or furnished Landlord reasonably sufficient bond therefore, within thirty (30) days after written notice to Tenant by Landlord (or such shorter period as indicated by Landlord if during the pendency of a sale or refinance), Landlord may pay the amount without being responsible for making any investigation as to the validity thereof, and the amount so paid shall be due and payable as Additional Rent. Notwithstanding the foregoing, so long as Tenant has furnished Landlord a bond or other security sufficient to allow a nationally recognized title company to insure over the lien, Tenant may contest such lien.

### ARTICLE 7    DAMAGE OR DESTRUCTION BY FIRE OR CASUALTY

If the Premises is materially damaged or destroyed by fire or other casualty, Tenant shall have the right to terminate this Lease as of the date of the fire or casualty by notice to the Landlord within sixty (60) days after the date of the casualty, in which event Rent shall be apportioned on a per diem basis and be paid to the date of the fire or casualty. For purposes of this Article 7, any damage to the Premises shall be considered material if the loss resulting therefrom is in excess of One Million Dollars ($1,000,000.00). In the event of termination hereunder, any insurance proceeds on loss for buildings, improvements or other covered items, with the exception of Tenant's personal property, shall be made payable to Landlord. If Tenant elects not to terminate this Lease or if the damage is not material, this Lease shall not be terminated and Tenant shall, at its expense, repair and restore the Building so as to be substantially the

A000165

1.11. **Possession.**

Tenant is already in possession of the Premises.

## ARTICLE 2    PREMISES

Subject to the Title Exceptions (the "Title Exceptions") identified in Exhibit C, Landlord hereby demises and leases to Tenant and Tenant hereby accepts, the property legally described in Exhibit A ("Property"), including all improvements located thereon ("Building") and fixtures contained therein. The Property and Building are collectively referred to herein as the Premises.

## ARTICLE 3:    TERM

3.1. **Term.**

This Lease shall become effective upon its execution by authorized representatives of the parties. The term (the "Term") of this Lease shall commence and Base Rent and Additional Rent shall become payable upon the Lease Execution Date and shall continue thereafter to and including the last day of the number of months set out in Section 1.6 measured from the first day of the first month immediately following the Commencement Date set out in Section 1.7; provided, however, that if the Commencement Date is the first day of a month, such Term shall continue thereafter to and including the date which is the aforesaid number of months from the Commencement Date.

3.2. **Commencement Certificate**

As soon as practicable following the Commencement Date, Landlord and Tenant will complete and execute the Commencement and Rent Certificate in the form attached hereto as Exhibit B.

## ARTICLE 4:    RENT

4.1. **Base Rent.**

Tenant shall pay to Landlord at the office of Landlord as set forth in Section 1.1 or such other place or places as Landlord may designate in a written notice delivered to Tenant from time to time, annual base rent ("Base Rent"), in twelve (12) equal monthly installments, each in advance as of the first day of each and every calendar month during the Term, the rent set out in Section 1.8. If the Term commences on a day other than the first day of a calendar month or ends on a day of a calendar month other than the last day of a calendar month, Base Rent for such fractional month shall be prorated on the basis of one-thirtieth (1/30) of the monthly Base Rent for each day of such fractional month and for each such fractional month within the Term. Base Rent shall be payable without any prior demand therefore and without any deduction or setoff whatsoever except as provided herein. Although Base Rent is due and payable on the first day of each calendar month, the parties hereto recognize and agree that Base Rent accrues on a daily basis.

4.2. **Additional Rent.**

All amounts due Landlord by Tenant pursuant to this Lease other than Base Rent shall be additional rent ("Additional Rent"). Base Rent and Additional Rent are sometimes referred to herein as "Rent". Except as otherwise expressly set forth in this Lease, Additional Rent shall be payable without demand, deduction or set-off whatsoever.

\000166

same as prior to such damage or destruction. Tenant shall begin such repairs or restoration within six (6) months from the date of such fire or other casualty and shall complete said repairs or restoration within twelve (12) months from said date. Tenant shall notify Landlord in writing of the date by which repairs to or replacement of the Building is to commence, and the estimated date of completion and shall diligently pursue such repairs or restoration to final completion.

## ARTICLE 8    INSURANCE

### 8.1.    Fire and Other Casualty.

#### 8.1.1.    Property.

Landlord agrees to purchase and keep in force and effect replacement value insurance on the Building, including, but not limited to, coverage against fire, vandalism and malicious mischief, and perils covered on an "all risk" or "special form" basis, as such coverage is from time to time available

#### 8.1.2.    Deductible.

Such Landlord's insurance shall be subject to a deductible of not more than $50,000.00 per occurrence. Any insurance proceeds on loss for buildings, improvements or other covered items, with the exception of Tenant's personal property, shall be payable to Landlord.

#### 8.1.3.    Waiver.

Tenant waives any claim(s) against Landlord, related to damage to Tenant's improvements and to Tenant's merchandise, contents, furniture, equipment, files, and all other personal property located on the Premises (collectively referred to herein as "Tenant's Property"); including, but not limited to, claims arising from vandalism, malicious mischief, perils covered by extended coverage, theft, sprinkler leakage, water damage (however caused), explosion, malfunction, or failure of heating and cooling or other apparatus, and other similar risks. Landlord will not procure any insurance against damage to Tenant's Property. Tenant shall secure its own insurance coverage for Tenant's Property. Landlord shall be named as an additional insured as its interests may appear.

### 8.2.    Liability.

Tenant shall, at Tenant's sole cost and expense, maintain during the entire Term hereof, (a) commercial general liability insurance and property damage insurance under policies issued by insurers having a Best's Insurance Reports rating of at least A/V, with a combined single limit of not less than $2,000,000 for personal injury, bodily injury, sickness, disease, or death or for damage or injury to or destruction of property (including the loss of use thereof) for any one occurrence and (b) pollution liability insurance for bodily injury, property damage, and environmental damage resulting from sudden and accidental releases of pollution, and covering related or resultant clean-up and/or remediation costs arising out of the occupancy and use of the Premises, with a combined single limit of not less than $1,000,000 for any one occurrence. Such insurance shall be subject to reasonable levels of risk retention by Tenant as approved by the Landlord from time to time. Tenant's policies shall name as additional insureds, Landlord, its agents, servants, and employees, and any mortgagees as their interests may appear. Such policies

Page 11 of 30

\000167

shall provide by endorsement that the insurer is required to provide Landlord at least thirty (30) days' written notice prior to any cancellation or termination of such insurance. The minimum limits of Tenant's comprehensive public liability policies of insurance shall be subject to increase from time to time during the Term if such amounts are no longer adequate as determined by coverage carried by prudent owners or operators of comparable properties in the area.

Landlord may purchase and keep in force and effect commercial general liability insurance on the Building and the Property with like policy limits to those required of the Tenant by an umbrella policy or otherwise, the costs of which shall be borne by Tenant as Additional Rent and paid in the same manner as provided for in Section 8.1.1.

8.3.    <u>Estimated Monthly Payments of Insurance</u>

Within ten (10) days of Landlord's receipt of the insurance premium invoice for all insurance obtained by Landlord pursuant to this Lease, Landlord shall furnish Tenant with a written statement of the premium amount. Tenant shall pay the premium to Landlord within five (5) days of such Notice. Tenant shall insure its own personalty, including any improvements.

8.4.    <u>Landlord's Rights to Procure Insurance.</u>

In the event Tenant fails to provide any policy or policies of insurance as required hereunder, Landlord may, but shall not be required to, obtain such insurance and the amounts so paid shall be deemed reserved under this Lease due and payable forthwith in the full amount chargeable to Tenant as Additional Rent. Landlord shall, within five (5) days of obtaining such insurance, send a notice to Tenant informing Tenant of Landlord's action. This right is in addition to any other rights Landlord may have arising from a breach of Tenant's obligation hereunder to provide insurance.

8.5.    <u>Waiver of Subrogation.</u>

Nothing in this Lease shall be construed so as to authorize or permit any insurer of Landlord or Tenant to be subrogated to any right of Landlord or Tenant against the other party arising under this Lease. Landlord and Tenant each hereby release the other to the extent of any perils to be insured against by either of the parties under the terms of this Lease, whether or not such insurance has actually been secured, is collectible, is through self-insurance or otherwise, and to the extent of their respective insurance coverage (whether such insurance is through self-insurance or otherwise) for any loss or damage caused by any such casualty, even if such incidents shall be brought about by the fault or negligence of either party or persons for whose acts or negligence the other party is responsible. All insurance policies to be provided under this ARTICLE 8 by either Landlord or Tenant shall contain a provision that they are not invalidated by the foregoing waiver. Such waiver shall, however, cease to be effective if the existence thereof precludes either Landlord or Tenant from obtaining any such policy.

8.6.    <u>Host Liquor Liability Insurance.</u>

In the event that at any time during the Term of this Lease or any extension or renewal thereof, beer, wines, or other alcoholic liquors or beverages are sold or given away upon or from the Premises (it being understood and agreed, however, that the foregoing provision shall not authorize use of the Premises for such purposes without the express consent of the Landlord being set forth otherwise in this Lease), Tenant shall, at its sole expense, obtain, maintain and keep in force, adequate Host Liquor Liability insurance protecting both Tenant and Landlord in

Page 12 of 30

\000168

connection therewith with policy limits covering the full amount of potential liability provided for from time to time under the laws of the state in which the property is located. Said policies shall be in such companies as are authorized to write such coverage in the state in which the property is located, shall be acceptable to Landlord and/or its lender (which shall be named as an additional insured) and copies shall be maintained on file with Landlord, and shall contain non-cancelable clauses unless Landlord is given at least thirty (30) days' notice of such proposed cancellation. In the event Tenant shall fail to procure such insurance where applicable, Landlord may procure the same and, in the event Landlord shall be unable to procure the same (all at Tenant's expense), then the activity shall be suspended until such coverage is again in force. If Landlord does procure the same, the cost thereof, shall be Additional Rent due immediately.

8.7.    Certification of Insurance.

The insurance required to be provided by Tenant under this Article shall be effective as of the date Tenant takes possession. The parties shall provide each other evidence of the insurance policy or policies required by this ARTICLE 8 at least ten (10) business days prior to the date Tenant takes possession, and at least ten (10) days prior to the expiration thereafter of any such policy. In the event the certificate of insurance provided hereunder contains any defenses or exclusions from coverage that are not specifically identified on the certificate, Tenant shall provide an original of any required policy upon Landlord's reasonable request.

### ARTICLE 9    USE; QUIET ENJOYMENT

9.1.    Tenant's Use.

The Premises shall be used solely for the uses set out at Section 1.9, and for no other purpose whatsoever. Tenant shall not use or permit upon the Premises anything that will invalidate any policy of insurance now or hereafter carried on the Building or, that will increase the rate of insurance on the Building, Property, or Premises. Tenant shall not do anything or permit anything to be done upon the Premises which in any way may tend to create a nuisance, disturb any other tenants in the Building or the occupants of any neighboring property. Tenant shall comply with all governmental health and safety requirements and regulations respecting the Premises and shall not conduct or permit to be conducted on the Premises any business which is in violation of any applicable law. Landlord shall not be required to remedy code or ordinance violations existing at the time Tenant takes possession of the Premises.

9.2.    Use Restrictions.

Tenant, for itself, its employees, agents, servants, clients, customers, invitees, licensees, and guests, agrees to observe and comply at all times with the following rules and regulations as herein set forth.

9.2.1.    Title Exceptions.

Tenant shall not violate any of the Title Exceptions.

9.3.    Quiet Enjoyment.

The Landlord agrees that, so long as Tenant is not in Default under the Lease beyond the expiration of any applicable cure period, Tenant shall lawfully and quietly hold, occupy and enjoy

Page 13 of 30

\000169

the Premises during the Term of this Lease free from any hindrance by Landlord or any person or entity claiming by, through or under Landlord, subject to the provisions of this Lease.

## ARTICLE 10    UTILITIES

**10.1.    Water.**

Domestic water shall not be furnished by the Landlord but by the municipality in which the Premises are located. Tenant shall pay the cost of all water furnished for any purpose within the Premises. Tenant shall not waste or permit the waste of water.

**10.2.    Electricity.**

Electricity shall not be furnished by the Landlord, but shall be furnished by Commonwealth Edison Company or another approved electric utility company serving the area. Landlord shall permit Tenant to receive such service direct from such utility company at Tenant's cost. Tenant shall make all necessary arrangements with the utility company for paying for electric current furnished by it to Tenant, and Tenant shall pay for all charges for electric current consumed on the Premise during Tenant's occupancy thereof. Tenant shall make no material alterations or additions to the electric equipment or appliances without the prior written consent of the Landlord in each instance which consent shall not be unreasonably withheld or delayed. Tenant also agrees to purchase its own lamps, bulbs, ballasts, and starters used in the Premises during the Term hereof. Tenant covenants and agrees that at all times its use of electric current shall never exceed the capacity of the feeders to the Building or the risers or wiring installed thereon.

**10.3.    Failure or Delay of Service.**

Tenant agrees that Landlord shall not be liable in damages, by abatement of Rent or otherwise, for failure to furnish or delay in furnishing any service when such a failure or delay is occasioned, in whole or in part, by repairs, renewals, improvements, by any strike, lockout, or other labor trouble, by inability to secure electricity, gas, water, or other fuel at the Building after reasonable effort (including Landlord's cooperation in restoration of service) to do so, by any accident or casualty whatsoever, by the act or default of Tenant or other parties, by failure of Landlord's bank(s) or mortgagee(s) to provide financing or to release insurance or construction proceeds, or by any cause beyond the reasonable control of Landlord; and any such failure or delay shall never by deemed to constitute an eviction or disturbance of Tenant's use and possession of the Premises or to relieve Tenant from paying Rent or performing any of its obligations under this Lease.

**10.4.    Utility Access.**

Tenant agrees to cooperate fully, at all times, with Landlord in abiding by all reasonable regulations and requirements which Landlord may prescribe for the proper functioning and protection of all utilities and services reasonably necessary for the operation of the Building. Landlord, throughout the Term, shall have access at reasonable times after reasonable prior notice to Tenant to any and all mechanical installations; and Tenant agrees that there shall be no construction or permanent partitions or other permanent obstructions which might interfere with the moving of the servicing equipment of Landlord to or from the enclosures containing said installations. Notwithstanding the foregoing, Tenant may operate the mechanical equipment of the Building consistent with the manufacturer's operating instructions.

Page 14 of 30

A000170

10.5.    Utility Measurement.

The cost of all utilities shall be paid by Tenant directly to the service provider.

ARTICLE 11    MAINTENANCE AND REPAIRS; RIGHTS TO ENTER

11.1.    Tenant's Duty.

Tenant shall, at its sole cost and expense, keep and maintain all parts of the Premises clean, in good repair and tenantable condition during the Term and make all repairs, replacements, alterations, additions and improvements of every nature and description, whether ordinary or extraordinary, including, without limiting the generality of the foregoing, all plumbing and sewage facilities within or serving the Premises, including free flow up to the common sewer line; all heating, air conditioning, ventilation, refrigeration, fire protection, sprinkler, mechanical, electrical and lighting systems, facilities and equipment within or serving the Premises; all fixtures, ceilings, doors, windows, broken windows, glass entrance doors to the Building, skylights, interior walls and interior surfaces of exterior walls; any repairs required due to illegal entry or burglary of the Building; and all of the exterior of the Building (including all signs and dryvit areas), as well as the improvements to the Property, including, but not limited to, all sidewalks, landscaping, parking lots and entrance and exit driveways. Tenant shall perform the maintenance on the heating, ventilating and air conditioning system serving the Building at least quarterly and shall thereafter provide, at Landlord's request, maintenance reports identifying the maintenance provided. Tenant shall operate heating and cooling equipment to maintain such temperatures as will prevent the freezing or bursting of pipes within the Building. Tenant shall promptly, and at its sole cost and expense, repair all damage to the Premises. Tenant shall, at Tenant's cost, be responsible for janitorial services at the Premises and for regular trash and refuse removal in connection with Tenant's use and occupancy of the Premises in compliance with all applicable laws and regulations.

11.2.    Landlord's Right to Enter.

If Tenant does not act promptly as aforesaid, Landlord may, subject to prior notice to Tenant and opportunity to cure in situations other than emergencies, but shall not be required to, enter the Premises at all reasonable times to make any repairs, alterations, improvements, or additions that Tenant was required to make hereunder or, as Landlord may be required to do by any governmental authority or by the order or decree of any court or by any other proper authority. In the event Landlord or its agents or independent contractors shall elect or be required to make repairs, alterations, improvements, or additions to the Premises, Landlord shall be allowed to take into and upon the Premises, all material that may be required to make such repairs, alterations, improvements, or additions and during the continuance of any of said work, to temporarily close doors, entry ways, public space, and corridors in the Premises and to interrupt or temporarily suspend any services and facilities without being deemed or held guilty of an eviction of Tenant or for damages to any of Tenant's property, business, or person, and the Rent reserved herein shall in no way abate while said repairs, alterations, improvements, or additions are being made. Landlord shall minimize its obstruction of Tenant's business to the extent reasonably practical under the circumstances. Landlord may, at its option, make all such repairs, alterations, improvements, or additions in and about the Premises during ordinary business hours, but if Tenant desires to have the same done at any other time, and the same can be practicably done at any other time, Tenant shall then pay all overtime and additional expenses resulting therefrom. No notice need be provided in the event of an emergency. Landlord will pay for or repair any

A000171

damage to the Premises caused by any voluntary entry it makes, excluding those precipitated by emergency or Tenant's failure to act.

Landlord reserves the right at all reasonable times and upon reasonable prior notice, except in the event of emergencies, during the term of this Lease for Landlord or Landlord's agents to enter the Premises for the purpose of inspecting and examining the same, and to make such repairs, alterations, improvements, or additions as Landlord may deem necessary or desirable. Landlord agrees that it shall not unreasonably interfere with Tenant's use, of the Premises or the conduct of its business. If Tenant shall not be personally present to open and permit an entry into said Premises, at any time, when for any reason an entry therein shall be necessary or permissible, Landlord or Landlord's agents may enter the same by master key, or may forcibly enter the same, without rendering Landlord or such agents liable therefore, and without in any manner affecting the obligations and covenants of this Lease. Nothing herein contained, however, shall be deemed or construed to impose upon Landlord any obligation, responsibility, or liability whatsoever for the care, maintenance, or repair of the building or any part thereof, except as otherwise herein specifically provided.

### 11.3. Structural Repairs.

Tenant shall further be responsible for the repair and replacement of all broken windows, roof and roof drainage systems, and entrance doors. Tenant shall, at its expense, repair, reconstruct, or replace all structural damage or structural defects in the exterior or bearing walls and floor of the Building. Prior to commencing any structural repairs, Tenant shall send notice to Landlord, including in such notice a copy of the plans for such repairs. Landlord shall have seven (7) days to raise reasonable objections to such plans, which objections shall be satisfied by Tenant prior to commencement of construction. Any contractors hired by Tenant to perform any repairs, alterations, improvements, or additions Tenant elects or is required to make hereunder shall have insurance in commercially reasonable amounts. All repairs Tenant elects or is required to make hereunder shall be made in a good and workmanlike manner.

### 11.4. Additional Rent.

~~Any amount paid by Landlord for maintenance repairs or replacements which are the obligation~~ of Tenant shall be due immediately as Additional Rent.

### ARTICLE 12. CONDEMNATION

### 12.1. All or Part of Premises or Building.

If all or a material part of the Premises shall be taken or condemned by any competent authority for any public use or purpose, or sold to any such authority which has the power of eminent domain and has threatened to exercise such power with respect to the Premises, then, unless otherwise agreed to by the parties, the Term shall end sixty (60) days after the earlier of either: (1) The date of any court order or agreement approving such taking or condemnation; (2) The date Landlord receives Tenant's advance written Notice that it intends to terminate possession of the Premises, provided Tenant vacates the Premises within such sixty (60) day period; or (3) The date such authority takes possession of the portion of the Property so condemned or sold. For purposes of this Article 12, any taking shall be considered material if the initial award proposed to Landlord is more than One Million Dollars ($1,000,000.00) or more than twenty percent (20%) of the usable area of the Building is proposed to be taken; or if, in the reasonable judgment of the Tenant, the taking would prohibit the continued use of the property for the purpose set forth

\000172

herein. Landlord shall be entitled to any and all condemnation awards or judgments and Tenant hereby assigns such award or judgment to Landlord (except to extent such award or judgment specifically provides for payment thereof to Tenant for its relocation costs and Tenant improvements paid).

### 12.2.    Rent Apportioned.

Rent shall, in all cases, be apportioned and paid as of the date of any of the above such terminations. Any prepaid rent for periods beyond the termination of the Lease shall be promptly refunded to Tenant.

### 12.3.    Partial Taking Without Termination.

In the event any portion of the Premises is taken and this Lease is not terminated in accordance with the provisions of this ARTICLE 12, all sums due under this Lease shall abate ratably as to the portion of the Premises so taken. Tenant shall make any structural repairs or restoration necessary to make a complete architectural unit of the remainder of the Premises.

### ARTICLE 13    DEFAULT AND LANDLORD REMEDIES

### 13.1.    Tenant Default.

If: (1) Tenant fails to make any payment of Base Rent, Additional Rent, or any installment thereof, or any other sum required to be paid by Tenant under this Lease or related to the occupancy of the Premises following written Notice of default by Landlord and a five (5) calendar day period to cure, provided that Landlord shall not be obligated to provide any such notice and right to cure more than twice during any twelve (12) month period; (2) Tenant fails to perform any of the other covenants or conditions of this Lease which Tenant is required to observe and perform and such failure shall continue for thirty (30) calendar days after written notice to Tenant; provided, however, that if the nature of Tenant's obligation is such that more than thirty (30) calendar days are required for performance, then Tenant shall not be in default if Tenant commences performance within such 30-day period and thereafter diligently prosecutes the same to completion; (3) The interest of Tenant in this Lease shall be levied upon under execution or other legal process, or if any petition for bankruptcy, reorganization, arrangement, insolvency, or liquidation proceedings, or other proceeding for relief under any bankruptcy or similar law for the relief of debtors, are either instituted by Tenant or against Tenant and are allowed against it or consented to by it or not dismissed within sixty (60) calendar days after such institution against Tenant; or (4) Tenant becomes insolvent or admits in writing its inability to pay its debts as they mature, or if a general assignment of Tenant's property shall be made for the benefit of creditors, or if a receiver or trustee is appointed for Tenant or its property, (any of the foregoing events being herein referred to as a "Default"), then Landlord may treat the occurrence of any one or more of the foregoing events as a breach of this Lease by Tenant and thereupon at its option may, without further notice or demand of any kind to Tenant or any other person, have any one or more of the following described remedies in addition to all other rights and remedies provided at law or in equity.

### 13.2.    Remedies.

If a Default occurs and has not subsequently been waived in writing by Landlord, Landlord shall have the rights and remedies hereinafter set forth, which shall be distinct, separate, and cumulative.

Page 17 of 30

\000173

**13.2.1.**  **Lease Termination.**

Landlord may terminate this Lease by giving to Tenant written Notice of the Landlord's election to do so, in which event the Term of this Lease shall expire, and all right, title, and interest of Tenant shall expire on the date stated in such notice.

**13.2.2.**  **Termination of Tenant's Right to Possession.**

Landlord may terminate the right of Tenant to possession of the Premises without terminating this Lease by giving Notice to Tenant that Tenant's right of possession shall expire on the date stated in such notice, whereupon the right of Tenant to possession of the Premises or any part thereof shall cease on the date stated in such notice.

**13.2.3.**  **Legal Enforcement.**

Landlord may enforce the provisions of this Lease and may enforce and protect the rights of Landlord hereunder by a suit or suits in equity or at law for the specific performance of any covenant or agreement contained herein, or for the enforcement of any other appropriate legal or equitable remedy, including, without limitation, injunctive relief and the recovery of all moneys due or to become due from Tenant under any of the provisions of this Lease.

If Landlord exercises either of the remedies provided for in Subsections 13.2.1 and 13.2.2 herein above, Tenant shall surrender possession and vacate the Premises and immediately deliver possession thereof to the Landlord, and Landlord may re-enter and take complete and peaceful possession of the Premises. If Landlord terminates the right of Tenant to possession of the Premises without terminating this Lease, such termination of possession shall not release Tenant, in whole or in part, from any of Tenant's obligations to pay all Rent reserved hereunder for the full Term and Landlord shall have the right to pursue any and all available remedies against the Tenant. In addition, Landlord shall have the right, from time to time, to recover from Tenant, and Tenant shall remain liable for, all Rent and any other sums thereafter accruing as they become due under this Lease during the period from the date of such notice of termination of possession to the stated end of the Term. In addition, if the consideration collected by Landlord upon any such reletting, after payment of the expenses of reletting the Premises which have not been reimbursed by Tenant, is insufficient to pay monthly the full amount of the Rent, Tenant shall pay to Landlord the amount of each monthly deficiency as it becomes due.

Landlord shall use commercially reasonable efforts to relet the Premises or any part thereof for the account of Tenant for such rent and for such time (which may be for a term extending beyond the Term of this Lease), and upon such terms as Landlord in Landlord's sole discretion shall determine, and Landlord shall not be required, in the exercise of its reasonable judgment, to accept any tenant offered by the Tenant or to observe any instructions given by Tenant relative to such reletting. Landlord shall not be required to offer the Premises for lease in preference to other space available from it or its affiliates. In any case, Landlord may make reasonable repairs, alterations, and additions to the Premises and redecorate the same to the extent deemed by Landlord necessary or desirable and in connection therewith, change the locks of the Premises, and Tenant shall upon demand pay the cost thereof together with all Landlord's reasonable expenses of reletting. Landlord may collect the rents from any such reletting and apply the same first to the payment of the reasonable expenses of reentry, redecoration, repair, and alterations and the expenses of reletting, and second to the payment of Rent herein provided to be paid by Tenant, and any excess or residue shall operate only as an off-setting credit to future Rent payable

A000174

hereunder, but the use of such off-setting credit to reduce the amount of Rent due Landlord, if any, shall not be deemed to give Tenant any right, title, or interest in or to such excess or residue and any such excess or residue shall belong to Landlord solely; provided, that in no event shall Tenant be entitled to a credit on its indebtedness to Landlord in excess of the aggregate sum which the credit to Tenant is being determined had no Default occurred. No such re-entry or repossession, repairs, alterations, and additions, or reletting shall be construed as an eviction or ouster of Tenant or as an election on Landlord's part to terminate this Lease, unless a written notice of such intention is given to Tenant, or shall operate to release Tenant, in whole or in part, from any of Tenant's obligations hereunder, and Landlord may, at any time and from time to time, sue and recover judgment for any deficiencies remaining after the application from time to time of the proceeds of any such reletting.

### 13.3.  Attorney Fees.

In the event either party hereto fails to comply with any of the terms of this Lease to be complied with on its part or if Tenant holds over its tenancy in violation of this Lease, and the other party commences legal proceedings to enforce the terms of this Lease, the prevailing party in such proceedings shall receive from the other, and such non-prevailing party agrees to pay to the prevailing party, the prevailing party's reasonable attorney fees and reasonable costs incurred in connection with such enforcement action or proceedings.  In addition, Tenant shall pay all of Landlord's costs, charges and expenses incurred by Landlord for negotiations on transactions with respect to reletting the Premises which Tenant causes Landlord as a result of Tenant's breach of this Lease and without Landlord's fault.

### 13.4.  Bankruptcy.

If Tenant shall be adjudged bankrupt, or any trustee in bankruptcy shall be appointed for Tenant and not dismissed within the period provided herein above, Landlord and Tenant hereby agree, to the extent permitted by law, to request that a trustee in bankruptcy (or debtor in possession, as the case may be) determine within sixty (60) days thereafter whether to accept or reject this Lease, and Tenant hereby agrees not to seek or request any extension or continuation of such time in any bankruptcy proceeding to, assume or, reject this Lease. In no event after the assumption of this Lease, shall any then existing Default remain uncured for a period in excess of the earlier of ten (10) days or the time period for curing such Default as set forth herein.  Failure to cure such Default within such time shall constitute a Default hereunder.  Landlord and Tenant agree that adequate assurance of performance of this Lease, as set forth in Section 365 (b)(i) of the Bankruptcy Code with respect to monetary Default under this Lease shall be in the form of cash or immediately available funds in an amount equal to at least the amount of such monetary Default so as to assure Landlord that it will realize the amount of such Default.  If Tenant assumes this Lease and proposes to assign this Lease pursuant to the provisions of the Bankruptcy Code to any person or entity who shall have made a bona fide offer to accept an assignment of this Lease, the notice of such proposed assignment, setting forth (1) The name and address of such person or entity; (2) All of the terms and conditions of such offer; and (3) The adequate assurance to be provided Landlord to assure such person's or entity's future performance under this Lease, shall be given to Landlord by Tenant within twenty (20) calendar days after receipt of such offer by Tenant, and in no event later than ten (10) calendar days prior to the date the Tenant shall make such application to the Bankruptcy Court for authority and approval to enter into such assumption and assignment.  In addition, Landlord shall thereby have a right of first refusal to be exercised by notice to Tenant given within ten (10) days prior to the effective date of such proposed assignment, to accept an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such a person or entity, less

1000175

any broker's commissions which may be payable out of any consideration to be paid by such person or entity for the assignment of this Lease.

All money or other consideration payable by Tenant or otherwise to be delivered to or on behalf of Landlord under this Lease, whether or not expressly denominated as rent hereunder, shall constitute rent for purposes of Section 502(b)(vi) of the Bankruptcy Code and shall be the sole property of the Landlord.

### 13.5.    Landlord Default.

Landlord shall not be in default unless Landlord fails to perform obligations required of Landlord within a reasonable time, but in no event later than thirty (30) business days following the date Tenant notifies Landlord of Landlord's Default. No default shall exist until the expiration of the applicable cure period after Landlord's receipt of written notice by Tenant to Landlord specifying wherein Landlord has failed to perform such obligation; provided, however, that if the nature of Landlord's obligation is such that more than thirty (30) business days are required for performance then Landlord shall not be in default if Landlord commences performance within such time period and thereafter diligently prosecutes the same to completion.

### 13.6.    Waiver of Damages and Limitation of Recourse.

Notwithstanding any provision in this Lease to the contrary, neither party to this Lease shall be liable to the other for any consequential, incidental or punitive damages (including without limitation, any claims for lost profits and/or lost business opportunity); provided, however, that such damages may be assessed by Landlord against Tenant in the event Tenant holds over its tenancy in violation of this Lease. The parties intend and agree that the doctrine of anticipatory breach or repudiation be and is applicable to this Lease. Notwithstanding any provision in this Lease to the contrary, any liability of Landlord under this Lease shall be limited solely to its interest in the Premises; and in no event shall any personal liability be asserted against Landlord, Landlord's officers, directors, shareholders, members, employees, or agents, in connection with this Lease nor shall any recourse be had to any other property or assets of Landlord, Landlord's officers, directors, shareholders, members, employees, or agents.

### ARTICLE 14.    SURRENDER OF POSSESSION

### 14.1.    Tenant's Duty.

On or before the date this Lease and the Term hereby created terminates, or on or before the date Tenant's right of possession terminates; whether by lapse of time or at the option of Landlord (if Landlord has a right to terminate possession); Tenant shall at its sole cost and expense perform the following acts as herein set forth:

### 14.1.1.    Removal of Trade Fixtures.

it.    Remove from the Premises all of Tenant's trade fixtures and personal property (hereinafter "Personal Property")

### 14.1.2.    Surrender of Possession.

or    Surrender possession of the Premises to Landlord, in the same condition as existed on the Commencement Date as modified by alterations either approved by Landlord or

A000176

permitted under this Lease and other modifications pursuant to ARTICLE 5, ordinary wear and tear and damage required to be repaired by Landlord due to a casualty excepted.

14.2.    **Landlord's Rights.**

If Tenant shall fail or refuse to comply with Tenant's duty to remove all trade fixtures and Personal Property from the Premises on or before the expiration of its right to possession of the Premises whether by expiration of the Term or otherwise, the parties hereto agree and stipulate that Landlord may, at its election after twenty (20) calendar days' prior written Notice to Tenant and Landlord's statement of its intention, pursue either of the following remedies as herein set forth.

14.2.1.    **Transfer of Title to Tenant's Trade Fixtures.**

Treat such failure or refusal as an offer by Tenant to transfer title to such Personal Property to Landlord, in which event title thereto shall thereupon pass under this Lease as a bill of sale to and vest in Landlord absolutely without any cost either by set-off, credit allowance or otherwise, and Landlord may remove, sell, donate, destroy, store, discard, or otherwise dispose of all or any part of said Personal Property in any manner that Landlord shall choose.

14.2.2.    **Disposal of Tenant's Trade Fixtures.**

Treat such failure or refusal as conclusive evidence, on which Landlord shall be entitled absolutely to rely and act, that Tenant has forever abandoned such Personal Property, and without accepting title hereto, Landlord may, at Tenant's expense, remove, store, destroy, discard, or otherwise dispose of all or any part thereof in any manner that Landlord shall choose without incurring liability to Tenant or to any other person. In no event shall Landlord ever become or accept or be charged with the duties of a bailee (either voluntary or involuntary) of any such Personal Property, and the failure of Tenant to remove all such Personal Property from the Premises shall forever bar Tenant from bringing any action or from asserting any liability against Landlord with respect to any such Personal Property which Tenant fails to remove.

**ARTICLE 15 : HOLDING OVER**

Tenant shall pay to Landlord double the Base Rent, plus the actual amount of any Additional Rent, and all other amounts due under the Lease then applicable for the last month of the Term for each month, or portion thereof, that Tenant retains possession of the Premises or any part thereof after the termination of this Lease (or termination of Tenant's right to possession under this Lease), whether by lapse of time or otherwise. Any such holding over shall not be deemed to create a new tenancy of any term whatever and Landlord shall retain all rights against Tenant as exist under this Lease or at law or in equity.

**ARTICLE 16 : NON-DISTURBANCE AND ATTORNMENT**

16.1.    **Attornment.**

If a mortgage is foreclosed for any reason, and a mortgagee succeeds to Landlord's interest under the Lease, Tenant shall be bound to the mortgagee under all of the terms of the Lease for the

\000177

balance of the remaining Term with the same force and effect as if mortgagee were the landlord
under the Lease. Upon presentation of reasonable evidence that title has changed, Tenant hereby
attorns to mortgagee as its landlord, such attornment to be effective and self-operative, without
the execution of any further instrument by either party, as soon as mortgagee succeeds to the
Landlord's interest under the Lease. Notwithstanding any contrary provision herein, Tenant shall
not be required to pay rent to the mortgagee until Tenant receives written notice from mortgagee
that it has succeeded to Landlord's interest under the Lease. The respective rights and obligations
of Tenant and mortgagee upon such attornment shall, to the extent of the then remaining balance
of the Lease Term, be the same as now set forth therein.

16.2.    Mortgagee's Obligations.

If a mortgage is foreclosed for any reason and a mortgagee succeeds to the Landlord's interest
under the Lease, such mortgagee shall be bound to the Tenant under all of the terms of the Lease,
and Tenant shall, from time and after such event, have the same remedies against mortgagee for
the breach of the Lease that Tenant might have had under the lease against the prior landlord
thereunder. In no event shall mortgagee be liable for any act or omission of any prior landlord,
(except to the extent that such act or omission is continuing after the date that mortgage becomes
the successor landlord), be subject to any offsets or defenses which Tenant might have against
any prior landlord, be bound by any amendment of this Lease made after mortgagee becomes the
Landlord without the mortgagee's consent (other than amendments expressly provided for in this
Lease), or be bound by any rent which Tenant might have paid to any prior landlord for more
than one (1) month in advance.

16.3.    Binding Effect.

The rights and obligations hereunder of Tenant and mortgagee shall bind and inure to the benefit
of their respective successors and assigns.

16.4.    Subordination.

Upon request of Landlord, and receipt of a commercially reasonable Subordination and Non-
Disturbance Agreement, Tenant shall subordinate its rights hereunder to the lien of any mortgage
or mortgages, or, the lien resulting from any other method of financing or refinancing now or
hereafter in force against the Property and/or Buildings or against any building any buildings
hereafter placed upon said Property.

ARTICLE 17.    ESTOPPEL.

Each party agrees that from time to time upon not less than ten (10) business days' prior Notice by the
other party, it will deliver to the other party a statement in writing certifying: (1) That this Lease is
unmodified and in full force and effect (or, if there have been modifications, that this Lease as modified is
in full force and effect); (2) The date to which the Rent and other charges have been paid; and (3) That the
other party is not in default under any provision of this Lease, or, if in default, the nature thereof in detail.
Tenant agrees to execute and deliver to Landlord with ten (10) business days of delivery of Landlord's
request therefore any subordination, non-disturbance, and attornment agreement in favor of any
mortgagee mutually agreeable to the parties.

A000178

## ARTICLE 18    COMPLIANCE WITH LAWS

18.1.    Compliance.

Tenant shall occupy and use the Premises in compliance with all and any applicable federal, state, and municipal laws, ordinances and regulations and shall not directly or indirectly, make use of the Premises which is prohibited by any such laws, ordinances or regulations. Furthermore, Tenant shall, at its sole cost and expense, make any improvements and alterations to the Premises required by any applicable federal, state, and municipal laws, ordinances and regulations.

18.2.    Hazardous Or Toxic Materials.

Notwithstanding any provision contained in this Agreement to the contrary, Tenant shall not cause any escape, release, or disposal of Hazardous or Toxic Materials as defined below, in, at, on, or under the Premises. Tenant shall not store or use Hazardous or Toxic Materials on, at, in, or under the Premises except as necessary for use in the ordinary course of business, and only in accordance with applicable laws, regulations and ordinances.

18.3.    Definition Of Hazardous Materials.

For purposes of this Agreement, "Hazardous or Toxic Materials" shall mean all materials or substances that have been determined to be hazardous to health or the environment, including, but not limited to, hazardous waste, as defined in the Resource Conservation and Recovery Act; hazardous substances as defined in the Comprehensive Emergency Response, Compensation and Liability Act, as amended by the Superfund Amendments and Reauthorization Act; gasoline, or any other petroleum product or by-product or other hydrocarbon derivative; toxic substances, regulated by the Toxic Substances Control Act; insecticides, fungicides, or rodenticides, regulated by the Federal Insecticide, Fungicide, and Rodenticide Act; asbestos and radon and other toxic or hazardous air pollutants regulated by the Clean Air Act, as amended, substances determined to be hazardous or toxic water pollutants, regulated by the Clean Water Act, as amended, and toxic or hazardous chemicals regulated by the Occupational Safety and Health Act, as amended, or regulations promulgated under any such statute. State and local regulations, rules or law which are applicable shall also be included as a reference for the purpose of this definition. References to any statute, act, regulation, or rule shall include amendments as they are made from time to time.

18.4.    Covenants.

Tenant and Landlord covenant that Landlord will provide Tenant with copies of all notices Landlord receives from any governmental authority regarding environmental matters in respect of the Premises and Tenant will provide Landlord with copies of all notices Tenant receives from any governmental authority regarding environmental matters in respect of the Premises. Tenant covenants that removal, disposal, handling, use, and storage of any Hazardous or Toxic Materials by the Tenant at the Premises shall comply with all applicable federal, state, and local statutes, regulations, or ordinances. If the Tenant's use, transportation, storage, or disposal of Hazardous or Toxic Materials results in contamination of the Premises, Tenant shall notify the Landlord of its method, time, and procedure for any clean-up or removal of Hazardous or Toxic Materials. The Landlord shall have the right to require reasonable changes in such method, time, or procedure, except that if Tenant is under a duty by federal, state, or local laws, regulations, or ordinances to immediately remove the contamination, or is under an order to proceed in a specified manner, that party shall comply with the law, regulation, ordinance, or order.

Page 23 of 30

A000179

18.5.   **Indemnification.**

Tenant shall promptly indemnify, defend (with counsel reasonably acceptable to Landlord),
protect and hold Landlord and each of Landlord's officers, directors, partners, employees, agents,
attorneys, successors and assigns free and harmless from and against any and all claims,
liabilities, damages, costs, penalties, forfeitures, losses or expenses (including reasonable
attorneys' fees) for death or injury to any person or damage to any property whatsoever
(including water tables and atmosphere) arising or resulting in whole or in part, directly or
indirectly, (1) from the presence or discharge of Hazardous Substances, in, on, under, upon or
from the Premises to the extent caused by Tenant, Tenant's employees, contractors, agents,
assignees, or other representatives, or (2) from the transportation or disposal of Hazardous
Substances to or from the Premises to the extent caused by Tenant, Tenant's employees,
contractors, agents, assignees, subtenants or other representatives.   Tenant's obligations
hereunder shall include, without limitation, and whether foreseeable or unforeseeable, all costs of
any required or necessary repairs, clean-up or detoxification or decontamination of Hazardous
Substances at the Premises, and the presence and implementation of any closure, remedial action
or other required plans in connection therewith, and shall survive the expiration of or early
termination of the term of this Lease.

### ARTICLE 19     CERTAIN RIGHTS RESERVED BY LANDLORD

Landlord shall have the following rights as herein set forth, exercisable with notice (except as otherwise
provided hereinafter) and without liability to Tenant for damage or injury to property, person, or business
and without effecting an eviction, constructive or actual, or disturbance of Tenant's use or possession of
the Premises or giving rise to any claim for set-off or abatement of rent.

19.1.   **Sign Maintenance.**

Landlord shall have the right to install, affix, and maintain signs on the interior and exterior of the
Building and elsewhere on the Premises.

19.2.   **Showing Premises.**

Landlord shall have the right to show the Premises to prospective tenants at reasonable hours,
after notice to Tenant, and to place "for rent" signs, during the last twelve (12) months of the
Term, as well as to post at any time "for sale" signs with respect to the Property without notice to,
or approval by, the Tenant.  Landlord shall endeavor to provide Tenant with 48 hours notice prior
to showing the Premises, although the parties acknowledge that such notice may not be feasible in
every instance.

Landlord may enter upon the Premises and may exercise any or all of the foregoing rights hereby reserved
without being deemed guilty of an eviction or disturbance of Tenant's use or possession and without being
liable in any manner to Tenant.

### ARTICLE 20     ASSIGNMENT AND SUBLETTING

Tenant may not voluntarily assign or encumber its interest in this Lease or in the Premises, or sublease all
or any part of the Premises, or allow any other person or entity (except Tenant's authorized
representatives) to occupy or use all or any part the Premises, without first obtaining Landlord's prior
written consent which shall not be unreasonably withheld or delayed.  Notwithstanding the foregoing, no
consent of Landlord shall be required for an assignment or sublease to (1) any corporation, partnership, or

A000180

other legal entity that controls, is controlled by, or is under common control with Tenant, or (ii) any corporation or other legal entity resulting from the merger or consolidation with Tenant or to any other entity that acquires all of Tenant's assets as a going concern of the business that is being conducted on the Premises, as long as the assignee or sublessee is a bona fide entity, maintains a net worth equal to or greater than Tenant on the Lease Execution Date and assumes the obligations of the Tenant. In no event shall Tenant be released from any of its obligations under this Lease. In the event of such an assignment or sublet, Landlord shall be provided upon request with documentation satisfactory to it in Landlord's reasonable discretion that this Lease is binding upon such affiliate and successor and that such affiliate or successor is financially capable of performing the obligations of Tenant under this Lease, and Landlord may charge a reasonable fee for its review of the facts and documents in support of any request to assign or sublease. Any assignment or sublease without Landlord's required prior written consent shall be voidable and, at Landlord's election, shall constitute a Default. Notwithstanding any provision of this Lease to the contrary, Tenant shall remain primarily liable for all covenants, agreements, obligations, and rents under this Lease in the event of any assignment or sublease. Notwithstanding anything to the contrary contained herein in no event may Tenant receive any profit, bonus or income from assigning or subleasing all or part of the Premises for a greater Base Rent, Additional Rent or other stream than charged by Landlord to Tenant, all such amounts being due and payable to Landlord. In the event Tenant incurs customary and reasonable out-of-pocket transactional costs in securing an assignment or sublease, including, leasing commissions and legal fees, Tenant shall be able to recoup such costs without such amounts being considered profit. This exclusion from profit shall not apply to non-transactional costs, including, but not limited to, costs incurred in subdividing of or improvements to the Premises.

### ARTICLE 21    NOTICE

All process, notices or other writings ("Notice") either required hereunder or desired to be sent or served by either of the parties hereunder, shall be in writing and shall be delivered personally or sent by certified U.S. Mail, with postage prepaid or by recognized national courier service and addressed to the respective party at the address shown in Section 1.1.2 or 1.2.2 or such an address as given by Notice from one party to the other. Any Notice served shall be deemed effective on the date received or refused by the addressee. Following occupancy by Tenant, the address for Tenant for purposes of the Notice shall be the Building address. For purposes of notice, days shall be calculated for business days only, excluding weekends and national banking holidays.

### ARTICLE 22    CONVEYANCE BY LANDLORD

In case Landlord or any successor owner of the Building shall convey or otherwise dispose of any portion thereof to another person including any mortgagee, such other person shall thereupon be and become Landlord hereunder and shall be liable upon all liabilities and obligations of this Lease to be performed by Landlord which first arise after the date of such conveyance and Landlord shall be released from any further such responsibility, liability, and claims under this Lease.

### ARTICLE 23    RECORDING

Landlord or Tenant, at either's option, may record a memorandum of this Lease in form reasonably satisfactory to attorneys for Landlord and Tenant for the purpose of giving notice of its terms and provisions, and Landlord and Tenant, if either requests, agree that they will execute such memorandum.

\000181

## ARTICLE 24    INDEMNIFICATION

### 24.1.    Landlord's Indemnification.

Tenant hereby indemnifies and holds Landlord harmless from and against any and all claims, demands, liabilities, losses, damages, and expenses, including reasonable attorney fees, arising from the negligence or willful misconduct of Tenant or its agents, employees or contractors in or about the Premises or arising from Tenant's occupancy or use of same, except to the extent caused by Landlord's negligence or willful misconduct or as to any claims, demands, liabilities, losses, damages, and expenses, including reasonable attorneys' fees, covered by insurance maintained by the Landlord under ARTICLE 8 of this Lease.

### 24.2.    Tenant's Indemnification.

Landlord hereby indemnifies and holds Tenant harmless from and against any and all claims, demands, liabilities, losses, damages, and expenses, including reasonable attorney fees, arising from the negligence or willful misconduct of Landlord or its agents, employees or contractors in or about the Premises, except to the extent caused by Tenant's negligence or willful misconduct or as to any claims, demands, liabilities, losses, damages, and expenses, including reasonable attorneys' fees, covered by insurance required to be maintained by the Tenant under ARTICLE 8 of this Lease.

## ARTICLE 25    CONSTRUCTION

### 25.1.    Landlord's Work.

Landlord shall deliver to Tenant the Premises in its AS-IS and WHERE-IS condition.

### 25.2.    Accepting Possession.

Tenant's taking possession of the Premises and acceptance of the Premises for occupancy shall constitute a waiver of any warranty or of any defect in regard to workmanship or material for any improvements contained on the Premises.

## ARTICLE 26    RIGHT OF FIRST OFFER

In the event that the Landlord elects to sell the Premises during the term of the Lease, other than to Permitted Transferees, which shall be defined as any entity owned, managed or controlled by Sunil Puri, William Charles or Chuck Howard or a member of any of their immediate families, then, the first time Landlord shall so elect, Tenant is given the first right to offer to purchase the same (provided no condition of default by Tenant exists) in accordance with the procedures hereinafter set forth. In the event Landlord desires to sell the Premises, Landlord shall give written notice to Tenant of its desire ("Landlord's Offer Notice"). Tenant shall have ten (10) days from the date of receipt of the Landlord's Offer Notice in which to present an offer to the Landlord containing all such terms and conditions that would be acceptable to Tenant ("Tenant's Offer"). Landlord shall notify Tenant within ten (10) days of its receipt of Tenant's Offer whether such offer is accepted or rejected. In the event Landlord rejects Tenant's Offer or in the further event such offer is accepted and Tenant subsequently fails to comply with the terms of Tenant's Offer, then Landlord shall have the right to sell the Premises to any other party without restriction and Tenant shall have no further right to purchase with respect to any subsequent contemplated sale. This Right of First Offer is personal to the Tenant and is not assignable to any other person or entity.

Page 26 of 39

\000182

## ARTICLE 27   MISCELLANEOUS

**27.1.   Binding Effect.**

This Lease shall be binding upon and inure to the benefit of the successors and assigns of Landlord, and shall be binding upon and inure to the benefit of Tenant, its successors, and, to the extent subleasing or assignment may be approved by Landlord hereunder, Tenant's sublessees and assigns.

**27.2.   Illinois Law Governs.**

This Lease is declared to be an Illinois contract, and all of the terms thereof shall be construed according to the internal laws of the State of Illinois, that is without reference to any conflict provisions. Venue shall only be proper in Winnebago County where the Lease was signed.

**27.3.   Headings.**

Landlord and Tenant mutually agree that the headings and captions contained in this Lease are inserted for convenience of reference only, and are not to be deemed part of or to be used in construing this Lease.

**27.4.   Severability.**

If any term or provision of this Lease or the application thereof to any person or circumstances shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to which it is held invalid or unenforceable, shall not be affected thereby, and each term of this Lease shall be valid and enforceable to the fullest extent permitted by law.

**27.5.   Relationship of Parties.**

Nothing contained herein shall be deemed or construed by the parties hereto, or by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, it being understood and agreed that neither the method of computation of Rent nor any other provision contained herein, nor any acts of the parties hereto, shall be deemed to create any relationship between the parties hereto other than the relationship of Landlord and Tenant.

**27.6.   Rent.**

All amounts due and payable from Tenant under this Lease shall be considered as Rent.

**27.7.   Consents and Waivers.**

No consent or waiver, by either party expressed or implied, to or of any breach of any covenant, condition, or duty of the other party shall be construed as a consent or waiver to or of any other breach of the same or any other covenant, condition, or duty. The subsequent acceptance by Landlord of any Rent due, Additional Rent or any other monetary obligation of Tenant under this Lease shall not be a waiver of any preceding breach by Tenant of any term, covenant or condition of this Lease. No term, covenant, or condition of this Lease shall be deemed waived by either party unless such waiver is executed by the party in writing.

Page 27 of 30

A000183

**27.8.  Remedies Cumulative.**

No remedy herein or otherwise conferred upon or reserved to Landlord shall be considered to exclude or suspend any other remedy, but the same shall be cumulative and shall be in addition to every other remedy given hereunder, or now or hereafter existing at law or in equity or by statute, and every power and remedy given by this Lease to Landlord may be exercised at any time and from time to time and so often as occasion may arise or as may be deemed expedient.

**27.9.  Delay.**

With the exception of the payment of Base Rent, Additional Rent or any other amounts due under this Lease, whenever a period of time is provided in this Lease for either party to do or perform any act or thing, and except as specifically stated otherwise in this Lease, such party shall not be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, acts of terrorism, environmental releases, embargoes, material unavailability, war or governmental regulation beyond the reasonable control of such party and in any such event said time period shall be extended for the amount of time such party is delayed.

**27.10.  Submission of Lease.**

The submission of this document for examination and negotiation does not constitute an offer to lease, or a reservation of, or option for, the Premises, and this document becomes effective and binding only upon the execution and delivery hereof by Tenant and Landlord, and approval by Landlord's mortgagee if applicable.  All negotiations, considerations, representations, and understandings between Landlord and Tenant are incorporated herein and may be modified or altered only by agreement in writing between Landlord, and Tenant, and no act or omission of any employee or other agent of Landlord shall alter, change, or modify any of the provisions hereof.

**27.11.  Context.**

All terms used in this Lease, regardless of the number or gender in which they are used shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine, or neuter as the context or sense of this Lease or any Article, Section or clause herein may require, as if such terms has been fully and properly written in such number or gender.

**27.12.  Brokerage.**

Tenant warrants that it has had no dealings with any broker or agent, other than Ted Ingrassia, in connection with this Lease. Tenant agrees to fully defend, hold harmless and indemnify Landlord from and against any and all cost, expense or liability from any compensation, commissions and charges claimed by any broker or agent in connection with this Lease or the negotiations thereof. The parties acknowledge that Ted Ingrassia is entitled to only one commission for the sale and leaseback transaction.

**27.13.  Authorship.**

This Lease has been the subject of extensive negotiations between the parties and the interpretation hereof shall not be based upon any presumption that either party has been the drafter hereof.

\000184

27.14.  Interest.

Any amounts paid by Landlord pursuant to Landlord's Right to Procure Insurance- Section 8.3, Dram Shop Insurance- Section 8.6, Maintenance and Repairs- ARTICLE 11, Covenant Against Liens- ARTICLE 6, shall be due and payable as Additional Rent together with interest at the rate of twelve (12%) percent per annum from the date said funds were expended by Landlord until the reimbursement is received from Tenant by Landlord.

27.15.  Survival of Obligations.

All of the obligations arising under this Lease shall survive the expiration or earlier termination of this Lease.

27.16.  Accord and Satisfaction.

No payment by Tenant or receipt by Landlord of a lesser amount than any installment or payment of Rent, Additional Rent, or other sum due other than account of the amount due, and no endorsement or statement on any check or any letter accompanying any check or payment of Rent, Additional Rent, shall be deemed an accord and satisfaction, and Landlord may accept such check payment without prejudice to Landlord's right to recover the balance of such installment or payment of Rent, Additional Rent or other sum and pursue any other remedies available to Landlord. No receipt of money by Landlord from Tenant after the termination of this Lease or Tenant's right of possession of the Premises shall reinstate, continue or extend the Term.

27.17.  Joint and Several Liability.

In the event Tenant is comprised of two or more individuals or entities, each such party shall be jointly and severally liable for all obligations of Tenant hereunder including, but not limited to, the payment of Rent and Additional Rent.

27.18.  Independent Covenants.

The obligations of Landlord and Tenant, respectively, under this Lease are expressly agreed by the parties to be independent covenants. If Landlord fails to perform any obligation under this Lease required to be performed by Landlord, Tenant shall have no right to: (i) terminate this Lease; (ii) avail itself of self-help or to perform any obligation of Landlord; (iii) abatement or withholding of rent or any other charges or sums payable by Tenant under this Lease; or (iv) any right of setoff.

27.19.  Specially Designated National.

Tenant certifies, represents, and warrants to Landlord on which representation Tenant acknowledges Landlord was justified in relying and did rely and which representation was material to Landlord's decision to enter into this Lease that Tenant: (a) it is not acting, directly or indirectly, for or on behalf of any person, group, entity, or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or other banned or blocked person, entity, nation, or Transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control; and (b) it has not executed this Lease, directly or indirectly on behalf of, or instigating or facilitating this Lease, directly or indirectly on behalf of, any such person, group, entity, or nation. Tenant hereby agrees to defend, indemnify, and hold harmless Landlord from and against

Page 29 of 30

\000185

any and all claims, damages, losses, risks, liabilities, and expenses (including attorney's fees and costs) arising from or related to any breach of the foregoing certification.

IN WITNESS WHEREOF, the parties hereto have executed this Lease under their seal as of the day and year first above written.

LANDLORD:                                    TENANT:
HARRISON-KISHWAUKEE, L.L.C.                  Rockford Products Corporation
  By: Rockford Industrial Holdings, L.L.C., Member

    By: Trust of Sunil Puri, Member

    By: _Sunil Puri_                         By: _[signature]_

          Sunil Puri, Trustee              Its: _CFO & VP FINANCE_

By:    William Charles Realty Investment, L.L.C., Member
  By:  William Charles Investments, Inc., Manager

    By: _[signature]_
          John Holmstrom, III, V.P.

Page 30 of 30

\000186

# THIRTY DAY NOTICE

To:   Rockford Acquisition, L.L.C.                    Rockford Acquisition, L.L.C.
      707 Harrison Ave.                               6905 Telegraph Rd., Suite 205
      Rockford, IL 61104                              Bloomfield Hills, MI 48301

      Thomas Forster II                               Rockford Products Corporation
      Honigman Miller Schwartz and Cohn LLP           707 Harrison Ave.
      38500 Woodward Avenue, Suite 100                Rockford, IL 61104
      Bloomfield Hills, MI 48304-5048

YOU ARE HEREBY NOTIFIED that you have violated the terms of the lease for the premises
situated in Winnebago, Illinois and commonly known as: 707 Harrison Ave., Rockford, IL
61104. The violation is a failure to maintain the premises in accordance with the requirements of
Article 11 of the Lease. The specific areas requiring immediate attention are as follows:

1.    Roof:
      a.  Portions of the roof are in significant disrepair.
      b.  There is evidence of numerous roof leaks within the building, including pooling
          of water on the floor and deterioration of the roof deck (rust, discoloration,
          pitting, holes, etc.).
      c.  There are sections of the roof where the roof membrane has been cut or has such
          severe alligatoring that the membrane is no longer functional to prevent water
          penetration.
      d.  There are numerous examples of flashing that is in need of repair/replacement.

AND YOU ARE FURTHER NOTIFIED, that if these repairs are not commenced on or before
July 12, 2010 and diligently pursued to completion, Landlord shall have the right to exercise any
of its remedies under the Lease. Only a commencement prior to July 12, 2010 and diligence in
completion of the repairs will waive Landlord's right to exercise its remedies under this notice,
unless the Landlord agrees in writing to continue the lease under any other condition.

Proof of commencement and completion shall be sent to First Rockford Group, Inc.
located at 6801 Spring Creek Road, Rockford, IL 61114.

Dated at Rockford, IL this 10th day of June, 2010.

                    Landlord: HARRISON-KISHWAUKEE, L.L.C..
                    By: Rockford Industrial Holdings, L.L.C., Member
                    By: Trust of Sunil Puri, Member

                    By: _____
                        Marvin L. Keys, one of its attorneys

EXHIBIT

A000186A

### STATE OF ILLINOIS
### IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT
### COUNTY OF WINNEBAGO

|  |  |  |
|---|---|---|
| HARRISON-KISHWAUKEE, L.L.C., an Illinois limited liability company, | ) ) ) | |
| Plaintiff, | ) ) ) | |
| vs. | ) | No. 10-CH-2390 |
| ROCKFORD ACQUISITION, LLC., a Delaware limited liability company, | ) ) ) | |
| Defendant. | ) ) ) | |

RECEIVED
AUG 1 1 2011
Williams McCarthy

### MEMORANDUM OPINION AND ORDER

This matter comes before the Court on the motion of Harrison-Kishwaukee, L.L.C. for summary judgment on the complaint it filed against Defendant, Rockford Acquisition. For the reasons stated below, the Court reserves ruling on the motion.

#### *Factual and Procedural Background*

*The Premises and the Lease.* The premises at issue are located at 707 Harrison Avenue, Rockford, Illinois, and were originally owned by Rockford Products Corporation. According to the Affidavit of Richard Mowris, President and CEO of Rockford Products, the premises consisted of a series of contiguous industrial buildings constructed in the 1930's. He described the condition of the premises in December 2006 as being "old and in general disrepair." Specifically, the roof had deteriorated and leaked in numerous locations throughout the premises.

On December 22, 2006, Rockford Products Corporation deeded the subject premises to Plaintiff. On the same day, Plaintiff leased back the premises to Rockford Products Corporation (the "Lease"). Under Section 11.1 of the Lease, it was the tenant's obligation to maintain and repair all parts of the premises, including "extraordinary" repairs. Section 11.3 specified that the tenant would be responsible for "repair and replacement" of the "roof." If the tenant failed to keep one of its covenants under the Lease, the landlord's default notice letter would trigger a period of 30 days in which to act before the tenant would be in default.

*The Bankruptcy Proceedings.* At some point in 2007, Rockford Products Corporation filed for bankruptcy protection. On November 15, 2007, the Honorable Jacqueline P. Cox of the U.S. Bankruptcy Court for the Northern District of Illinois issued an order approving the sale of certain assets of Rockford Products Corporation to Defendant. The sale included Rockford Products' rights as a tenant under the Lease. The Order provided, in pertinent part, as follows:

A000187

10   The transfer of Assets to Buyer ... constitutes a legal, valid and
effective transfer of the Assets, and shall vest the Buyer with all
right, title and interest in and to the Assets free and clear of all
Liens, Interest and/or Claims of any kind or nature whatsoever,
including without limitation, any Liens Interests or Claims held by
any of the Debtors, their affiliates, their affiliates'' creditors,
vendors, suppliers, customers, employees or lessors and any other
person (collectively, "Claimants"). . . .

22.   Upon assumption of any Assumed Agreement in accordance with
this Sale Order, each non-debtor party to an Assumed Agreement
is forever barred, estopped, and permanently enjoined from
asserting against the Debtors or the Buyer, or the property of either
of them, any default existing as of the Closing Date of the Sale. . . .

33.   Upon the Closing Date and the Buyer's payment to the Agents of
the Purchase Price, the Buyer shall not be liable, either directly or
indirectly, .... for any liabilities of or any Lien, Interest or Claim
against or in Rockford Products..... Under no circumstances shall
the Buyer be deemed a successor of or to Rockford Products for
any Lien, Interest or Claim against or in Rockford Products or the
Assets of any kind or nature whatsoever. The sale, transfer,
assignment and delivery of the Assets shall not be subject to any
Liens, Interests or Claims of any kind or nature whatsoever shall
remain with, and continued to be obligations of, Rockford
Products. After the Closing Date, and the Buyer's payment to the
Agents of the Purchase Price, all persons holding Liens, Interests
or Claims against the Assets of any kind or nature whatsoever shall
be, and hereby are, forever barred, estopped, and permanently
enjoined from asserting, prosecuting, or otherwise pursuing such
Liens, Interests or Claims of any kind or nature whatsoever against
the Buyer, its successors or assigns, its property or the Assets, the
Agents or the Sale Proceeds with respect to any Lien, Interest or
Claim of any kind or nature whatsoever such person or entity had,
has, or may have against or in Rockford Products, its estate, its
officers, its directors or its shareholders.

The Order also states that the Bankruptcy Court "retains exclusive jurisdiction to interpret,
construe, enforce and implement the terms and provisions of this Sale Order."

On November 16, 2007, Rockford Products Corporation and Defendant entered into an
Assignment and Assumption of Lease ("Assignment"). Also on November 16, 2007, Plaintiff
and Defendant entered into the First Amendment to Lease ("First Amendment"), which
contained a provision requiring Plaintiff to obtain an environmental insurance policy. The First
Amendment also contained the following provision pertinent here:

2

\000188

It is the intention of the Landlord and Tenant that Tenant not be responsible for any environmental matters or conditions relating to the Property which exist, accrue or related to the period of time prior to the effective date of the Assignment or otherwise due to the acts or omissions of the Prior Tenant. Therefore, Tenant's obligations for or relating to environmental matters under Sections 18.5 and 24.1 of the Lease shall not relate to or arise from any matters or circumstances existing, arising or relating to the period of time on or prior to the effective date of the Assignment or the acts or omissions of the Prior Tenant.

At some point, Plaintiff's in-house counsel made demand on Defendant to repair or replace the roof pursuant to the terms of the Lease, but Defendant has not done so.

In its responses to discovery from Defendant, Plaintiff states that it is "impossible for any party to know with certainty when a Leak first occurred."

### *Standard in Deciding a Motion for Summary Judgment*

Summary judgment is a drastic remedy to be awarded only with care and caution. *Gassner v. Raynor Mfg. Co.*, 409 Ill.App.3d 995, 948 N.E.2d 315, 324 (2d Dist. 2011). "A motion for summary judgment should be granted only where the pleadings, depositions, and admissions on file, together with the affidavits, if any, show there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.*, citing 735 ILCS 5/2-1005.

### *Analysis*

*Existence of a Factual Issue.* Defendant here appears to acknowledge that, with respect to 'new' issues with the roof – meaning those arising after mid-November 2007 – Defendant, as the tenant would be responsible. However, Defendant argues that Plaintiff lacks the evidence to show that the current roof leaks didn't first occur prior to that time. As noted by the Court during oral argument, in understanding Defendant's argument it is perhaps better to think of roof *defects*, rather than leaks. Clearly, while leaking can occur whenever there is rain, the timing of the defect is more important in Defendant's argument. Defendant is essentially arguing that it is not responsible to repair defects in the roof which existed prior to the time it took over as the tenant under the Lease.

It is clear to the Court that the question of *when* defects first appeared is a factual issue which cannot be resolved on a motion for summary judgment. However, the underlying legal issues can be addressed, because it is Plaintiff's position that it is immaterial when the defects first existed. The Court will examine the issues in the following three respects: (1) under the Lease, who is responsible for roof repairs; (2) does the Bankruptcy Court order affect responsibility for defects existing at the time of the Assignment; and (3) does this Court have the authority to decide the second question?

3

\1000189

*Determination of the Issue Pursuant to the Lease*. The question here is which party is to be responsible for repair of the roof. The dispute here appears to be in relation to the condition of the roof when Defendant began its tenancy. Each party essentially accuses the other of failing to exercise due diligence in examining the condition of the roof at the time of the Assignment, but the underlying question is who was at risk for failing to perform such due diligence.

Under Section 11.1 of the Lease, it is the tenant's obligation to repair the roof, including "extraordinary" repairs. If the Court were to look simply to the four corners of the lease, the obligation for repairs of any kind, for any reason, falls on Defendant as tenant.

Ideally, there would have been some memorialization by the parties with respect to the condition of the roof, and who was responsible for defects existing at that time. Defendant argues that there was such a memorialization in First Amendment provision cited above. Defendant argues that this provision released it from liability for "any . . . conditions relating to the Property which exist . . ." prior to November 16, 2007.

The Court is called upon to construe the meaning of this contractual language in the First Amendment; the rules guiding the court are well established:

> The basic rules of contract interpretation are well settled. In construing a contract, the primary objective is to give effect to the intention of the parties. A court will first look to the language of the contract itself to determine the parties' intent. A contract must be construed as a whole, viewing each provision in light of the other provisions. The parties' intent is not determined by viewing a clause or provision in isolation, or in looking at detached portions of the contract.

*Thompson v. Gordon*, 241 Ill.2d 428, 441, 948 N.E.2d 39, 47 (2011).

Here, reading the entire clause at issue, the Court concludes that the language relied upon by Defendant relates to environmental conditions only, not the condition of the roof. The first issue presented is whether the word "environmental" in the phrase "environmental matters or conditions" modifies just "matters," or both "matters or conditions." Either construction is possible; the document could be referring to "environmental matters" or other types of "conditions." Alternatively, it could be referring to those "matters or conditions" which are environmental in nature.

Based on a complete reading of the provision in question, the Court concludes that the latter interpretation is correct: the language refers to only those "matters or conditions" which are environmental in nature. The two topics of the First Amendment were environmental matters (including the purchase of an insurance policy for such matters) and refinancing. Furthermore, and more importantly, Section 1.c of the First Amendment, which contains the language in question, elsewhere appears clearly to relate only to environmental matters. The sentence following the one in question refers to only "environmental matters," and it specifically refers to provisions of the Lease which specifically involve environmental matters. Read as a whole, the Court finds that the language cited does not address conditions of the property other than those which are environmental in nature.

4

\000190

*Determination of the Issue Pursuant to the Bankruptcy Court's Order.*  Defendant essentially argues that the Bankruptcy Court Order effectively exonerates it for Rockford Products' failures to maintain the roof during its tenancy.  Plaintiff contends that Defendant voluntarily undertook a lease which imposed on it a continuing duty to maintain the roof.

One troubling aspect of Defendant's position is that Defendant does not clearly state who *is* responsible for repair of roof defects existing at the time of the Assignment.  Certainly one party or the other must have the obligation; it would be an absurdity to suggest that both parties may proceed with the original roof defects remaining as they are, without remedy.  Implicitly, it appears that Defendant suggests that it is Plaintiff's obligation to fix the old roof defects.  Such a position, however, now begins to engraft affirmative obligations on one party which were never agreed to by both parties.  Certainly the Bankruptcy Court Order is of no help in defining the nature, extent, or boundaries of the undertaking Defendant implicitly seeks to impose on Plaintiff.  On what basis could Defendant prosecute a claim seeking to compel Plaintiff to take affirmative measures to fix the old roof defects?  There is no contract giving rise to such a duty, nor does one arise under the Bankruptcy Court Order.

Were the Court to address this issue directly, it would likely conclude that the Bankruptcy Court Order does not apply to the question presented here.  Simply put, Plaintiff is not seeking to impose an obligation of Rockford Products on Defendant, but to enforce a new obligation Defendant has undertaken with the Assignment.  The issue is perhaps most clearly understood if considered hypothetically with one change to the factual circumstances, namely, if the Rockford Products lease had been terminated, not assigned.  In that circumstance, Plaintiff would have had possession of premises which, according to Defendant, already had a defective roof.  Plaintiff could certainly attempt to market the premises to a new tenant under the same terms as the old Lease (i.e., imposing all duties of repair and maintenance on the tenant).  Any prospective tenant would clearly act at is own risk if it failed to learn the existing condition of the premises before it undertook a new lease which imposed upon it the absolute responsibility to maintain those premises.  This would simply be a new undertaking on the part of the new tenant, and enforcement of a new claim arising out of that undertaking.

The Court does not believe the situation is different because the parties here operated pursuant to an assignment of original Rockford Products Lease.  Plaintiff is not seeking to hold Defendant liable for a default of Rockford Products, or seek recovery of a "Claim" it had against Rockford Products.  The obligation assumed by the new assignee-tenant was the same as if a new (identical) lease had been undertaken: the obligation to maintain the premises.  It is that duty, voluntarily undertaken, that is at issue here, not a claim seeking to make Defendant liable for an old claim against Rockford Products.

*Does this Court have the authority to interpret the Bankruptcy Court's Order?*  As stated above, the foregoing represents this Court's analysis if it were answering the question presented head-on, but there is another question which must be answered first: *can* the Court properly decide this issue, or must it defer to the Bankruptcy Court?

\000191

The Bankruptcy Court states in its Order that it retains exclusive jurisdiction to "interpret" its
Order. Reading this literally goes perhaps too far, as certainly the Bankruptcy Court intended
that its Order might be read and understood by other Courts. Still, a dispute has arisen
concerning the meaning and effect of the Order. While this Court has stated how it would likely
resolve the issue presented, it has no intention of acting in a way which might infringe on the
authority of the Bankruptcy Court.

Consequently, the Court will at this point delay ruling on the pending motion for summary
judgment to allow Defendant the opportunity to seek a ruling from the Bankruptcy Court. If that
Court makes a ruling on interpretation and application of the Bankruptcy Court Order, this Court
will defer to that ruling. If, however, the Bankruptcy Court declines to rule, then this Court will
stand by its own interpretation as stated above. The Court reserves, of course, its right to
determine the issues of contractual interpretation as discussed above.

### Conclusion

For the reasons stated above, this Court will defer its ruling on the pending motion for summary
judgment in order to allow Defendant the opportunity to seek a ruling from the Bankruptcy
Court.


8/10/11
_____
Date


_____
Hon. Eugene G. Doherty, Circuit Judge


6

A000192

STATE OF ILLINOIS
IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT
COUNTY OF WINNEBAGO

HARRISON-KISHWAUKEE, L.L.C.,
an Illinois limited liability company

      Plaintiff,                         Case No. 10CH2390

vs.

ROCKFORD ACQUISITION, LLC n/k/a
ROCKFORD PRODUCTS, LLC, a Delaware
limited liability company

      Defendant.

_____/

### AFFIDAVIT OF RICHARD MOWRIS

STATE OF ILLINOIS       )
                       ) SS
COUNTY OF WINNEBAGO    )

Richard Mowris, being first duly sworn, deposes and says:

    1.    I have personal knowledge of the facts set forth herein and am competent to testify to them.

    2.    I am employed by Rockford Products, LLC ("Rockford") as its President and Chief Executive Officer, and have been employed by Rockford since 2007.

    3.    Immediately prior to being employed by Rockford, I was employed by Rockford Products Corporation ("RPC") for over twenty years. I served in various positions at RPC, including Vice President – Operations, Vice President – Administration, Vice President – International, and General Manager.

A000193

4.      RPC owned the facility at 707 Harrison Ave., Rockford, Illinois (the "**Premises**") until approximately December 2006, when it sold the Premises to Harrison-Kishwaukee, L.L.C. ("**Harrison**"). Simultaneously with the sale, Harrison and RPC entered into a lease under which RPC leased the Premises back from Harrison (the "**Lease**").

5.      In November 2007, Rockford acquired RPC's tenant interest in the Premises in a bankruptcy-court approved sale (the "**Sale**"). Since that time, Rockford has used the Premises as its primary manufacturing facility.

6.      The Premises are a series of contiguous industrial buildings that were constructed beginning in the 1930s and have been used since then in the manufacture of steel products for the automotive and agricultural industries.

7.      The Premises were old and in general disrepair in December 2006, and the roof had substantially deteriorated and leaked at numerous locations throughout the Premises.

8.      No material roof repairs were made between the 2006 Lease and the 2007 Sale. Accordingly, the Premises remained in a state of general disrepair in November 2007, and the roof continued to leak at numerous locations throughout the Premises.

9.      After assuming control of the Premises in late 2007, Rockford embarked on a series of repairs and upgrades to the roof. Since the Sale, Rockford has incurred over $615,000 in costs for the repair and improvement of the roof.

2

A000194

10.    The condition of the roof has meaningfully improved since the Sale. Nonetheless, the roof still periodically leaks as a result of conditions that existed before the Sale.

_____
RICHARD MOWRIS

Subscribed and sworn to before
me this 25 day of June 2011

_____

92:263.3

```
OFFICIAL SEAL
NIKKI L. SCHIRO
Notary Public, State of Illinois
My Commission Expires 02/26/12
```

3

A000195

**Certificate of Service**

I hereby certify that on September 19, 2013, I electronically filed the foregoing

with the Clerk of the Court for the U.S Court of Appeals for the Seventh Circuit by

using the CM/ECF system.  I certify that all participants in the case are registered

CM/ECF users and that service will be accomplished by the CM/ECF system.

s/ Nancy G. Lischer
*Nancy G. Lischer, one of the attorneys for*
*appellant Harrison Kishwaukee, LLC*

Dated:  September 19, 2013